# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

In re:                                          Case No. 19-43217-PJS

CENTRAL PROCESSING                      In Proceedings Under
SERVICES, INC.,                              Chapter 11

        Debtor.                              Hon. Phillip J. Shefferly

_____/


## DEBTOR'S COMBINED PLAN OF
## REORGANIZATION AND DISCLOSURE STATEMENT


PREPARED BY:

JOHN STOCKDALE, JR. (P71561)
KIM K. HILLARY (P67534)
SCHAFER AND WEINER, PLLC
Counsel for Debtor
40950 Woodward Ave., Ste. 100
Bloomfield Hills, MI 48304
(248) 540-3340


**DISCLAIMER: THE PROPOSED DISCLOSURE STATEMENT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT AS CONTAINING ADEQUATE INFORMATION UNDER SECTION 1125(b) OF THE BANKRUPTCY CODE FOR USE IN CONNECTION WITH THE**

{00795995.4}

SOLICITATION OF ACCEPTANCES OR REJECTIONS OF THE PLAN OF REORGANIZATION DESCRIBED HEREIN. ACCORDINGLY, PRIOR TO THE ENTRY OF AN ORDER GRANTING PRELIMINARY APPROVAL TO THE DISCLOSURE STATEMENT, THE FILING AND DISSEMINATION OF THIS COMBINED PLAN OF REORGANIZATION AND DISCLOSURE STATEMENT ARE NOT INTENDED TO BE AND SHOULD NOT IN ANY WAY BE CONSTRUED AS A SOLICITATION OF VOTES ON THE PLAN NOR SHOULD THE INFORMATION CONTAINED HEREIN BE RELIED ON FOR ANY PURPOSE. THIS DISCLAIMER MAY BE REMOVED AFTER THE COURT GRANTS PRELIMINARY APPROVAL TO THE DISCLOSURE STATEMENT AND PRIOR TO DISSEMINATION TO THE CREDITORS.

THE DEBTOR EXPRESSLY RESERVES ITS RIGHT TO AMEND THIS COMBINED PLAN OF REORGANIZATION AND DISCLOSURE STATEMENT.

## PLAN OF REORGANIZATION

### INTRODUCTION

Central Processing Services, LLC (the "Debtor"), a Michigan limited liability company, hereby proposes in good faith the following Plan of Reorganization (the "Plan") for the resolution of outstanding Creditor[1] Claims and equity Interests. Reference is made to the Disclosure Statement, combined with this Plan, for a discussion of the Debtor's history, business, properties, results of operations, risk factors and a summary and analysis of the Plan. The Debtor is the proponent of this Plan within the meaning of section 1129 of the Bankruptcy Code.

---

[1] Defined terms have the meanings ascribed in Article I of this Plan. *See* Section 1.1.

## ARTICLE I

### DEFINITIONS, RULES OF INTERPRETATION,
### COMPUTATION OF TIME AND GOVERNING LAW

1.1 **SCOPE OF DEFINITIONS; RULES OF CONSTRUCTION.** For the purposes of the Plan, except as expressly provided or unless the context otherwise requires, all capitalized terms not otherwise assigned shall have the meaning ascribed to them in this Article I of the Plan. Any term used in the Plan that is not defined in this Article I of the Plan, but is defined in the Bankruptcy Code, the Bankruptcy Rules or the Disclosure Statement shall have the meaning ascribed to such terms in the Bankruptcy Code, the Bankruptcy Rules or the Disclosure Statement, as the case may be. Whenever the context requires, such terms shall include the plural as well as the singular.

1.2 **DEFINITIONS**

1.2.1 "**Administrative Claim**" means a Claim for payment of an administrative expense of a kind specified in section 503(b) of the Bankruptcy Code and entitled to priority pursuant to section 507(a)(2) of the Bankruptcy Code, including, but not limited to, (a) the actual necessary costs and expenses, incurred after the Petition Date, of preserving the Estate and operating the Debtor's business, including wages, salaries or commissions for services rendered after the Petition Date, (b) Professional Fees, (c) all fees and charges assessed against the Estate under

28 U.S.C. § 1930 and (d) all Allowed Claims that are entitled to be treated as administrative claims pursuant to a Final Order under section 546(c)(2) of the Bankruptcy Code.

1.2.2 **"Administrative Creditor"** means any Creditor entitled to payment of an Administrative Claim.

1.2.3 **"Allowed"** means, when used in reference to a Claim or Interest within a particular Class, an Allowed Claim or Allowed Interest of the type described in such Class.

1.2.4 **"Allowed Claim"** means

    A.    A Proof of Claim or Interest that was:

        1.    Timely filed;

        2.    Deemed filed pursuant to section 1111(a) of the Bankruptcy Code; <u>or</u>

        3.    Filed late with leave of the Bankruptcy Court after notice and an opportunity for hearing given to Debtor and counsel for Debtor; <u>and</u>

    B.    1.    The Claim is not a Contested Claim or a Contested Interest, <u>or</u>

        2.    The Claim is allowed (and only to the extent allowed) by a Final Order of the Bankruptcy Court.

1.2.5 **"Article"** refers to a specific article of this Plan.

1.2.6 "**Avoidance Actions**" means all claims granted to the Debtor-in-Possession or to the Estate under chapter 5 of the Bankruptcy Code.

1.2.7 "**Ballot**" means the official bankruptcy form no. B314 adopted for this Case or a document prepared to substantially conform to same which was distributed to all Creditors and parties-in-interest in connection with the solicitation of votes for or against the Plan.

1.2.8 "**Bankruptcy Code**" or "**Code**" means the Bankruptcy Reform Act of 1978, as codified in Title 11 of the United States Code (11 U.S.C. §§101, *et seq*.), as in effect as of the Petition Date or thereafter amended to the extent such amendments are applicable to this Case.

1.2.9 "**Bankruptcy Court**" means the United States Bankruptcy Court for the Eastern District of Michigan, Southern Division, or such other court as may have jurisdiction over this Case.

1.2.10 "**Bankruptcy Rules**" or "**Rules**" means the Federal Rules of Bankruptcy Procedure, as promulgated by the Supreme Court that became effective on August 1, 1991 and any amendments thereto, and the Federal Rules of Civil Procedure as amended and as made applicable to this Case or any proceedings therein. To the extent applicable, Bankruptcy Rules also refers to the local rules of the U.S. District Court for the Eastern District of Michigan, as

amended and as applicable to this Case, and the local bankruptcy rules for the Eastern District of Michigan, as amended.

      1.2.11    **"Bar Date(s)"** means the date(s), if any, designated by the Bankruptcy Court as the last date(s) for filing Proofs of Claim or Interest against the Debtor, or otherwise asserting any claim against the Debtor, or, in the absence of such designation as shall be applicable under the Bankruptcy Rules.

      1.2.12    **"Business Day"** means any day other than a Saturday, Sunday or "Legal Holiday" as that term is defined in Bankruptcy Rule 9006(a).

      1.2.13    **"Case"** or **"Chapter 11 Case"** means the chapter 11 case of the Debtor pending in the Bankruptcy Court, styled *In re Central Processing Services, LLC* Case No. 19-43217-pjs.

      1.2.14    **"Cash"** means legal tender of the United States or the equivalence thereof.

      1.2.15    **"Causes of Action"** means any and all present or future claims, rights, legal and equitable defenses, offsets, recoupments, actions in law or equity or otherwise, choses in action, obligations, guaranties, controversies, demands, action suits, damages, judgments, third-party claims, counter-claims, cross-claims against any Person or Entity, whether known or unknown, liquidated or unliquidated, foreseen or unforeseen, existing or hereafter arising, whether based on legal or equitable relief, whether arising under the Bankruptcy Code or

federal, state, common, or other law or equity, whether or not the subject of a pending litigation or proceedings on the Effective Date or thereafter, including without limitation, all other actions described in the Plan, including all Avoidance Actions.

1.2.16 **"Claim"** means any right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, contested, disputed, undisputed, legal, equitable, secured or unsecured, or any right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured.

1.2.17 **"Class"** means a category of Holders of Claims or Interests as described in Article III of this Plan.

1.2.18 **"Closing"** means the closing of the equity sale contemplated by Section 5.1 of this Plan following the Equity Auction.

1.2.19 **"Collateral"** means any property or interest in property of the Estate subject to an unavoidable Lien securing the payment or performance of a Secured Claim.

1.2.20 **"Confirmation Date"** means the date on which the Bankruptcy Court enters the Confirmation Order.

1.2.21 **"Confirmation Hearing"** means the hearing to consider the confirmation of the Plan under section 1128 of the Bankruptcy Code.

1.2.22 **"Confirmation Order"** means the order entered by the Bankruptcy Court confirming this Plan pursuant to section 1129 of the Bankruptcy Code.

1.2.23 **"Contested"** means, when used in reference to a Claim or Interest in this Plan, any Claim or Interest as to which the Debtor or any other party-in-interest has interposed an objection or commenced an adversary proceeding in accordance with the Bankruptcy Code, Bankruptcy Rules and this Plan, which objection has not been determined by a Final Order.

1.2.24 **"Creditor"** means any Holder of a Claim against the Debtor.

1.2.25 **"Cure"** means the payment or other honor of all obligations required to be paid or honored in connection with assumption of an executory contract or unexpired lease pursuant to section 365 of the Bankruptcy Code, including, to the extent such obligations are enforceable under the Bankruptcy Code and applicable non-bankruptcy law: (a) the cure of any non-monetary defaults to the extent required, if at all, pursuant to section 365 of the Bankruptcy Code, and (b) with respect to monetary defaults, the distribution within a reasonable period of time following the Effective Date of Cash, or such other property as may be agreed upon by the parties or ordered by the Bankruptcy Court,

with respect to the assumption (or assumption and assignment) of an executory contract or unexpired lease, pursuant to section 365(b) of the Bankruptcy Code, in an amount equal to all unpaid monetary obligations or such lesser amount as may be agreed upon by the parties, under such executory contract or unexpired lease.

 1.2.26 **"Debtor"** or **"Debtor-in-Possession"** means Central Processing Services, LLC, a Michigan limited liability company.

 1.2.27 **"Disallowed"** means (a) a Claim or Interest or any portion thereof, that has been disallowed by a Final Order or a settlement, (b) a Claim or Interest or any portion thereof that is listed in the Debtor's Schedules at zero or as contingent, disputed, or unliquidated and as to which a Bar Date has been established but no Proof of Claim has been timely filed or deemed timely filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any Final Order of the Bankruptcy Court or otherwise deemed timely filed under applicable law, or (c) a Claim or Interest or any portion thereof that is not listed in the Debtor's Schedules and as to which a Bar Date has been established but no Proof of Claim has been timely filed or deemed timely filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any Final Order of the Bankruptcy Court or otherwise deemed timely filed under applicable law.

 1.2.28 **"Disclosure Statement"** means the written Disclosure Statement that is incorporated with and into the Plan, as amended, supplemented or

modified from time to time, and that was prepared and distributed in accordance with section 1125 of the Bankruptcy Code and applicable Bankruptcy Rules.

1.2.29 **"Disputed"** means with respect to any Claim or Interest, any Claim or Interest or portion thereof, that is neither an Allowed nor Disallowed.

1.2.30 **"Effective Date"** means the later of the first Business Day (i) after the Confirmation Order becomes a Final Order or (ii) fourteen days after the occurrence or waiver of the Conditions Precedent.

1.2.31 **"Equity Auction"** shall have the meaning ascribed to it in Section 5.1.1.1 of this Plan.

1.2.32 **"Equity Purchase Agreement"** means that Equity Purchase Agreement attached hereto as **Exhibit 1.2.33**.

1.2.33 **"Estate"** means the estate of the Debtor in this Case, or created pursuant to section 541 of the Bankruptcy Code.

1.2.34 **"Exculpated Claim"** means any Claim against the Debtor or its officers, employees, agents or Professionals related to any act or omission in connection with, relating to, or arising out of the Chapter 11 Case, the filing of the Disclosure Statement or Plan or any contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement or Plan, the filing of the Chapter 11 Case, the pursuit of confirmation, the pursuit of consummation, the administration and implementation of the Plan, or

the distribution of property under the Plan or any other agreement.

1.2.35    **"Final Order"** means an order of the Bankruptcy Court as to which (i) the time for appeal has expired and no appeal has been timely taken, or (ii) any timely appeal has been finally determined or dismissed and the time for any successive appeal has expired and no successive appeal has been timely taken or (iii) an appeal has been timely taken but such order has not been stayed within ten (10) days after the filing of such appeal.

1.2.36    **"GAAP"** means generally accepted accounting principles.

1.2.37    **"Governmental Unit"** has the meaning ascribed to it in section 101(27) of the Bankruptcy Code.

1.2.38    **"Group"** means the categories of Claims receiving payment in accordance with the terms set forth in Article II hereof.

1.2.39    **"Holder"** means a Person holding a Claim, Interest, or Lien, as applicable.

1.2.40    **"Impaired"** means, when used with reference to a Claim or Interest, that is impaired within the meaning of section 1124 of the Bankruptcy Code.

1.2.41    **"Interest"** means any equity interests in the Debtor, of any kind or nature, including without limitation, any corporate share interests.

1.2.42    **"Interest Rate"** means, as the situation requires, either (i) the prime rate of interest as published in the *Wall Street Journal* on the Effective Date

plus one (1) percent, (ii) the rate of interest provided in the applicable document between the Debtor and such Creditor, or (iii) the rate of interest required by applicable non-bankruptcy law. For clarity and without limitation, the applicable interest rate on the Claim of the IRS is set by I.R.C. § 6621, which is currently 6% per annum, and the applicable interest rate on the Claim of the Treasury is set by M.C.L. § 205.23(2), which is currently 4.51% per annum.

1.2.43 **"IRS"** means the Internal Revenue Service of the United States of America.

1.2.44 **"IRS Claim"** means the claim of the IRS as evidenced by Proof of Claim No. 1, as amended.

1.2.45 **"Landlord"** means HJH Southfield 2, LLC.

1.2.46 **"Lease"** means that certain real estate lease between Landlord and Debtor dated July 14, 2014, for premises located at 23800 W. 10 Mile Road, Southfield, Michigan.

1.2.47 **"Lien"** means a charge against, or an interest in, property to secure payment of a debt or performance of an obligation.

1.2.48 **"New Interests"** means the member interests in the Reorganized Debtor issued pursuant to Article 3.5(B) of this Plan upon the cancellation of the Class III Interests.

1.2.49 **"Person"** shall have the meaning given to it under section 101(41) of the Bankruptcy Code.

1.2.50 **"Petition Date"** means March 6, 2019, which is the date that the Debtor voluntarily filed its petition for relief pursuant to chapter 11 of the Bankruptcy Code.

1.2.51 **"Plan"** or **"Plan of Reorganization"** means this Combined Plan of Reorganization and Disclosure Statement, as it may be altered, amended, supplemented or modified from time to time.

1.2.52 **"Priority Claim"** means a Claim under or entitled to priority under section 507(a) of the Bankruptcy Code and which is not a Secured Claim or an Administrative Claim.

1.2.53 **"Priority Creditor"** means any Creditor entitled to payment of a Priority Claim.

1.2.54 **"Professional"** means any professional employed in this Chapter 11 Case pursuant to sections 327 or 1103 of the Bankruptcy Code seeking compensation or reimbursement of expenses in connection with the Case pursuant to section 503(b) of the Bankruptcy Code or otherwise.

1.2.55 **"Professional Fees"** means the fees and reimbursement for disbursements and expenses owed to Professionals.

1.2.56 **"Proof of Claim"** means a Claim that was either scheduled by the Debtor on its Schedules as a Claim which was not disputed, not contingent and liquidated, or a Claim filed by a Holder of a Claim before the Bar Date.

1.2.57 **"Pro-Rata"** means, at any time, the proportion that the face amount of a Claim in a particular Class bears to the aggregate face amount of all Claims (including disputed or Contested Claims) in such Class as of the Confirmation Date, unless the Plan expressly provides otherwise.

1.2.58 **"Reorganized Debtor"** means the Debtor upon the occurrence of the Effective Date of the Plan.

1.2.59 **"Reorganized Debtor's Net Income"** means all revenue less all expenses, including taxes, calculated using GAAP.

1.2.60 **"Reorganized Debtor's Net Cash Flow"** means Reorganized Debtor's Net Income (i) less (a) all payments relating to its restructuring, including, without limitation, all payments to Holders of Allowed Claims in Group I, II and III and Class I, II, III, IV, V and those Class II Holders of Claims that are part of the convenience class and (b) capital expenditures (net of financing) and (ii) plus depreciation (less any principal payments).

1.2.61 **"Schedules"** means the schedules of assets and liabilities, the list of Holders of Interests, and the statement of financial affairs filed by the Debtor under section 521 of the Bankruptcy Code and Bankruptcy Rule 1017, as such

schedules and statements have been, or may be, supplemented or amended through the Confirmation Date.

1.2.62 **"Section"** refers to a specific section or subsection of this Plan, unless otherwise set forth herein.

1.2.63 **"Secured Claim"** means a Claim secured by a Lien on property in which the Estate has an interest but only to the extent of the value of the Creditor's interest in the Estate's interest in such property as of the Petition Date and only if such Secured Claim is Allowed.

1.2.64 **"Treasury"** means the State of Michigan, Department of Treasury.

1.2.65 **"Unsecured Claim"** means a Claim that is not a Secured Claim and is not an Administrative Claim or a Priority Claim.

1.2.66 **"Unsecured Creditor"** means any Creditor that holds an Unsecured Claim.

1.3 **RULES OF INTERPRETATION** For purposes of the Plan;

1.3.1 Any reference in the Plan to a contract, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially on such terms and conditions.

1.3.2    Any reference in the Plan to an existing document or exhibit filed or to be filed means such document or exhibit as it may have been or may be amended, modified or supplemented.

1.3.3    Any reference in the Plan to a docket number ("DN") is a reference to a docket number in the Case, unless specifically noted to the contrary.

1.3.4    The words "herein" and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan, unless expressly stated otherwise.

1.3.5    Captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or effect the interpretation of the Plan.

1.3.6    The rules of construction set forth in section 102 of the Bankruptcy Code and in the Bankruptcy Rules apply to this Plan.

1.3.7    The Disclosure Statement may be used as an aid for interpretation of this Plan to the extent that any provision of this Plan is determined to be vague or ambiguous.  However, to the extent any statement in the Disclosure Statement conflicts with any provision of this Plan, this Plan controls.

1.4    **COMPUTATION OF TIME**    In computing any period of time prescribed or allowed by the Plan, the provisions of Federal Rules of Bankruptcy Procedure 9006(a) shall govern.

1.5   **GOVERNING LAW**    Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules), the laws of the State of Michigan shall govern the construction and implementation of the Plan and any agreements, documents and instruments executed in connection with the Plan.

## ARTICLE II

### TREATMENT OF CLAIMANTS NOT SUBJECT TO CLASSIFICATION OR OTHERWISE NOT REQUIRED TO VOTE FOR OR AGAINST THE PLAN

Administrative Creditors and Priority Creditors shall be paid as follows:

2.1   **GROUP I - ADMINISTRATIVE CLAIMS**. The Claims of Group I shall consist of all Allowed Administrative Claims, including any Professional Fees and taxes that qualify as Administrative Claims.

2.1.1 Claims included in this Group shall be Administrative Claims notwithstanding (i) the confirmation of this Plan, (ii) the occurrence of the Effective Date, and/or (iii) the filing of any subsequent proceeding under any chapter of the Bankruptcy Code. The Reorganized Debtor shall remain responsible for every Claim in this Group if any such Claim is not paid on or before the Effective Date.

2.1.2  Each claimant in this Group shall be paid the full amount of its Claim on such date as may be mutually agreed upon between the Debtor and/or the Reorganized Debtor and the particular claimant, or, if no such date is agreed upon, the latest of (i) the Effective Date, (ii) the date by which payment would be due in the ordinary course of business between the Debtor and such Administrative Creditor, or (iii) the date upon which the Bankruptcy Court enters its order, if necessary, allowing and approving such Debtor's payment of such Administrative Claim and such order becomes a Final Order.

2.1.3  The Bar Date for asserting any Administrative Claim is two (2) months after the Effective Date.  Any Administrative Claim first asserted after the Bar Date shall be deemed Disallowed and shall not be entitled any payment under this Plan.  The objection procedures in Article XII of this Plan are applicable to the any Administrative Claim.

2.2  **GROUP II - PRIORITY TAX CLAIMS.**  The Claims of Group II shall consist of the Allowed Claims that are entitled to priority under section 507(a)(8) of the Bankruptcy Code.

2.2.1  The Claimants of this Group shall receive on account of such Allowed Priority Claim four (4) deferred equal annual cash payments equal to the amount of each Allowed Priority Claim divided by four, plus interest calculated at

the Interest Rate. The first annual payment shall be made on the first Business Day that is one year after the Petition Date.

2.2.2 Notwithstanding anything to the contrary in this Section 2.2, the IRS and the Treasury may assert an Administrative Claim as allowed by applicable law and subject to the Debtor or Reorganized Debtor's rights to object to such Administrative Claim.

2.2.3 Upon failure of the Debtor to make any payment due under the Plan or this Order on any Administrative, Secured, Priority or General Unsecured Claim of the IRS or the Treasury, a failure that is not cured within 30 days of the mailing of a written notice of such default by the IRS or the Treasury, as applicable, then the IRS or the Treasury, as applicable, may exercise all rights and remedies applicable under non-bankruptcy law for the collection of its entire claim and/or seek appropriate relief from this Court.

2.3     **GROUP III - OTHER PRIORITY CLAIMS**.  The Claims of Group III shall consist of all other Priority Creditors entitled to receive priority for their Allowed Claim under section 507(a) of the Bankruptcy Code other than the Group II Claims and Class III Claims (unless such Class rejects the Plan).  Unless otherwise agreed between the particular claimant and the Debtor, the Priority Claims of this Group will be paid upon the latest of (i) the Effective Date, (ii) the date by which

payment would be due in the ordinary course of business between the Debtor and such Priority Creditor, or (iii) the date upon which the Bankruptcy Court enters its order, if necessary, allowing and approving such Debtor's payment of such Priority Claim and such order becomes a Final Order. As of the date hereof, this Group is vacant.

2.4 **DETERMINATION OF PRIORITY CLAIMS**: Subject to section 505(a)(2) of the Bankruptcy Code, the Debtor and/or the Reorganized Debtor shall have the right to challenge any Priority Claim through the claims objection process set forth in Article XII, which challenge may include, but need not be limited to, a challenge to any penalty portion of such Claim, the amount and the value of the property which forms the basis for any assessment of taxes, and the computation of any tax. The right to challenge these Claims shall include, without limitation, an objection to the assessment of any Debtor's real or personal property that may or may not have been made by the respective taxing authority.

## ARTICLE III

### SPECIFICATION OF TREATMENT OF CLASSES OF CLAIMS OR INTERESTS NOT IMPAIRED UNDER PLAN AND THOSE IMPAIRED UNDER THE PLAN

The Plan divides Claims and Interests into five (5) Classes and treats them as follows:

3.1   **Class I**:     Class I consists of Holders of Allowed Claims that are Secured by an Interest in Collateral. Holders of Class I Secured Claims, if any, when Allowed, include CIT Financing, Inc. and CIT Bank.

3.1.1 Except as otherwise provided in Section 3.1 of the Plan, the Holder of Allowed Class I Claims shall receive, in the Reorganized Debtor's sole discretion, either (i) the return of the Collateral securing such Holder's Claim or (ii) the value of such Holder's Allowed Secured Claim as determined under Section 3.1.1.1 and an Unsecured Class II Claim equal to the difference between the Holder's Allowed Class I Secured Claim and the Holder's Allowed Claim.

3.1.1.1     The value of an Allowed Class I Claim shall be determined either by (i) agreement of the Reorganized Debtor and the respective Class I Claim Holder, or (ii) in the absence of agreement, pursuant to an order of the Bankruptcy Court determining the value of the Secured Claim pursuant to section 506(a) of the Bankruptcy Code.

3.1.1.2     Unless otherwise agreed by the Debtor or Reorganized Debtor and the Holder of an Allowed Class I Claim, beginning on the first Business Day of the first calendar month immediately following the Effective Date, the Reorganized Debtor shall make monthly payments of principal and interest to the applicable Holder of the Allowed Class I Claim. The Allowed Class I Claim determined under Section 3.1.1.1 shall be amortized over five (5) years and shall bear interest at the Interest Rate.

3.1.1.3     Upon payment of each respective Allowed Class I Claim, all Liens securing such Allowed Class I Claim shall be released and extinguished.

3.1.2 Notwithstanding anything in Section 3.1.1, the Reorganized Debtor may elect, in its sole and unfettered discretion, to pay the Allowed Class I Claim pursuant to the applicable contract with the Holder of such Allowed Class I Claim; however, if any periodic payments went unpaid prior to the Petition Date, then the term of such contract shall be extended by an amount of time equal to the time such unpaid payments. *E.g.*, if the Debtor failed to make two monthly payments prior to the Petition Date, the contract shall be extended for an additional two months during which time the Debtor shall make up such missed payments.

3.1.3 If the Reorganized Debtor elects to return the Collateral to the Holder of such Class I Claim, the return of Collateral shall be in full and final satisfaction of such Holder's Claim related to that Collateral regardless of whether the Claim or a part of the Claim has been allocated by an order of the Bankruptcy Court pursuant to section 506(a) of the Bankruptcy Code or otherwise to Class II.

3.1.4 The Debtor and Reorganized Debtor expressly reserve, and nothing contained in this Plan or this Article shall prejudice, the Debtor or the Reorganized Debtor from challenging the validity, extent or priority of a security interest and/or Lien asserted by a Holder of Class I Claim or otherwise objecting to such Class I Claim under any provision of the Bankruptcy Code, including without limitation section 365 of the Bankruptcy Code.

**3.1.5 This Class is Impaired.**

3.2    **Class II**.    Class II consists of the Holders of Allowed General Unsecured Claims.

3.2.1 Neither pre-confirmation interest nor post-confirmation interest shall be paid on Allowed Class II Claims.

3.2.2 **Convenience Class**:  On a date that is six (6) months after the Effective Date, the Reorganized Debtor shall pay the Holders of all Allowed Class II Claims whose Allowed Claims are individually less than $5,000, or who voluntarily elect to reduce their respective Claim to $5,000, an amount equal to twenty-five percent (25%) of the Allowed amount of such Claim.  Upon payment of this amount, the Reorganized Debtor shall have no further liability to such Holder.

3.2.3 **Unsecured Claim Greater than $5,000:**  Other than as set forth in Section 3.2.2 above, Holders of Allowed Class II Claims shall receive, in full satisfaction of their Allowed Class II Claims, a Pro-Rata share of three (3) annual distributions equal to fifteen percent (15%) of the Reorganized Debtor's Net Cash Flow, commencing on the first (1st) day of the second (2nd) month after the end of the Reorganized Debtor's third full fiscal year after the Effective Date and on the same date thereafter for the following two years until the earlier to occur of (i) the Allowed Class II Claims are paid in full or (ii) the Fifth Anniversary of the Effective

Date. For clarity, Allowed Class II claimants may receive one annual payment in 2022, 2023, and 2024.

3.2.4 Any Insider or Affiliate of an Insider that is a holder of a Class II Claim that votes in favor of the Plan shall have waived its right to receive a distribution pursuant to Section 3.2.

3.2.5 The Debtor waives and releases all Avoidance Actions against Holder of Allowed Class II Claims.

**3.2.6 Class II is Impaired.**

3.3 **Class III**: Class III consists of Holders of Priority Unsecured Claims having priority pursuant to 11 U.S.C. § 507(a)(4) (the "507(a)(4) Claim"). As of the filing of this Plan, this Class III is comprised of a single member, Richard A. Dawson.

3.3.1 Each Holder of an Allowed 507(a)(4) Claim shall be paid (i) one-half of such Allowed 507(a)(4) Claim on the date that is thirty (30) days after the later of the Effective Date or the date that such 507(a)(4) Claim is Allowed (the "First 507(a)(4) Payment") and (ii) one-half of such Allowed 507(a)(4) Claim on the date that is six (6) months after the date of the First 507(a)(4) Payment. Each Holder of an Interest or the New Interests, as the case may be, personally guaranties the obligations arising under this Section 3.3.1.

3.3.2 Each Holder of an Allowed 507(a)(4) Claim that votes to accept the Plan and except for the rights provided under Section 3.3.1, (i) each Holder of an Allowed 507(a)(4) waives any right such Holder has or may have to a claim against the Debtor, the Reorganized Debtor, or either of their Insiders under applicable state law including, without limitation, any wage and hour claim involving or related to employment or wages, and (ii) the Debtor and the Reorganized Debtor waive all Avoidance Actions against such Holder arising prior to the Effective Date and any objections to such Holder's 507(a)(4) Claim.  Notwithstanding the forgoing, nothing in this section 3.3.2, the Plan, or the Confirmation Order impairs the rights of the Holders of Allowed Class III Claims to pursue Associated Community Services, Inc. pursuant to that certain wage and hour Determination Order issued by the State of Michigan, Department of Licensing and Regulatory Affairs in favor of Richard Dawson in the amount of $4,410.00 plus interest.

3.3.3 Notwithstanding anything to the contrary in this Plan or the Confirmation Order, such Holder recognizes and agrees that its employment with the Debtor or Reorganized Debtor, as the case may be, has been, is, and continues to be "at will" employment and the Holder has no right to continued employment by the Debtor or Reorganized Debtor, as the case may be.

3.3.2 **This Class III is Impaired.**

3.4    **Class IV:**    Class IV consists of the claims of the Landlord, which shall be treated as follows:

3.4.1   The Lease shall be assumed under section 365(a) of the Bankruptcy Code as provided herein.

3.4.2   Section 1(f) of the Lease shall be modified to reduce the rent as follows:

| Months | Rate per Sq. Ft. | Monthly Basic Rent | Annual Basic Rents |
|---|---|---|---|
| 56-70 | $9.00 | $13,389.00 | $160,668.00 |
| 71-82 | $9.25 | $13,760.92 | $165,131.00 |
| 83-94 | $9.50 | $14,132.83 | $169,594.00 |
| 95-106 | $9.75 | $14,504.75 | $174,057.00 |
| 107-118 | $10.00 | $14,876.67 | $178,520.00 |
| 119-130 | $10.25 | $15,248.58 | $182,983.00 |
|  |  |  |  |

3.4.3   All rental payments under the Lease shall be paid by AH or wire transfer, in the Debtor's or Reorganized Debtor's discretion, as the case may be.

3.4.4   Notwithstanding anything to the contrary contained in the Lease and for clarity, each monthly payment under the Lease shall be due on the first day of

each month, but the Debtor or Reorganized Debtor may pay such monthly rental payments on or before the seventh day of each month without penalty and such payment shall be deemed timely.

3.4.5 In addition to the forgoing, the Landlord's Claim shall be Allowed in the amount of $89,786.47, which (i) shall be Cured pursuant to 365(a) of the Bankruptcy Code in twelve (12) equal monthly payments of $7,416.67 due contemporaneously with the monthly rent beginning the first month after the Confirmation Date and (ii) and a $786.47 Class II Claim.

3.4.6 The Landlord waives any and all Administrative Claims, including, without limitation, claims for late fees or legal fees, against the Debtor except for Claims for base rent and utility reimbursement due under the Lease.

3.4.7 **This Class IV is Impaired.**

3.5. **Class V:** Class V consists of the Interest Holders which shall be treated in one of two alternative methods:

A.  If Class II and III accept the Plan, then the rights of the Interest Holders shall remain the same and **this Class shall not be Impaired.**

B.  If Class II and III rejects the Plan, and the Court determines that, as a result of such rejection, the Plan but for Section 3.5(A) does not comply with the absolute priority rule, the Interests of the Debtor held by Class III Holder shall be cancelled, and New Interests shall be issued and sold at the Equity Auction as set forth in Section 5.1 of this Plan. The successful purchaser at the Equity Auction shall be bound by the terms of this Plan and shall

be required to use all of the proceeds of the Equity Auction to satisfy the Allowed Claims set forth in this Plan in the order of their priority, and all payments shall be subject to the terms of, and payments shall be made in accordance with, the Plan. **This Class shall be Impaired.**

## ARTICLE IV
### ACCEPTANCE

4.1 **PRESUMED ACCEPTANCE OF THE PLAN:** Except as provided in Section 3.5(A), there are no Classes that are unimpaired under the Plan. If Section 3.5(A) of the Plan is applicable, then Class V shall be conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.

4.2 **PRESUMED REJECTION OF THE PLAN:** There are no Classes that are conclusively presumed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.

4.3 **VOTING CLASSES:** Classes I, II, III, IV and V under Section 3.5(B) of the Plan are Impaired under the Plan, and Holders of Claims or Interests in such Classes shall be entitled to vote to accept or reject the Plan.

4.4 **ELIMINATION OF VACANT CLASSES:** Any Class of Claims that does not have a Holder of an Allowed Claim or a Claim temporarily Allowed by the Bankruptcy Court as of the date of the Confirmation Hearing shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for

purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

4.5    **CRAMDOWN:**  The Debtor shall request confirmation of the Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code. The Debtor reserves the right to modify the Plan to the extent, if any, that confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification of the Plan.

## ARTICLE V
### EXECUTION AND IMPLEMENTATION OF THE PLAN

5.1    **Equity Sale.**  In the event that Class II or III fails to accept this Plan, the Debtor shall sell all of its New Interests.

5.1.1  The Debtor shall sell its New Interests in accordance with the following procedures:

> 5.1.1.1      The Debtor shall conduct an auction sale (the "Equity Auction") at 9:00 a.m. on the ninetieth (90th) day following the Confirmation Date at the office of Debtor's counsel.  Any party interested in attending and/or bidding at the Equity Auction may obtain additional details regarding the time, place and process of the Equity Auction by contacting Debtor's counsel.

> 5.1.1.2      Within fourteen (14) days after the Confirmation Date, Harmon Partners or its successor shall market for forty-five (45) days the New Interests for sale at the Equity Auction and the Debtor shall provide notice to the Legal News of

the Equity Auction. Unless the Court expressly ordered otherwise, this Section 5.1.1.2 shall be deemed sufficient marketing and notice of the Equity Auction and no further or additional marketing or notice shall be provided.

5.1.1.3 The successful purchaser will be required at the Equity Auction to (i) execute the Equity Purchase Agreement, as modified by the results of the Equity Auction, and (ii) take such actions as are necessary and reasonable to release any guarantor of any post-petition debtor-in-possession financing, if any, from such personal guaranty, which may include providing a substitute guarantor.

5.1.1.4 The Debtor may establish procedures designed to maximize value from the sale of the Debtor's Interests or to ensure in the discretion of the Debtor the orderly conduct of the Equity Auction without further notice to Creditors, provided that the Equity Auction procedures are announced at the beginning of the Equity Auction.

5.1.1.5 Bid increments of $15,000 are approved and shall be utilized during the Equity Auction.

5.1.1.6 The Holders of Class IV Interests shall be the stalking horse bidder and within fourteen (14) days after the Confirmation Date (if necessary), shall provide a cash deposit in actual funds of $15,000 (the "Deposit"), which shall not be refundable in the event that Holders of Class V Interests are the successful purchaser and fail to close the transaction for a reason not attributable to the Debtor.

5.1.1.7 To qualify as a bidder (a "Qualified Bidder"), a Person must provide in writing to counsel for the Debtor no later than three (3) Business Days after the Confirmation Date each of the following: (A) a cash deposit in actual funds of $30,000, which is equal to the Deposit plus the next bid increment (the "Qualified Bidder Deposit"), which shall not be refundable in the event that such Person is the successful purchaser and fails to close the transaction for a reason not

attributable to the Debtor; (B) financial and such other information that will reasonably allow the Debtor to make a determination as to the Qualifying Bidder's financial and other capabilities to consummate the transactions contemplated by the Plan, which information is satisfactory to the Debtor and any debtor-in-possession financier, in their sole discretion; (C) the identity of each Person seeking to be a Qualified Bidder and the identity of its ownership, if it is an Entity; and (D) a representation and warranty from the Person seeking to be a Qualified Bidder that its ability to consummate the purchase under this Section 5.1 and ability to consummate the transactions under the Plan are not subject to any diligence or financing contingency. The stalking horse bidder shall be deemed to be a Qualified Bidder.

5.1.1.8    If no Person becomes a Qualified Bidder other than the Holders of Class V Interests, then the Debtor shall not be required to hold the Equity Auction and may sell the New Interests to the Holders of Class V Interests.

5.1.1.9    The sale of New Interests pursuant to the Equity Auction shall not become effective until the Effective Date of the Plan.

5.1.1.10    Notwithstanding anything to the contrary contained herein, the successful bidder at the Equity Auction is bound by all the terms and provisions of this Plan, the Confirmation Order, and the Equity Purchase Agreement.

5.1.1.11    The Closing must take place no later than two (2) Business Days after the Equity Auction and all funds must be deposited in Cash in the client trust account of the Debtor's counsel prior to Closing.

5.1.1.12    If the successful purchaser does not close, the successful purchaser shall forfeit the Deposit or Qualified Bidder Deposit and the Debtor shall sell the New Interests to the next highest bidder, who shall have two (2) Business Days to close.

5.1.1.13    Unsuccessful bidder's Deposit or Qualified Bidder Deposit, if any, shall be returned to the Person that paid such Deposit or Qualified Bidder Deposit with seven (7) Business Days after Closing. The Equity Auction winner's Deposit or Qualified Bidder Deposit shall be retained and applied toward the payment of Administrative Claims.

5.1.1.14    The proceeds of the Equity Auction shall be used to satisfy or fund the following in order of priority: (i) Allowed Group I Claims, (ii) the Convenience Class established under Article 3.2.2, and (iii) Reorganized Debtor's working capital needs.

5.2    **AVOIDANCE ACTIONS**:    Upon the Effective Date of the Plan and subject to any releases contained within this Plan or the Confirmation Order, the Reorganized Debtor shall have, and is hereby assigned, standing to pursue any and all Causes of Action, including those described in the Disclosure Statement, all of which have been adequately described and preserved.

5.3    **POST-EFFECTIVE DATE PROFESSIONAL FEES**:    Any    services performed or expenses incurred by any professional on behalf of the Debtor, the Reorganized Debtor or any Committee (if any) with respect to this Case after the Confirmation Date shall not be subject to the prior review and approval of the Bankruptcy Court.    All fees and expenses of the Reorganized Debtor arising after the Confirmation Date shall be billed directly to the Reorganized Debtor.    The entity

responsible for such fees and expenses shall pay the portion not objected to in accordance with the terms of the invoice.

5.4 **Conditions Precedent to the Effective Date**: Except as otherwise set forth in the Confirmation Order as expressly waived by the Debtor in writing, the following conditions must be met before the Effective Date:

5.4.1 the Bankruptcy Court shall have entered a Confirmation Order confirming the Plan in the Debtor's Case without any material modifications of or additions to the terms, conditions, and liabilities set forth in this Plan, and no request for revocation of the Confirmation Order under section 1144 of the Bankruptcy Code shall have been made, or, if made, shall remain pending.

5.4.2 There shall be no pending appeal of the Confirmation Order.

5.4.3 There shall be no pending motion to dismiss or convert the Debtor's Case or to appoint a chapter 11 trustee or examiner.

5.4.4 The Debtor has sufficient Cash, in the Debtor's reasonable discretion, to pay all Allowed Administrative Claims and Allowed Priority Claims required to be paid by this Plan as of the Effective Date.

5.4.5 The Equity Auction shall have been completed.

5.5 **Failure of a Condition Precedent**:

5.5.1  if the Conditions Precedent are neither satisfied or waived within one hundred and eighty (180) days after entry of the Confirmation Order, the Confirmation Order and this Plan shall be null and void, unless the Debtor files a motion on or before such date requesting the Court extend the one hundred and eighty (180) day period.

5.5.2  The Debtor may seek to withdraw this Plan at any time prior to the Effective Date by filing an appropriate motion with the Bankruptcy Court.  If the Debtor withdraws the Plan, it shall be null and void for all purposes.

## ARTICLE VI
### EFFECT OF CONFIRMATION

6.1  **DISCHARGE OF INDEBTEDNESS**:  Except as provided in this Plan, the occurrence of the Effective Date of this Plan shall, and does hereby act to discharge and release the Claims of all Creditors and, except as provided in Sections 3.4 and 5.1, all Interests against the Debtor and the Reorganized Debtor, the same constituting a full, total and complete settlement with said Creditors and Interest Holders.  Except as provided in this Plan, the occurrence of the Effective Date shall also act as a merger and relinquishment of any and all Claims that Creditors have, or may have, against either of the Debtor and the Reorganized Debtor except as provided in the treatment of the Creditors in Articles II and III.  The forgoing

notwithstanding, this paragraph shall not affect the rights of any taxing authority against any other entity or Person who may be liable or responsible for the taxes of the Debtor or Reorganized Debtor.

6.2 **WAIVER OF CLAIMS:** **EXCEPT AS TO ANY TAXING AUTHORITY, CONFIRMATION SHALL ALSO CONSTITUTE A WAIVER BY CREDITORS OF ANY RIGHT THAT THEY MAY HAVE, UNLESS SUPPORTED BY A WRITTEN GUARANTEE (OR SIMILAR DOCUMENT), TO SEEK TO ENFORCE THEIR CLAIMS AGAINST THE INTEREST HOLDERS, WHETHER PURSUANT TO AN "ALTER EGO" CLAIM, A CLAIM FOR "PIERCING THE VEIL" OF THE DEBTOR'S OR THE REORGANIZED DEBTOR'S CORPORATE EXISTENCE, OR OTHER SIMILAR CLAIM.**

6.3 **SUBORDINATED CLAIMS.** Pursuant to section 510 of the Bankruptcy Code, the Reorganized Debtor reserves the right to re-classify (or request that the Bankruptcy Court re-classify) any Allowed Claim or Allowed Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

6.4 **EXCULPATION. EXCEPT AS OTHERWISE PROVIDED IN THE PLAN, NO PERSON THAT IS ACTING OR HAS ACTED FOR OR ON BEHALF OF THE DEBTOR OR REORGANIZED DEBTOR SHALL HAVE OR INCUR, AND IS HEREBY RELEASED AND EXCULPATED FROM,**

ANY CLAIM, OBLIGATION, CAUSE OF ACTION, OR LIABILITY FOR ANY EXCULPATED CLAIM, EXCEPT FOR GROSS NEGLIGENCE OR WILLFUL MISCONDUCT. THE DEBTOR AND THE REORGANIZED DEBTOR (AND ITS RESPECTIVE AFFILIATES, AGENTS, DIRECTORS, SHAREHOLDERS, MANAGERS, PARTNERS, OFFICERS, EMPLOYEES, ADVISORS, AND ATTORNEYS) HAVE, AND ON THE CONFIRMATION DATE SHALL BE DEEMED TO HAVE, PARTICIPATED IN COMPLIANCE WITH THE APPLICABLE PROVISIONS OF THE BANKRUPTCY CODE AND SHALL NOT BE, LIABLE AT ANY TIME FOR THE VIOLATION OF ANY APPLICABLE LAW, RULE, OR REGULATION GOVERNING THE SOLICITATION OF ACCEPTANCES OR REJECTIONS OF THE PLAN OR SUCH DISTRIBUTIONS MADE PURSUANT TO THE PLAN.

6.5 INJUNCTION. EXCEPT AS PROVIDED IN THE PLAN OR THE CONFIRMATION ORDER, AS OF THE EFFECTIVE DATE, ALL ENTITIES THAT HAVE HELD, CURRENTLY HOLD, OR MAY HOLD CLAIMS THAT HAVE BEEN DISCHARGED OR TERMINATED PURSUANT TO THE TERMS OF THE PLAN (OR WILL BE DISCHARGED UPON COMPLETION OF PAYMENTS UNDER THIS PLAN), ARE PERMANENTLY ENJOINED FROM TAKING ANY OF THE FOLLOWING

ACTIONS AGAINST ANY OF THE DEBTOR AND THE REORGANIZED DEBTOR (OR ITS PROPERTY) ON ACCOUNT OF ANY SUCH DISCHARGED CLAIMS, DEBTS, LIABILITIES, OR TERMINATED RIGHTS: (I) COMMENCING OR CONTINUING, IN ANY MANNER OR IN ANY PLACE, ANY ACTION OR OTHER PROCEEDING; (II) ENFORCING, ATTACHING, COLLECTING OR RECOVERING IN ANY MANNER ANY JUDGMENT, AWARD, DECREE, OR ORDER; (III) CREATING, PERFECTING, OR ENFORCING ANY LIEN OR ENCUMBRANCE; (IV) ASSERTING A SETOFF, RIGHT OF SUBROGATION OR RECOUPMENT OF ANY KIND AGAINST ANY DEBT, LIABILITY, OR OBLIGATION DUE TO THE DEBTOR; AND (V) COMMENCING OR CONTINUING ANY ACTION IN ANY MANNER, IN ANY PLACE THAT DOES NOT COMPLY, OR IS CONSISTENT, WITH THE PROVISIONS OF THIS PLAN.

6.6 **PROTECTIONS AGAINST DISCRIMINATORY TREATMENT**. Consistent with section 525 of the Bankruptcy Code and the Supremacy Clause of the United States Constitution, all Persons, including Governmental Units, shall not discriminate against the Reorganized Debtor or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, the Reorganized Debtor or other Person with whom the Reorganized Debtor has been associated, solely because the

Debtor has been a debtor under chapter 11 of the Bankruptcy Code, has been insolvent before the commencement of the Chapter 11 Case (or during the Chapter 11 Case but before the Debtor is granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Case.

6.7 **POST-EFFECTIVE DATE OPERATIONS**.    On and after the Confirmation Date, the Reorganized Debtor shall operate its business in the ordinary course under the terms of this Plan and applicable non-bankruptcy law.    The rules, restrictions, reports and other requirements of the Bankruptcy Code, Bankruptcy Rules and orders entered by the Bankruptcy Court shall continue to apply pending entry of a Final Decree only to the extent that such rules, restrictions, reports and other requirements expressly apply, by their terms, after confirmation and the occurrence of the Effective Date.

6.8 **SETOFFS**.  Except as otherwise expressly provided for in the Plan, the Reorganized Debtor pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code), applicable non-bankruptcy law, or as may be agreed by the Holder of a Claim, may setoff against any Allowed Claim and the distributions to be made pursuant to the Plan on account of such Allowed Claim (before any distribution is made on account such Allowed Claim), any Claims, rights, and Causes of Action of any nature that the Debtor or the Reorganized Debtor, as applicable, may hold against the Holder of such Allowed Claim (or against the predecessor-in-interest to

Holder to the extent that the Holder takes such Allowed Claim subject to setoffs and defenses that may be asserted against the predecessor-in-interest), to the extent such Claims, rights, or Causes of Action against such Holder have not been otherwise compromised or settled on or prior to the Effective Date (whether pursuant to the Plan or otherwise); provided, however, that neither the failure to effect such a setoff nor the allowance of any Claim pursuant to the Plan shall constitute a waiver or release by the Reorganized Debtor of any Claims, rights, setoff rights and Causes of Action that the Reorganized Debtor may possess against such Holder. The Reorganized Debtor shall not be required to make any distributions to the Holder of any Allowed Claim to the extent that the Reorganized Debtor asserts setoff rights against such Holder until after entry of a Final Order resolving such setoff rights. In no event shall any Holder of Claims be entitled to setoff any Claim against any Claim, right, or Cause of Action of the Debtor or Reorganized Debtor unless such Holder has filed a motion with the Bankruptcy Court requesting the authority to perform such setoff on or before the Confirmation Date, and notwithstanding any indication in any Proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to section 553 of the Bankruptcy Code or otherwise. Notwithstanding the forgoing and subject only to the provisions of section 553 of the Bankruptcy Code, nothing in this Plan limits the IRS's or the Treasury's rights to setoff which existed prior to the Petition Date.

# ARTICLE VII
## MODIFICATION OF THE PLAN

7.1    **AMENDMENTS TO PLAN**: The Debtor may, from time to time, propose amendments or modifications of this Plan prior to its confirmation, without leave of the Court.   After confirmation, the Debtor may, with leave of the Bankruptcy Court, and upon notice and opportunity for hearing to the affected Creditor(s) only, remedy any defect or omission, reconcile any inconsistencies in the Plan or in the Confirmation Order or otherwise modify the Plan.

7.2    **REVOCATION OR WITHDRAWAL OF THE PLAN**: The Debtor reserves the right to revoke or withdraw the Plan prior to the Confirmation Date and to file subsequent chapter 11 plan(s).  If the Debtor revokes or withdraws the Plan, or if confirmation or consummation does not occur, then: (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests), assumption, assignment, or rejection of executory contracts or unexpired leases effected by the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (3) nothing contained in the Plan shall: (i) constitute a waiver or release of any Claims, Interests, or Causes of Action; (ii) prejudice in any manner the right of the Debtor

or any other Person; or (iii) constitute an admission, acknowledgement, offer, or undertaking of any sort by the Debtor or any other Person.

## ARTICLE VIII
### JURISDICTION OF THE COURT

8.1     Following the Effective Date, the Bankruptcy Court shall retain jurisdiction over all matters arising from or relating to the Chapter 11 Case to the fullest extent of applicable law, including, without limitation, all of the following:

A.     To hear and determine any timely objections to Claims, including Proofs of Claim, or to Administrative Claims, both before and after the Effective Date, including any objections to the classification of any Claim, and to Allow, Disallow, determine, liquidate, classify, estimate or establish the amount, priority, secured or unsecured status of any Claim in whole or part.

B.     The classification of the Claim of any Creditor and the re-examination of Claims which have been Allowed for purposes of voting, and the determination of such objections as may be filed to Claims of Creditors. The failure by the Debtor or the Reorganized Debtor to object to, or to examine any Claim for the purposes of voting, shall not be deemed to be a waiver of any right to object to, or reexamine the Claim in whole or in part. Furthermore, the fact that this Plan has provided a treatment for the benefit of a particular Creditor shall not in any way be deemed to be

a waiver of any right to object to or re-examine the Claim or any secured interest whether by mortgage or otherwise which secures such Claim, in whole or in part.

C.   The resolution of any Disputed Claims or Disputed Interests.

D.   To hear and determine any and all motions, adversary proceedings, applications and contested or litigated matters that may be pending on the Effective Date or that, pursuant to this Plan, may be instituted by the Reorganized Debtor after the Effective Date including any claims to recover assets for the benefit of the Estate, except for matters waived or released under this Plan.

E.   The determination of all questions and disputes regarding title to the assets of the Estate, and all Causes of Action, controversies, disputes, or conflicts, whether or not subject to action pending as of the Confirmation Date, between the Debtor or the Reorganized Debtor or any other party.

F.   The correction of any defect, the curing of any omission or the reconciliation of any inconsistency in this Plan or the Confirmation Order as may be necessary to carry out the purposes and intent of this Plan.

G.   The modification of this Plan after confirmation pursuant to the Bankruptcy Rules and the Bankruptcy Code and as provided as in Article VII of the Plan.

H.    The enforcement and interpretation of the terms and conditions of this Plan and the entry of orders in aid of confirmation of this Plan, including the Equity Auction.

I.    The entry of any order, including injunctions, necessary to enforce the title, rights, and powers of the Debtor, the Reorganized Debtor or any party-in-interest, and to impose such limitations, restrictions, terms and conditions of such title, rights and powers as this Court may deem necessary, to accomplish its obligations under the Plan.

J.    To hear and determine applications for allowance of compensation and reimbursement of expenses of Professionals under sections 330, 331 and/or 503(b) of the Bankruptcy Code and any other fees and expenses authorized to paid or reimbursed under this Plan.

K.    To determine matters concerning local, state and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code and to determine any tax claims that may arises as a result of the transactions contemplated by this Plan.

L.    The assumption or rejection of executory contracts and/or unexpired leases, including issues related to cure rights, under Article XI of this Plan.

M.    The right to pursue any Avoidance Actions or Cause of Action.

N.    The entry of an order determining the validity of any Lien.

O. The entry of an order concluding and terminating this Case.

P. To hear any other matter not inconsistent with the Bankruptcy Code.

## ARTICLE IX
### TITLE TO PROPERTY

9.1 **VESTING OF PROPERTY.** Title to the property of the Debtor shall vest in the Reorganized Debtor upon the Effective Date of the Plan. The Debtor shall be discharged from its status as a Debtor-in-Possession and the affairs and business of the Reorganized Debtor shall thereafter be conducted without Court involvement except as may be governed by Articles V and VIII of the Plan. As of and following the Effective Date, the Reorganized Debtor may operate its businesses and use, acquire, and dispose of property and settle and compromise Claims or Interests without the supervision of the Bankruptcy Court, free of any restrictions of the Bankruptcy Code, Bankruptcy Rules or Bankruptcy Court Order, other than those restrictions expressly imposed by this Plan and the Confirmation Order.

## ARTICLE X
### UNITED STATES TRUSTEE FEES

10.1 **U.S. TRUSTEE FEES AND REPORTS.** The Reorganized Debtor shall continue to remit to the office of the United States Trustee all appropriate post

{00795995.4}

confirmation monthly reports/affidavits for all relevant time periods until the Case is closed by order of the Bankruptcy Court or converted to a case under chapter 7 of the Bankruptcy Code. The Reorganized Debtor shall pay to the United States Trustee the appropriate sum required pursuant to 28 U.S.C. § 1930(a)(6) for all quarters and shall continue to remit quarterly fee payments based on all disbursements, until the Case is closed by order of the Bankruptcy Court, or converted to a case under chapter 7 of the Bankruptcy Code. Notwithstanding the foregoing, if any Creditor or other party-in-interest reopens this Case after it has been first closed, then such party-in-interest shall be solely responsible for all sums required pursuant to 28 U.S.C. §1930(a)(6) and shall reimburse and indemnify the Reorganized Debtor against any and all expenses, including, without limitation, reasonable attorneys' fees, incurred as a result of such reopening of this Case.

## ARTICLE XI
### EXECUTORY CONTRACTS

11.1 **ASSUMPTION OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES.**
Unless addressed in Article III of this Plan or otherwise assumed or rejected by Final Order of the Bankruptcy Court, all executory contracts and unexpired leases of the Debtor which are either: (i) not expressly assumed or (ii) not the subject of a pending application to assume as of thirty (30) days after the Effective Date, shall be deemed rejected. Within the time period set forth herein, the Reorganized Debtor shall be

allowed to file a Notice of Assumption of Executory Contract and unexpired leases (the "<u>Assumption Notice</u>") with the Bankruptcy Court and serve the Assumption Notice upon the affected party only. The executory contract and/or unexpired leases which are the subject thereof shall thereupon be assumed subject to the provisions of this Article XI.

11.2  **REJECTION CLAIMS.** Any Creditor who has a Claim as a result of such rejection shall have thirty (30) days after the Effective Date to file a Proof of Claim, failing which such Claim shall be Disallowed in its entirety. The solicitation of this Plan shall be sufficient notice informing any potential Creditor of this requirement.

11.3  **OBJECTIONS TO REJECTION CLAIMS.** The Reorganized Debtor may file an objection to any Proof of Claim filed in accordance with Section 11.2 on or before the later of (i) sixty (60) days after the filing of the Proof of Claim or (ii) the time set for the filing of objections in Section 12.1 (including any extensions). The objection will be resolved in accordance with Article XII.

11.4  **ASSUMPTION AND CURE PAYMENTS.** All assumed executory contracts and unexpired leases shall be Cured by the Reorganized Debtor pursuant to Section 11.5, unless other provisions have been agreed to by the counter-party or provided under this Plan. As long as the Reorganized Debtor complies with Section 11.5, all executory contract and unexpired lease counterparties must fulfill all contract and

lease obligations and are enjoined from declaring a default for non-performance due to the bankruptcy or pre-assumption default.

11.5 **RESOLUTION OF CURE CLAIM DISPUTES.** For each executory contract or unexpired lease to be assumed under this Article XI, within thirty (30) days after the Effective Date, the Debtor or Reorganized Debtor shall deliver a written proposal to the contract counter-party describing the method, timing and amount of any proposed Cure. The Reorganized Debtor's proposal shall be binding unless the contract counter-party delivers to the Reorganized Debtor's counsel, within fourteen (14) days after receipt of the proposal, a written objection detailing all reasons for the counter-party's objection and setting forth a counter-proposal. In the event that the dispute cannot be resolved, either party may petition the Bankruptcy Court to resolve the dispute through filing of a properly noticed motion. In the event that the Bankruptcy Court sets a Cure amount greater than the Cure amount proposed by the Debtor, the Debtor shall have ten (10) Business Days to Cure or reject the contract or lease by filing a notice of rejection on the docket in this Case and sending notice thereof to the affected Creditor.

11.6 **PRELIMINARY ASSUMPTION PENDING CHALLENGES:** The assumption of a contract or lease under this Article does not prejudice the Debtor's or Reorganized Debtor's right to challenge whether any contract or lease is an executory contract or unexpired lease, as opposed to a disguised security

agreement. If the Debtor or Reorganized Debtor challenges an assumed executory contract or unexpired lease, the Reorganized Debtor shall not be required to comply with the disputed portions of the executory contract or unexpired lease until a Final Order is entered resolving the dispute. If the dispute is not resolved in the Reorganized Debtor's favor, the Reorganized Debtor has the right to reject the executory contract or unexpired lease for a period of twenty-one (21) days after entry of a Final Order by filing a notice of rejection on the docket in this Case and sending notice thereof to the affected Creditor.

# ARTICLE XII
## OBJECTIONS TO CLAIMS

12.1. **TIMING OF OBJECTIONS:**  The Debtor or the Reorganized Debtor may object to the allowance of any Claim, or the extent, validity and enforcement of any security interest, whether listed on the Schedules filed by the Debtor or filed by any Creditor, on or before the later of (a) sixty (60) days from the date of filing of any Proof of Claim or (b) eight (8) months after the Effective Date.

12.2 **EXTENT OF OBJECTIONS:**  As part of the objection process set forth in Section 12.1 above, and without limiting same, the Debtor and/or the Reorganized Debtor shall have the right to object to any Lien.

12.3 **CLAIM DISPUTE RESOLUTION PROCEDURES:**  The Reorganized Debtor shall be authorized to resolve all Disputed Claims by withdrawing or settling objections thereto, or by litigating to judgment in the Bankruptcy Court, or such other court having competent jurisdiction, the validity, nature and/or amount thereof.  If the Reorganized Debtor agrees with the Holder of a Disputed Claim to compromise, settle and/or resolve a Disputed Claim by granting such Holder an Allowed Claim, then the Reorganized Debtor may compromise, settle and/or resolve such Disputed Claim without Bankruptcy Court approval.

12.4 **CLAIMS BAR DATE:**  Except as provided herein or otherwise agreed, any and all Proofs of Claim filed after the applicable Bar Date shall be deemed

Disallowed and expunged as of the Effective Date without any further notice to or action, order, or approval of the Bankruptcy Court, and Holders of such Claims may not receive any distributions on account of such Claims, unless on or before the Confirmation Date such late Claim has been deemed timely filed by a Final Order.

## ARTICLE XIII
### PROVISIONS REGARDING DISTRIBUTIONS

13.1 **DISPUTED PAYMENTS**: Notwithstanding anything in this Plan to the contrary, the Debtor or Reorganized Debtor shall not be obligated to make any payments towards the Disputed portion of any Disputed Claim. Except as provided in Class III and Class IV, the Reorganized Debtor shall withhold any such payments, and, if the dispute is resolved in favor of the Claim Holder, the Reorganized Debtor shall make any missed distributions within fourteen (14) days after entry of a Final Order determining the Claim. Except as provided in Class III and Class IV, if a Secured Claim is Disputed then upon escrowing the Disputed amount any Lien shall be transformed to the escrowed proceeds and the affected Creditor shall be and is hereby required to discharge its Lien.

13.2 **DELIVERY OF DISTRIBUTIONS IN GENERAL**: Except as otherwise provided in the Plan, and notwithstanding any authority to the contrary, distributions to Holders of Allowed Claims and Allowed Interests shall be made by

the Reorganized Debtor, in order of preference, (a) at the addresses set forth in any written notices of address changes delivered to the Reorganized Debtor after the date of any related Proof of Claim, (b) at the addresses set forth on the Proofs of Claim filed by such Holders of Claims, or (c) at the addresses reflected in the Schedules if no Proof of Claim has been filed and the Reorganized Debtor has not received a written notice of a change of address. Except as set forth herein, distributions under the Plan on account of Allowed Claims shall not be subject to levy, garnishment, attachment, or similar legal process, so that each Holder of an Allowed Claim shall have and receive the benefit of the distributions in the manner set forth in the Plan. The Reorganized Debtor shall not incur any liability whatsoever on account of any distributions under the Plan except for gross negligence or willful misconduct.

13.3 **ALLOCATION OF PAYMENTS**: All distributions shall be allocated first to principle until the principle amount of the Claim is paid in full, next to interest if interest is Allowed in relation to the Claim and finally, to fees, costs and expenses if such are Allowed.

13.4 **COMPLIANCE WITH TAX REQUIREMENTS AND ALLOCATIONS**: In connection with the Plan, to the extent applicable, the Reorganized Debtor shall be authorized to take all actions necessary or appropriate actions to comply with all tax withholding and reporting requirements imposed on them by any

Governmental Unit, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate. The Reorganized Debtor reserves the right, in its sole discretion, to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, other spousal awards, Liens, and encumbrances. To the extent that, in the opinion of the Reorganized Debtor's tax professional, that its necessary or appropriate for the Reorganized Debtor to obtain federal tax identification or social security numbers (the "Tax Information") from any Creditor or Interest Holder and such Creditor or Interest Holder does not provide the Tax Information with thirty (30) days after written request, then such Creditor's or Interest Holder's Claim or Interest shall be Disallowed whether such request is prior to or after any applicable Bar Date.

13.5 **UNDELIVERABLE DISTRIBUTIONS AND NON-NEGOTIATED CHECKS**: If any distribution to a Holder of a Claim is returned as undeliverable, no further distributions to such Holder of such Claim shall be made unless and until the Reorganized Debtor is notified of the then-current address of such Holder of the Claim, after which time future distributions shall be made to such Holder of the Claim without interest at such address. If checks issued by the Reorganized

Debtor on account of Claims are not negotiated within one hundred and twenty (120) days after the issuance of such check, the check shall be null and void. Amounts in respect to undeliverable distributions and non-negotiated checks shall be held by the Reorganized Debtor until (i) such distributions are claimed or (ii) ninety (90) days after the check is returned or voided due to non-negotiation, after which date all such undistributed and non-negotiated amounts shall revert to the Reorganized Debtor free of any restrictions thereon and the Claim of any Holder or successor to such Holder with respect to such distribution shall be discharged and forever barred, notwithstanding federal or state escheat laws to the contrary. Nothing contained herein shall require the Reorganized Debtor to attempt to locate any Holder of an Allowed Claim.

13.6 **FRACTIONAL PAYMENTS**: Notwithstanding any other provision of the Plan to the contrary, payments of fractions of dollars shall not be required. Payment of fractions of dollars that would otherwise be distributed under the Plan shall be rounded to the lower whole number of dollars.

13.7 **INTEREST AND PENALTIES ON CLAIMS:** Unless otherwise specifically provide for in the Plan, the Confirmation Order or required by applicable bankruptcy law, post-petition interest and penalties shall not accrue or be paid on any Claims, and no Holder of a Claim shall be entitled to interest and penalties accruing on or

after the Petition Date through the date that such Claim is satisfied in accordance with the terms of this Plan.

13.8    **PREPAYMENT.**    Any distribution required under this Plan may be prepaid, in whole or in part, in the sole and absolute discretion, of the Reorganized Debtor.

## ARTICLE XIV
## MISCELLANEOUS PROVISIONS

14.1    **RELEASE OF LIENS:**    The Debtor, the Reorganized Debtor and all parties-in-interest, including without limitation any Creditor, shall be required to execute any document reasonably requested by the other to memorialize and effectuate the terms and conditions of this Plan.    This shall include without limitation any execution by the Debtor or the Reorganized Debtor of uniform commercial code ("UCC") financing statements and the execution by Creditors of any UCC or mortgage discharges, releases or terminations.

14.2    **RECOUPMENT.**    In no event shall any Holder of a Claim or Interest be entitled to recoup any Claim or Interest against any Claim, right, or Cause of Action of the Debtor or the Reorganized Debtor, as applicable, unless such Holder actually has performed such recoupment and provided notice thereof in writing to the Debtor on or before the Confirmation Date, notwithstanding any indication in any Proof of

Claim or otherwise that such Holder asserts, has, or intends to preserve any right of recoupment.

14.3 **COMPROMISE OF LITIGATION:** The Reorganized Debtor shall have the right to commence, continue, amend or compromise all Causes of Action (including without limitation any Avoidance Action and any action described in the Debtor's Disclosure Statement) available to the Debtor, the Estate, or the Reorganized Debtor, whether or not those Causes of Action were the subject of a suit as of the Confirmation Date.

14.4 **BINDING EFFECT/SUCCESSORS AND ASSIGNS:** Except as otherwise provided in this Plan or the Confirmation Order, entry of the Confirmation Order makes this Plan binding on the Debtor, the Creditors, Interest Holders, and all parties-in-interest, regardless of whether a ballot was cast to accept or reject this Plan and notwithstanding any post-confirmation conversion or dismissal of this Case under section 1112 of the Bankruptcy Code. This Plan and the Confirmation Order shall inure to the benefit of, and be binding upon, all parties-in-interest and their respective successors and assigns.

# DISCLOSURE STATEMENT

## I. INTRODUCTION AND OVERVIEW

### A. PURPOSE OF DISCLOSURE STATEMENT

Unless defined in this Disclosure Statement, all capitalized terms shall have the meaning ascribed to them in the Debtor's Plan of Reorganization (the "Plan"), unless the context indicates a different meaning.

Debtor submits this Disclosure Statement pursuant to section 1125 of the Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.*, to all known Holders of a Claim against it. The Debtor has filed the Plan with the United States Bankruptcy Court for the Eastern District of Michigan, Southern Division, a copy of which accompanies this Disclosure Statement.

The Debtor provides this Disclosure Statement to its Creditors to disclose information deemed by it to be material and necessary for Creditors to make a reasonably informed decision in exercising their right to vote for the acceptance of the Plan.

### B. SOURCE OF INFORMATION

The Disclosure Statement and the Plan have been prepared from information furnished primarily by the Debtor. The Debtor's counsel has not conducted an independent investigation to verify such information.

The statements contained in this Disclosure Statement are made as of the date hereof, unless another time is specified. Neither the delivery of this Disclosure Statement nor any exchange of rights made in connection with it shall, under any circumstances, create an implication that there has been no change of the facts set forth herein since the date of this Disclosure Statement.

**NO PERSON OR ENTITY HAS BEEN AUTHORIZED BY THE DEBTOR OR THE COURT TO GIVE ANY INSTRUCTIONS OR MAKE ANY REPRESENTATIONS CONCERNING THE DEBTOR OR ITS FINANCIAL AFFAIRS, OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT. ANY REPRESENTATIONS, PROMISES OR INDUCEMENTS MADE TO SECURE YOUR ACCEPTANCE OR REJECTION OF THE PLAN, WHICH ARE OTHER THAN AS CONTAINED IN THIS DISCLOSURE STATEMENT, SHOULD NOT BE RELIED UPON BY YOU IN ARRIVING AT YOUR DECISION. SUCH REPRESENTATION, INDUCEMENTS AND/OR PROMISES, IF ANY, SHOULD BE REPORTED TO COUNSEL FOR THE DEBTOR WHO, IN TURN, SHALL DELIVER SUCH INFORMATION FOR SUCH ACTION AS THE COURT MAY DEEM APPROPRIATE.**

C.    **OVERVIEW OF CHAPTER 11**

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Under Chapter 11, a debtor is authorized to reorganize its business for the benefit of itself, its creditors and equity interest holders. In addition to permitting a rehabilitation of a debtor, another goal of Chapter 11 is to

promote equality of treatment for similarly situated creditors and similarly situated equity interest holders with respect to the distribution of a debtor's assets.

The commencement of a chapter 11 case creates an estate that is comprised of all of the legal and equitable interests of a debtor as of the filing date. The Bankruptcy Code provides that a debtor may continue to operate its business and remain in possession of its property as a debtor-in-possession.

The consummation of a plan of reorganization is the principal objective in a chapter 11 reorganization case. A plan of reorganization sets forth the means for satisfying claims against and interests in a debtor. Confirmation of a plan of reorganization by the Bankruptcy Court makes the plan binding upon a debtor, any issuer of securities under the plan, any person acquiring property under the plan and any creditor or equity interest holder of a debtor. Subject to certain limited exceptions, the confirmation order discharges a debtor from any debt that arose prior to the date of confirmation of the plan and substitutes the obligations specified under the confirmed plan.

After a plan of reorganization has been filed, the holders of claims against or interests in a debtor are permitted to vote to accept or reject the plan. Before soliciting acceptances of the proposed plan, however, section 1125 of the Bankruptcy Code requires a debtor to prepare a disclosure statement containing

adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment about the plan.

The Debtor is submitting this Disclosure Statement to Holders of Claims against, and equity Interests in, the Debtor to satisfy requirements of section 1125 of the Bankruptcy Code.

## II. **DESCRIPTION OF DEBTOR**

### A. **THE DEBTOR-IN-POSSESSION**

On March 6, 2019 (the "Petition Date"), the Debtor filed a Voluntary Petition under Chapter 11 of Title 11 of the United States Code, §§101 *et. seq.* in the United States Bankruptcy Court for the Eastern District of Michigan commencing its Chapter 11 Case. The Chapter 11 Case was assigned to the Honorable Phillip J. Shefferly. Upon filing for reorganization, the Debtor became the "Debtor-in-Possession," as that term is understood in the Bankruptcy Code. The Debtor seeks to restructure its debt and, if necessary, sell its equity in this chapter 11 proceeding pursuant to auction procedures set forth in Article V of the Plan.

## B.    DEBTOR'S PRINCIPAL AND MANAGEMENT

The core of the Debtor's sales and management has remained intact.  Many of these individuals have a long history with the company and have been and will continue to be instrumental in its return to profitability.

### 1.    Background:

Since the Petition Date, Richard T. Cole ("Mr. Cole"), R. William Burland, Jr. ("Mr. Burland") and Scot Stepek ("Mr. Stepek") have been the primary individuals responsible for the Debtor's strategic operations.  A summary of each individual's background is set forth below:

**Richard T. Cole:**    Mr. Cole serves as Co-Manager of the Debtor and holds fifty percent of the Debtor's equity Interests. As Co-Manager, Mr. Cole manages the strategic operations of the business, and he is responsible for obtaining new clients as well as maintaining relationships with existing clients. Mr. Cole has forty years of experience in the telemarketing and charitable fundraising industries as either a business owner or a consultant. Prior to his work in the charitable fundraising industry, Mr. Cole attended Lake Superior University where he studied business.

**R. William Burland, Jr:**    Since the Debtor's formation in 2004, Mr. Burland has held fifty percent of the Debtor's equity Interests and has been its Co-

Manager. As Co-Manager, Mr. Burland oversees the Debtor's compliance with the various state, federal and local laws, rules and regulations applicable to professional fundraising enterprises. For the twenty years prior to founding the Debtor, Mr. Burland was a commercial real estate broker where he sold or leased more than $500 million in properties, and Mr. Burland continues to hold that license today. Mr. Burland attended Northern Michigan University and Bedford College in London, England, where he studied humanities.

**Scot Stepek:** Since October 22, 2018, Mr. Stepek has been the chief executive officer ("CEO") of the Debtor and manages the Debtor's day-to-day operations including, without limitation, payroll, compliance, print and mail, and human resources. Prior to joining the Debtor, Mr. Stepek worked in the telemarketing and charitable fundraising business for thirty-one years. Mr. Stepek attended Macomb County Community College.

2. **Compensation:**

Neither Mr. Cole nor Mr. Burland receive a salary from the Debtor; however, each receives health care benefits as well as expense reimbursement. Further, the Debtor pays $5,200 on behalf of Mr. Burland toward a mortgage.

On the Petition Date, Mr. Stepek receives a salary of $300,000 per year from the Debtor, plus health care benefits and expense reimbursement. After the Petition Date, Mr. Stepek voluntarily reduced his compensation to $210,000 per year.

### 3. Legal Relationship Between Principals and Debtor

Each of Mr. Cole and Mr. Burland hold fifty percent (50%) of the Debtor's issued and outstanding stock. Further, each of Mr. Cole and Mr. Burland are indebted to the Debtor in the respective amounts of $398,181.00 and $874,848.00.

Furthermore, Mr. Cole and Mr. Burland also own the Debtor's affiliate, Associated Community Services, Inc. ("ACS"). The Debtor and another affiliate, Community Services Appeal, LLC, guarantied ACS's secured and priority claim owing to the IRS, which is estimated in the Debtor's schedules to be approximately $9,000,000. The settlement agreement creating this liability for the Debtor is available from this Court's PACER system in Case No. 14-44095-pjs at docket number 443 or upon written request to counsel for the Debtor through the Confirmation Date.

### 4. Future Principals of the Debtor and Compensation

The Debtor expects that during the life of the Plan, Mr. Cole and Mr. Burland will continue to manage operations of the Debtor and will continue to receive the benefits that are outlined above. As the Debtor's circumstances

improve, the Debtor anticipates providing Mr. Cole and Mr. Burland with a salary, in addition to the benefits discussed above, that is commensurate with their positions with the Debtor. However, in the event that the New Interests are sold and Mr. Cole and Mr. Burland are not the purchasers at the Equity Auction, then (i) neither Mr. Cole nor Mr. Burland will provide services to the Reorganized Debtor after the Effective Date unless mutually acceptable compensation arrangements are made with the successful purchaser and (ii) to the extent that either Mr. Cole or Mr. Burland have guaranteed any obligations of the Debtor, Mr. Cole and Mr. Burland have reserved the right to terminate any such guarantee(s).

The Debtor also anticipates that Mr. Stepek will continue to act as the Debtor's CEO through the reorganization period and receive the compensation (as voluntarily reduced) and benefits outlined above.

### C. DESCRIPTION OF DEBTOR'S BUSINESS AND CAUSES FOR CHAPTER 11 FILING

The Debtor provides print, mail, and lockbox services to the charitable fundraising and medical communities. The Debtor's income is primarily reliant on the professional charitable fundraising activities of two clients: Directel and its affiliate ACS. Once a charitable fundraiser obtains a telephonic donation commitment, CPS prints and mails the donation cards, receives the donation

(which are made payable to respective charity), and deposits the donations into the charity's bank accounts. To a lesser degree, it prints and mails medical bills.

The charitable fundraising industry has been under scrutiny by the Federal Trade Commission ("FTC") for some time. As a result, the number of charities utilizing telephonic fundraising has decreased. Additionally, the recent changes to tax law has negatively impacted charitable giving by removing the tax deduction accorded to small donations. As a result, the Debtor's business has experienced cash-flow shortages. While robbing Peter to pay Paul, the Debtor became significantly behind with its Landlord and the Debtor's Case was filed to stay an eviction hearing.

In order to avoid termination of the Debtor's Lease of its Southfield location, among other factors, the Debtor determined that was in its best interest to commence its Chapter 11 Case.

### III. POST-PETITION EVENTS OF SIGNIFICANCE

#### A. POST-PETITION TRANSFERS OUTSIDE THE ORDINARY COURSE OF BUSINESS

The Debtor has operated in the ordinary course of business. Any transactions that are outside of the ordinary course of business require approval from the Bankruptcy Court. The Debtor has made no post-petition transfers outside the ordinary course of business other than as disclosed herein.

**B.**     **CHAPTER 11 EVENTS AND ORDERS**

    1.     **Employment of Professionals:**

        a.     On March 22, 2019, the Court authorized the Debtor to employ Schafer and Weiner, PLLC as its general bankruptcy counsel. *See* DN 31.

        b.     On April 22, 2019, the Court authorized the Debtor to employ Harmon Partners as its financial advisor. *See* DN 49.

        c.     On April 17, 2019, the Court authorized the Debtor to employ ATS Advisors as its Accountants. *See* DN 42.

    2.     **Cash Collateral:**     There were no parties having an interest in the Debtor's cash collateral.   As such, no request to use cash collateral was necessary in this Case, and the Debtor continues to use its cash collateral in the ordinary course of its business.

    3.     **Pre-Petition Employee Obligations:**     On the Petition Date, the Debtor filed its *First Day Motion for an Order Authorizing Payment of Pre-petition Wages, Salaries, and Employee Benefits* [DN 7].   Through this motion, the Debtor sought authority to pay pre-petition payroll obligations and employee benefits for work performed prior to and through the Petition Date, which amounts become payable after the Petition Date. *Id.*  The Court granted this Motion.

4.  **Litigation Stay:**   The Debtor's chapter 11 filing immediately gave rise to the Bankruptcy Code's automatic stay which, with limited exceptions, enjoined commencement and continuation of all Creditor collection efforts, litigation against the Debtor, and enforcement of Liens against the Debtor's property.   This relief provided the Debtor with "breathing room" to assess and reorganize its business.   The automatic stay remains in effect, unless modified by the Bankruptcy Court, until consummation of the Plan.

The Debtor's Landlord prospectively sought to lift the automatic stay in the event that the Debtor failed to timely pay its post-petition rent or rejected the Lease. *See* DN 48.   The Court denied the prospective relief and adjourned final determination on the Landlord's motion. *See* DN 57.

5.  **Executory Contracts and Unexpired Leases:**   Section 365 of the Bankruptcy Code grants the Debtor the power, subject to approval of the Bankruptcy Court to assume or reject executory contracts and unexpired leases. The Debtor and the Landlord stipulated, and the Court entered an order, to extend the deadline to assume or reject the Lease under section 365 through September 6, 2019. *See* DN 59.   Through this Plan, the Debtor seeks authority to assume the Landlord's Lease on the terms and conditions contained in Class IV of this Plan.

6.  **Use of Property Outside the Ordinary Course of Business:** Section 363(b) of the Bankruptcy Court authorizes the Debtor, subject to

Bankruptcy Court approval to lease, use or sell property of the bankruptcy estate outside the ordinary course of business. Except as provided herein, no request to use, lease or sell assets outside of the ordinary course of business has been made.

Notwithstanding the forgoing, the Debtor is seeking up to $150,000 in post-petition debtor-in-possession financing. It is engaged in discussions with several potential debtor-in-possession financiers. Once a lender is selected, the Debtor anticipates filing a motion to approve such financing prior to September 6, 2019, the date set for the hearing on confirmation of this Plan.

### C. LITIGATION INVOLVING THE DEBTOR

To the best of the Debtor's information and belief, the following lawsuit(s) represent all cases in which the Debtor is a named party pending as of or filed after the Petition Date:

- HJH Southfield 2, LLC v. Central Processing Services, LLC, Case No. LT-19-0568 (46th District Court, State of Michigan)

Pursuant to section 362 of the Bankruptcy Code, cases commenced against the Debtor were automatically stayed due to the bankruptcy filings. The Debtor has not been involved in any litigation in any court in or of the United States of America during the pendency of this Bankruptcy Case.

Notwithstanding the forgoing, the Debtor filed its *Objection to the Internal Revenue Service's Proof of Claim* [DN 62] (the "IRS Objection") on June 28,

2019. Through the IRS Objection, the Debtor seeks to reduce the IRS Claim from more than $10 million to a $5.4 million wholly unsecured claim. *See* DN 62. The Debtor anticipates that the resolution of the IRS Objection may not occur before the Effective Date, and it has filed a motion to estimate the IRS Claim for confirmation purposes under section 506 of the Bankruptcy Code. *See* DN 64.

## IV. ASSETS AND LIABILITIES

### A. LIQUIDATION ANALYSIS

The Debtor's Liquidation Analysis is attached as **Exhibit A**.

In the event that the Plan is not accepted by the Creditors or is not otherwise confirmed by the Bankruptcy Court, the Debtor believes that its assets would be liquidated in a straight bankruptcy liquidation under Chapter 7 of the Bankruptcy Code. As a result, the Debtor anticipates that no money would be available to pay Unsecured Claims in a straight bankruptcy liquidation under Chapter 7 of the Bankruptcy Code.

### B. RISKS, CONDITIONS AND ASSUMPTIONS IN LIQUIDATION ANALYSIS

The Debtor has estimated the forced liquidation value to determine the value of its assets. The risks, conditions and assumptions are estimations by the Debtor's management in consultation with Harmon Partners, the Debtor's financial advisors, based upon their collective experience in the market.

## C.   CAUSES OF ACTION

The Debtor reserves its right to collect all accounts receivable and all other amounts due the Debtor for any reason whatsoever (whether owed to the Debtor pursuant to contract rights, quasi contract, tort law, refund rights, deposits, or for any other reason) including, without limitation, any claims against (i) Organizational Development, Inc., a dissolved Florida corporation, including those involving or related to services or monies provided by the Debtor, (ii) Community Services Appeal, LLC, a Michigan limited liability company, and/or Directel involving or related to services provided by the Debtor, (iii) Richard T. Cole involving or related to monies booked as shareholder loans, and (iv) R. William Burland, Jr. involving or related to monies booked as shareholder loans. The Debtor reserves all setoff and recoupment rights of all kinds. The Debtor reserves the right to commence Avoidance Actions unless expressly waived in the Plan. Accordingly, the Debtor may have potential causes of action and reserves its right to bring a lawsuit against any entity listed on the Debtor's Schedules (as filed with the Bankruptcy Court and as may be amended) as owing a debt to the Debtor, and any entity listed on its Statement of Financial Affairs (as filed with the Bankruptcy Court and as may be amended) as having received a transfer from the Debtor. More specifically, and without waiving any other claim, the Debtor may seek to avoid from any direct or indirect transferee, (i) under section 547 of the Code, any

transfer of an interest of the Debtor in property, including all payments to vendors and suppliers, which occurred within 90 days of the Petition Date, or, for Insiders of the Debtor, within one year of the Petition Date; (ii) under sections 544(a) and 545, any liens asserted against the Debtor, (iii) under sections 544(b) and 548, any actual or constructive fraudulent transfers or obligations, and (iv) under section 549, any unauthorized post-petition transactions. A list of transfers made by the Debtor within 90 days of the Petition Date is attached as **Exhibit B**.

The Debtor generally reserves any and all potential Causes of Action to recover accounts receivable, to enforce contractual obligations, or to otherwise enforce and protect their rights. The Debtor has not investigated any potential Causes of Action or Avoidance Actions, and cannot make any representation concerning their value. Except as otherwise provided in this Disclosure Statement, the Debtor is unable to estimate what, if anything at all, that will be recovered on account of the Avoidance Actions.

The Debtor made payments aggregating $225,000 to Bull Run, Inc. within the ninety (90) days before the Petition Date. The Debtor has reviewed its books and records, conducted a preliminary preference analysis, and reviewed a preference analysis provided by Bull Run's counsel. The Debtor has concluded that a preference action under section 547(b) against Bull Run, Inc. is not viable.

The Debtor has also begun investigations into the collectability of the shareholder loans received by the Debtor's principals. While the Debtor is vetting these Claims, the Debtor suspects that its principals are not collectible because each may be fully encumbered by federal tax liens related to Associated Community Services, Inc.'s federal tax obligations. In the event that the principals are determined to be uncollectible, the Debtor or Reorganized Debtor, as the case may be, reserves its right to forgive such shareholder loans, which requires the principals to recognize income on the forgiveness of indebtedness under 26 U.S.C. § 108.

## D.   SECURED CLAIMS

The Debtor and Toshiba Business Solutions entered into certain documents purporting to be leases for printers and printing equipment. The Debtor believes these leases are disguised purchased agreements. Pursuant to proof of claim nos. 2 and 3, the purported leases were transferred to CIT Finance, LLC and CT Bank, NA. CIT Finance, LLC asserts that $97,182.18 is owing under its leases while CIT Bank NA asserts that $35,391.94 is owning under its leases. *See* Proof of Claim Nos. 2 and 3.

The IRS also filed a Proof of Claim asserting a $1.8 million Secured Claim against the Debtor. *See* Proof of Claim No. 1 (amended June 25, 2019). The Debtor filed the IRS Objection, which asserts that no portion of the IRS Claim is a Secured

Claim against the Debtor. *See* DN 62. The Debtor also filed a motion to estimate the IRS Claim as a wholly Unsecured Claim having an aggregate value of $5.4 million. *See* DN 64.

### E.     PRIORITY CLAIMS AND ADMINISTRATIVE EXPENSE CLAIMS

The Debtor's priority claimants are (i) the Internal Revenue Service, who filed a Proof of Claim asserting $5.5 million Priority Claim (*see* Proof of Claim no. 1, amended June 25, 2019), (ii) the City of Detroit, who is scheduled with a $318.08 Claim, (iii) the City of Port Huron, who is scheduled with a $91.24 Claim, (iv) the Treasury, who is scheduled with a $12,228.61 Claim, and (v) Richard Dawson, who asserts a $13,650 Claim. The Allowed Priority Claims of shall be paid pursuant to the Plan or as otherwise agreed with such claimant.   The Debtor has filed an objection to the IRS Claim asserting that no portion of the IRS Claim is a Priority Claim. *See* DN 62. The Debtor reserves all of its rights and objections with respect to any Priority Claim.

Furthermore, the Debtor anticipates that all of its Administrative expense Claims for Professionals will be paid in the ordinary course. Schafer and Weiner, PLLC estimates that its professional fees will approximate $100,000; Harmon Partners estimates that its professional fees will approximate $50,000; and ATS Advisors estimates that its professional fees will approximate $10,000.

The Debtor estimates that it owes approximately $103,000 to the IRS in post-petition administrative taxes. The Debtor anticipates that this obligation to the IRS will be paid in full on or prior to the Effective Date.

**F.  NON-PRIORITY UNSECURED CLAIMS**

The Debtor estimates that Unsecured Creditors are owed approximately $13,301,789.00 in the aggregate pursuant to the Debtor's Schedules. However, this amount may increase or decrease in the event that contracts are rejected and/or the Court overrules or sustains objections to Claims that have been or will be made. The Debtor reserves all of its rights and objections to any non-priority Unsecured Claim.

A listing of the Debtor's Unsecured Creditors is on file with the Bankruptcy Court.

**G.  GUARANTEED DEBT**

To the best of the Debtor's knowledge and except as otherwise discussed herein, no other persons or entities have guaranteed or are co-liable on any other obligations owed by the Debtor.

The IRS may assert that Mr. Cole, Mr. Burland, Associated Community Services, Inc. and Community Services Appeal, LLC are also liable for the approximately $9,000,000 unsecured guaranty claim of the IRS identified in the Schedules.

Mr. Cole has personally guaranteed the Debtor's post-petition pre-Effective Date obligations to Bull Run, Inc., which provide paper to the Debtor.

Associated Community Services, Inc. is also jointly and severally liable for that (i) certain Settlement Agreement with Craig Copeland and Associates, Inc. in the amount of $49,500.00 and (ii) certain wage and hour Determination Order issued by the State of Michigan, Department of Licensing and Regulatory Affairs in favor of Richard Dawson in the amount of $4,410.00 plus interest.

In the event that the Debtor obtains post-petition debtor-in-possession financing, the Debtor anticipates that one or more of its principals will personal guaranty the Debtor's obligations to such post-petition debtor-in-possession financier.

## V.    <u>IMPLEMENTATION OF PLAN</u>

**A.**    The Debtor intends to continue in business by reorganizing its operations and debt structure. In particular, the Debtor anticipates restructuring its operations to shed unprofitable and over-market contracts and leases and implementing a plan to manage its state and federal tax burdens and prepetition debt load. In connection with its reorganization, the Debtor anticipates obtaining post-petition date financing, which will be used to satisfy Administrative Claims and provide working capital.

## B.  FINANCIAL INFORMATION

1.  **Pre-Petition Financial Summaries:**  The Debtor has attached as **Exhibit C**, financial summaries relating to the three fiscal years prior to the Petition Date (2016, 2017 and 2018). These documents summarize the Debtor's financial history prior to the commencement of the Debtor's bankruptcy proceeding.

2.  **Post-Petition Financial Summaries:**  The Debtor has attached as **Exhibit D**, summaries of its financial performance during this chapter 11 proceeding.  These documents summarize the financial condition relating to the Debtor's post-petition operations.  The source of this summary is the Debtor's books and records.

Furthermore, the Debtor has attached as **Exhibit E**, its summary of post-confirmation financial projections for the life of the Plan.  The summaries are estimates only, based on the Debtor's past performance, contain assumptions as to expected revenues from launching additional initiative and costs savings, and were prepared in consultation with its financial advisors. The Debtor anticipates, but cannot guaranty, that actual performance will be in-line with the projections. Events outside of the control could prove the projections in error.  These events include, without limitation, the success or failure of additional initiatives or costs

savings, changes in the current economic environment (and particularly in the charitable fundraising sector), increased costs, fewer bidders at the Equity Auction, and changes due to the political and regulatory environment. Actual performance may vary from the projected performance.

### C. TAX RAMIFICATIONS

    1. **To Debtor:** The Debtor believes that the forgiveness of indebtedness which may result from a discharge granted by the confirmation of the Plan will not result in a significant tax consequence to the Debtor. The forgiveness of indebtedness, pursuant to the Internal Revenue Code, can be applied either to the Debtor's basis in its respective assets or to its net operating loss carry forward. The Debtor cannot accurately determine the amount and extent of any forgiveness of indebtedness. First, the Debtor must determine if all of the Claims that have been filed, or deemed filed within this Case, are accurate. Also, depending on whether the Debtor achieves or exceeds the projection in its current fiscal year, the Debtor may elect to apply any forgiveness of a debt in this directly to its basis. Despite the fact that the Debtor believes that it can either (a) apply such forgiveness of indebtedness to its net operating loss carry forward or (b) to its basis it is not expected that the amount of forgiveness of debt will be totally offset by the foregoing. However, once these net operating losses are used by the Debtor to

offset forgiveness of indebtedness, it cannot be used again. Taxes paid by the Debtor in the future years would, therefore, be impacted as a result of confirmation of the Plan.

2. **To Creditors:** The tax consequences to each Creditor resulting from confirmation of the Plan may vary depending upon each Creditor's particular circumstances. The Debtor recommends that Creditors or Holders of Claims obtain independent tax counsel to advise them as to the tax consequences of the Plan.

## VI. LEGAL REQUIREMENTS

### A. VOTING PROCEDURES

Under the Bankruptcy Code, the only classes that are entitled to vote to accept or reject a plan are classes of Claims, or equity Interests, that are impaired under the Plan. Accordingly, classes of Claims or Interests that are not impaired are not entitled to vote on the Plan.

Creditors that hold Claims in more than one impaired class are entitled to vote separately in each class. Such a Creditor will receive a separate ballot for all of its Claims in each class (in accordance with the records of the Clerk of the Court) and should complete and sign each ballot separately. A Creditor who asserts a Claim in more than one class and who has not been provided with sufficient ballots may photocopy the ballot received and file multiple ballots.

Votes on the Plan will be counted only with respect to Claims: (a) that are listed on the Debtor's Schedules of Assets and Liabilities other than as disputed, contingent or unliquidated; or (b) for which a Proof of Claim was filed on or before the Bar Date set by the Court for the filing of Proofs of Claim (except for certain Claims expressly excluded from that Bar Date or which are allowed by Court order). However, any vote by a Holder of a Claim will not be counted if such Claim has been Disallowed or is the subject of an unresolved objection, absent an order of the Court allowing such Claim for voting purposes pursuant to 11 U.S.C. § 502 and Bankruptcy Rule 3018.

Voting on the Plan by each Holder of a Claim or Interest in an impaired class is important. After carefully reviewing the Plan and Disclosure Statement, each Holder of such a Claim or Interest should vote on the enclosed ballot either to accept or to reject the Plan, and then return the ballot by mail to the Debtor's attorney by the deadline previously established by the Court.

Any ballot that does not appropriately indicate acceptance or rejection of the Plan will not be counted.

A ballot that is not received by the deadline will not be counted.

If a ballot is damaged, lost, or missing, a replacement ballot may be obtained by sending a written request to the Debtor's attorney.

## B.    ACCEPTANCE

The Bankruptcy Code defines acceptance of a plan by an impaired class of claims as acceptance by the holders of at least two-thirds in dollar amount, and more than one-half in number, of the claims of that class which actually cast ballots.  The Bankruptcy Code defines acceptance of a plan by an impaired class of equity interests as acceptance by holders of at least two-thirds in number of the equity interests of that class that actually cast ballots.  If no creditor or interest holder in an impaired class votes, then that class will be deemed to have accepted the Plan.

## C.    CONFIRMATION

11 U.S.C. § 1129(a) establishes conditions for the confirmation of a plan. These conditions are too numerous and detailed to be fully explained here.  Parties are encouraged to seek independent legal counsel to answer any questions concerning the Chapter 11 process.

Among the several conditions for confirmation of a plan under 11 U.S.C. § 1129(a) are these:  1) Each class of impaired creditors and interest must accept the plan, as described in VI. B above or, 2) Either each holder of a claim or interest in a class must accept the plan, or the plan must provide at least as much value as would be received upon liquidation under Chapter 7 of the Bankruptcy Code.

## D.   MODIFICATION

The Debtor reserves the right to modify or withdraw the Plan at any time before confirmation.

## E.   EFFECT OF CONFIRMATION

If the Plan is confirmed by the Court:

1. Its terms are binding on the Debtor, all creditors, shareholders and other parties in interest, regardless of whether they have accepted the Plan.

2. Except as provided in the plan:

   a. In the case of a corporation that is reorganizing and continuing business:

      i. All Claims and Interests will be discharged.

      ii. Creditors and shareholders will be prohibited from asserting their Claims against or Interests in the Debtor or its assets.

   b. In the case of a corporation that is liquidating and not continuing in business:

      i. Claims and Interests will not be discharged.

      ii. Creditors and shareholders will not be prohibited from asserting their Claims against or Interests in the Debtor or its assets.

   c. In the case of an individual or husband and wife:

      i. Claims will be discharged, except as provided in 11 U.S. C. §§ 523 and 727 (1).

    ii.    Creditors will be prohibited from asserting their claims except as to those debts which are not discharged or dischargeable under 11 U.S.C. §§ 523 and 727 (a).

Respectfully submitted,

CENTRAL PROCESSING SERVICES, LLC

By: _____

        Richard T. Cole

Its:    Co-Manager

Prepared by:

SCHAFER AND WEINER, PLLC

By: _____

JOHN J. STOCKDALE, JR. (P71561)
KIM K. HILLARY (P67534)
Attorneys for Debtor
40950 Woodward Ave., Ste. 100
Bloomfield Hills, MI 48304
248-540-3340
jstockdale@schaferandweiner.com
khilary@schaferandweiner.com

Dated:  July 3, 2019

Exhibit 1.2.33

## EQUITY PURCHASE AGREEMENT

This Equity Purchase Agreement (the "Agreement") made as of this ___ day of _____, 2019, by and between _____, a person/corporation (described in this Agreement as "Purchaser"), and the Debtor (as defined in the Plan). The Debtor and the Purchaser are each a "Party" and are together the "Parties."

## RECITALS

A.     Debtor is the subject of a bankruptcy proceeding that is currently pending before the United States Bankruptcy Court for the Eastern District of Michigan, Southern Division (the "Bankruptcy Court") styled *In re:Central Processing Services, LLC*, Case No. 19-43217-pjs, and currently pending before the Hon. Phillip J. Shefferly (the "Bankruptcy Case").

B.     The Debtor has filed its Combined Plan of Reorganization and Disclosure Statement, as may be amended, modified, and/or confirmed, (the "Plan") in the Bankruptcy Case.

C.     Under the terms of the Debtor's Plan, in the event that a Class of Unsecured Creditors votes to reject the Plan, all of the New Interests of the Debtor will be sold to the successful purchaser at the Equity Auction or an entity organized by the Purchaser.

D.     The Purchaser has read and understands the Plan.

E.     The Purchaser must comply with all the terms of the Plan and the Confirmation Order.

F.     The Debtor has conducted the Equity Auction required under the Plan relating to the sale of the Debtor's New Interests. Purchaser is the successful purchaser at the Equity Auction, having bid [$_____] (the "Purchase Price").

G.     Purchaser will, under the terms of this Agreement and upon the Effective Date of the Plan, become the owner of the Debtor's New Interests.

**NOW THEREFORE** in consideration of the mutual covenants herein contained, and other good and valuable consideration, now paid by each of the Parties to this Agreement to the other, the receipt and sufficiency of which is

hereby acknowledged, the Parties to this Agreement agree each with the other as follows:

## ARTICLE I
## DEFINITIONS

1.01  **Defined Terms.**  Unless otherwise set forth in this Agreement, all capitalized terms herein shall have the meanings ascribed to such terms in the Plan.

1.02  **Incorporation of Recitals.**  The recitals identified above are specifically incorporated and made part of this Agreement.

## ARTICLE II

2.01  **Purchase of the New Interests.**  Subject to compliance with the terms of this Agreement, Purchaser shall become the owner of the New Interests on the Effective Date.

2.02  **Payment of Purchase Price.**  Purchaser shall pay the Purchase Price by Cash or cash equivalents within twenty-four (24) hours after the execution of this Agreement.  Failure of Purchaser to timely pay the Purchase Price shall cause this Agreement to become null and void except that Purchaser shall be liable for any diminution in the price bid for the New Interests at any subsequent Equity Auction, plus the costs and expenses of holding a subsequent Equity Auction.

2.03  **Distribution of Auction Proceeds**  The Purchase Price shall be used to satisfy those items set forth in section 5.1.1.14 of the Plan.

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES

The Debtor and the Purchaser acknowledge that each is relying on the following representations and warranties of the other in entering into this Agreement and each, for itself only, specifically represents and warrants to the other that:

(a)  **Due Organization and Corporate Authority**

The representing Party is an Entity duly organized, validly existing and in good standing under the laws of the state in which such corporation was incorporated, organized or otherwise established.

(b) **Authorization**

The execution, delivery and performance of this Agreement has been duly authorized by all necessary corporate or company action on the representing Party's part.

(c) **Consents**

No consent, approval, authorization or order of, and no filing with or notification to, any domestic or foreign governmental agency, body, regulatory authority, bureau, commission or instrumentality, or other person or entity (including, without limitation, persons or entities having contractual relationships with the Purchaser or the Debtor, as applicable) is required to be made or obtained in connection with the execution, delivery and performance of this Agreement by each Party hereunder.

(d) **Absence of Conflicts**

The execution, delivery and performance of this Agreement are not prohibited by, and do not violate, any provision or result in the breach (in each case material with respect to the representing Party) of (a) the articles of incorporation, bylaws, articles of organization, or operating agreement, as applicable, of the representing Party, or (b) any contract, indenture, agreement, lease or license relating to the businesses of the representing party and to which the representing Party is a party or by which it or its properties or assets are bound.

(e) **Due Execution and Enforceability**

This Agreement has been duly executed and delivered by the representing Party and, assuming due authorization, execution and delivery of it by the other Party, constitutes a legal, valid and binding obligation of the representing Party in accordance with its terms subject to bankruptcy, insolvency, reorganization, moratorium or other similar laws of general application and to general equitable principles.

(f) **Survival of Representations and Warranties**

The representations and warranties provided for herein shall be true and correct on the Closing Date as if then made and shall, together with all other covenants herein, survive the execution hereof and the Effective Date of the Plan for a period of one (1) year.

(g) **Subject to Bankruptcy Court Approval
and the Occurrence of the Effective Date**

All of Debtor's representations and warranties hereunder are explicitly subject to final approval by the Bankruptcy Court, confirmation of the Plan, and the occurrence of the Effective Date of the Plan.

## ARTICLE IV
## GENERAL

### 4.01 Successors

This Agreement shall be binding upon and shall inure to the benefit of the Parties to this Agreement, their successors and their permitted assigns.

### 4.02 Time of the Essence

Time shall be of the essence of this Agreement and the transactions contemplated hereby.

### 4.03 Severability

The invalidity of any provision of this Agreement or any covenant herein contained on the part of any Party shall not affect the validity of any other provision or covenant contained in this Agreement.

### 4.04 Interpretation

The division of this Agreement into Articles and Sections and the insertion of headings are for convenience of reference only and shall not affect the construction or interpretation of this Agreement. The terms "this Agreement", "hereof", "herein", "hereunder" and similar expressions refer to this Agreement and not to any particular Article, Section or other portion hereof and include any agreement or instrument supplemental or ancillary hereto.

### 4.05 Entire Agreement

This Agreement together with the Plan and Confirmation Order, constitutes the entire agreement between the Parties respecting the subject matter hereof. There are not and shall not be any oral statements, representations, warranties, undertakings or agreements between the Parties. This Agreement may not be amended or modified in any respect except by written instruments signed by the duly authorized representatives of the Parties to this Agreement.

### 4.06 **Governing Law**

This Agreement has been entered into and delivered and shall be construed in accordance with and governed by the applicable laws of the State of Michigan and federal laws of the United States of America applicable therein without reference to its conflict of laws principles.

### 4.07 **Consent to Jurisdiction and Venue**

The Debtor and the Purchaser each specifically consent to jurisdiction of the Bankruptcy Court over any dispute arising under or relating to this Agreement, and further consent and agree that the Bankruptcy Court shall be the exclusive venue for any such disputes unless the Bankruptcy Court, of its own volition abstains from or otherwise refuses to adjudicate the dispute. The Debtor and the Purchaser agree and covenant that they will raise no objection to jurisdiction and venue of the Bankruptcy Court.

### 4.08 **Assignment**

This Agreement may not be assigned, in whole or in part, by any Party to this Agreement without the prior written consent of the other Party hereto, which consent may be granted or withheld in the sole discretion of the consenting Party.

**IN WITNESS WHEREOF** the parties hereto have executed this Agreement as of the date and year first above written.

**CENTRAL PROCESSING SERVICES, LLC**

By: _____
     Richard T. Cole
Its:   Co-Manager

**PURCHASER**

By: _____

Its: _____

## Exhibit A

### LIQUIDATION ANALYSIS

| Asset | Scheduled Value[1] | Percent Recovery | Liquidation Value |
|---|---|---|---|
| Cash | $7,526.70 | 100% | $7,526.70 |
| Account receivable[2] | $25,505.81 | 50% | $12,752.91 |
| Office Equipment | $135,076.00 | 25% | $33,769.00 |
| Mailroom Equipment | $40,650.00 | 50% | $20,325.00 |
| Officer Loan (Cole) | $398,181.27 | 0%[3] | $0.00 |
| Officer Loan (Burland) | $874,848.68 | 0%[4] | $0.00 |
| Third Party Cause of Action | $1,413,299.68 | 0.018%[5] | $25,745.42 |
| | | **TOTAL** | **$100,119.03** |

### Liquidation Waterfall

| Creditor.Class[6] | Aggregate Face Value of Claims | Percent Recovery | Amount Recovered |
|---|---|---|---|
| Class I – Secured Claims | | N/A | Return of Collateral and balance treated as Class II general unsecured claim |
| Class III – 507(a)(4) Claims | $13,650.00[7] | 100% | $13,650 |
| Group II – Priority Tax Claims | $105,892.81[8] | 81.66% | $86,469.03 |
| Class II – General Unsecured Creditors | $13,438,245.23 | 0% | $0.00 |

---

[1] *See* DN 27, Schedule A/B.

[2] Exclusive of doubtful accounts receivable, which have a face value of $1,592,583.76 and were treated as wholly uncollectible.

[3] Mr. Cole's collectability is questionable. He has been assessed by the Internal Revenue Service for approximately $6,000,000 in unpaid federal withholding and income taxes, and his assets may be subject to a federal tax lien. Additionally, Mr. Cole has not received any compensation from the Debtor for his services to the Debtor since 2017 and, as a result, may assert a setoff against the Debtor for the reasonable value of his past services.

[4] Mr. Burland's collectability is questionable. He has been assessed by the Internal Revenue Service for approximately $5,000,000 in unpaid federal withholding and income taxes, and his assets may be subject to a federal tax lien. Additionally, Mr. Burland has not received any compensation from the Debtor for his services to the Debtor since 2017 and, as a result, may assert a setoff against the Debtor for the reasonable value of his past services.

[5] This is compromised of two potential causes of action. The first is against Children's Leukemia Research Association for $38,425.70. The other is against Organizational Development, Inc. ("ODI") for $1,413,299.68, but ODI has ceased operating and is considered uncollectible.

[6] Listed in order of priority.

[7] *See* Proof of Claim No. 6, filed by Richard Dawson. The Debtor disputes this Claim, but for the purpose of this liquidation has assumed it is accurate. The Debtor reserves all of its rights and remedies with respect to Mr. Dawson's Claims.

[8] This amount is aggregate of priority tax claims identified on the Debtor's Schedule E/F. *See* DN 27. These claims may be higher or lower depending on when or whether the taxing authorities file proof of claim, which are not due until October 7, 2019. *See* DN 16. The Debtor reserves all of its rights and remedies with respect to any tax Claims.

{00801001.3}

# EXHIBIT B

Central Processing Services LLC - Check Detail

December 7, 2018 through March 5, 2019

| Type | Num | Date | Name | Account | Original Amount |
|------|-----|------|------|---------|-----------------|
| Bill Pmt -Check | 9223 | 12/10/2018 | MailFinance | 1040 · Citizens Bank | -617.75 |
| Bill Pmt -Check | 9224 | 12/10/2018 | Ricoh USA, Inc. | 1040 · Citizens Bank | -5,000.00 |
| Bill Pmt -Check | 9225 | 12/10/2018 | Robinson Welding Supply | 1040 · Citizens Bank | -7.45 |
| Bill Pmt -Check | 9226 | 12/10/2018 | Toshiba Financial Services | 1040 · Citizens Bank | 0.00 |
| Bill Pmt -Check | 9227 | 12/10/2018 | Toshiba Financial Services | 1040 · Citizens Bank | -3,355.75 |
| Check | 9255 | 12/12/2018 | Shellpoint Mortgage Servicing | 1040 · Citizens Bank | -5,215.68 |
| Check | 9256 | 12/13/2018 | Hopkins, Piet & Associates, Inc | 1040 · Citizens Bank | -2,440.00 |
| Bill Pmt -Check | 9257 | 12/13/2018 | On-Demand Mail Services | 1040 · Citizens Bank | -8,700.00 |
| Bill Pmt -Check | 9258 | 12/13/2018 | On-Demand Mail Services | 1040 · Citizens Bank | -8,700.00 |
| Bill Pmt -Check | 9259 | 12/13/2018 | On-Demand Mail Services | 1040 · Citizens Bank | -8,700.00 |
| Bill Pmt -Check | 9260 | 12/13/2018 | On-Demand Mail Services | 1040 · Citizens Bank | -8,700.00 |
| Bill Pmt -Check | 9261 | 12/13/2018 | On-Demand Mail Services | 1040 · Citizens Bank | -8,700.00 |
| Bill Pmt -Check | 9262 | 12/13/2018 | American Data Security, Inc | 1040 · Citizens Bank | -370.00 |
| Bill Pmt -Check | 9263 | 12/13/2018 | FedEx | 1040 · Citizens Bank | -267.89 |
| Bill Pmt -Check | 9264 | 12/13/2018 | Oakland County Treasurer | 1040 · Citizens Bank | -479.87 |
| Bill Pmt -Check | 9265 | 12/13/2018 | Staples Advantage | 1040 · Citizens Bank | -278.93 |
| Bill Pmt -Check | 9266 | 12/13/2018 | R P Solutions, Inc. | 1040 · Citizens Bank | -2,500.00 |
| Bill Pmt -Check | 9294 | 12/18/2018 | Ricoh USA, Inc. | 1040 · Citizens Bank | -5,000.00 |
| Bill Pmt -Check | 9295 | 12/18/2018 | Toshiba Financial Services | 1040 · Citizens Bank | -3,589.76 |
| Check | 9296 | 12/19/2018 | The UPS Store - UBCF GA | 1040 · Citizens Bank | -389.35 |
| Bill Pmt -Check | 9297 | 12/19/2018 | R P Solutions, Inc. | 1040 · Citizens Bank | -2,500.00 |
| Check | 9298 | 12/20/2018 | Hopkins, Piet & Associates, Inc | 1040 · Citizens Bank | -2,440.00 |
| Bill Pmt -Check | 9299 | 12/21/2018 | FedEx | 1040 · Citizens Bank | -354.83 |
| Bill Pmt -Check | 9304 | 12/24/2018 | IRS | 1040 · Citizens Bank | -620.00 |
| Check | 9327 | 12/27/2018 | Hopkins, Piet & Associates, Inc | 1040 · Citizens Bank | -2,440.00 |
| Bill Pmt -Check | 9328 | 12/27/2018 | American Data Security, Inc | 1040 · Citizens Bank | -370.00 |
| Bill Pmt -Check | 9329 | 12/27/2018 | Blue Cross Blue Shield | 1040 · Citizens Bank | -6,218.44 |
| Bill Pmt -Check | 9330 | 12/27/2018 | FedEx | 1040 · Citizens Bank | -475.31 |
| Bill Pmt -Check | 9331 | 12/27/2018 | GTT Communications | 1040 · Citizens Bank | -1,514.10 |
| Bill Pmt -Check | 9332 | 12/27/2018 | Mechanical Comfort, Inc | 1040 · Citizens Bank | -440.00 |
| Bill Pmt -Check | 9333 | 12/27/2018 | Staples Advantage | 1040 · Citizens Bank | -445.26 |
| Bill Pmt -Check | 9334 | 12/27/2018 | Toshiba Business Solutions | 1040 · Citizens Bank | -22.01 |
| Bill Pmt -Check | 9335 | 12/27/2018 | Toshiba Financial Services | 1040 · Citizens Bank | -2,795.03 |
| Bill Pmt -Check | 9336 | 12/27/2018 | On-Demand Mail Services | 1040 · Citizens Bank | -5,900.00 |
| Bill Pmt -Check | 9337 | 12/27/2018 | On-Demand Mail Services | 1040 · Citizens Bank | -5,900.00 |

# Central Processing Services LLC - Check Detail

## December 7, 2018 through March 5, 2019

| Type | Num | Date | Name | Account | Amount |
|------|-----|------|------|---------|--------|
| Bill Pmt -Check | 9338 | 12/27/2018 | On-Demand Mall Services | 1040 · Citizens Bank | -5,900.00 |
| Check | 9367 | 01/03/2019 | Hopkins, Piet & Associates, Inc | 1040 · Citizens Bank | -1,830.00 |
| Bill Pmt -Check | 9403 | 01/07/2019 | On-Demand Mall Services | 1040 · Citizens Bank | -9,000.00 |
| Bill Pmt -Check | 9404 | 01/07/2019 | On-Demand Mall Services | 1040 · Citizens Bank | -9,000.00 |
| Bill Pmt -Check | 9405 | 01/07/2019 | On-Demand Mall Services | 1040 · Citizens Bank | -9,000.00 |
| Bill Pmt -Check | 9406 | 01/07/2019 | On-Demand Mall Services | 1040 · Citizens Bank | -9,000.00 |
| Bill Pmt -Check | 9407 | 01/07/2019 | On-Demand Mall Services | 1040 · Citizens Bank | -9,000.00 |
| Check | 9408 | 01/07/2019 | Eddie Dandridge II | 1040 · Citizens Bank | -428.63 |
| Check | 9409 | 01/09/2019 | Petty Cash | 1040 · Citizens Bank | -1,477.49 |
| Check | 9410 | 01/10/2019 | Cathee Andary | 1040 · Citizens Bank | -125.05 |
| Check | 9411 | 01/10/2019 | The UPS Store - WCF IL | 1040 · Citizens Bank | -56.67 |
| Check | 9412 | 01/10/2019 | Hopkins, Piet & Associates, Inc | 1040 · Citizens Bank | -1,830.00 |
| Check | 9413 | 01/10/2019 | Hopkins, Piet & Associates, Inc | 1040 · Citizens Bank | -1,464.00 |
| Bill Pmt -Check | 9414 | 01/11/2019 | American Data Security, Inc | 1040 · Citizens Bank | -340.00 |
| Bill Pmt -Check | 9415 | 01/11/2019 | FedEx | 1040 · Citizens Bank | -303.48 |
| Bill Pmt -Check | 9416 | 01/11/2019 | GTT Communications | 1040 · Citizens Bank | -22.71 |
| Bill Pmt -Check | 9418 | 01/11/2019 | Pitney Bowes Global Financial | 1040 · Citizens Bank | -53.60 |
| Bill Pmt -Check | 9419 | 01/11/2019 | R P Solutions, Inc. | 1040 · Citizens Bank | -1,000.00 |
| Bill Pmt -Check | 9420 | 01/11/2019 | Robinson Welding Supply | 1040 · Citizens Bank | -7.45 |
| Bill Pmt -Check | 9421 | 01/11/2019 | Staples Advantage | 1040 · Citizens Bank | -677.55 |
| Bill Pmt -Check | 9427 | 01/11/2019 | Mail Delivery Service | 1040 · Citizens Bank | -1,200.00 |
| Bill Pmt -Check | 9462 | 01/16/2019 | On-Demand Mall Services | 1040 · Citizens Bank | -9,200.00 |
| Bill Pmt -Check | 9463 | 01/16/2019 | On-Demand Mall Services | 1040 · Citizens Bank | -9,200.00 |
| Bill Pmt -Check | 9464 | 01/16/2019 | On-Demand Mall Services | 1040 · Citizens Bank | -9,200.00 |
| Bill Pmt -Check | 9465 | 01/16/2019 | On-Demand Mall Services | 1040 · Citizens Bank | 0.00 |
| Bill Pmt -Check | 9466 | 01/16/2019 | On-Demand Mall Services | 1040 · Citizens Bank | 0.00 |
| Bill Pmt -Check | 9467 | 01/16/2019 | On-Demand Mall Services | 1040 · Citizens Bank | 0.00 |
| Check | 9468 | 01/17/2019 | Hopkins, Piet & Associates, Inc | 1040 · Citizens Bank | -2,440.00 |
| Bill Pmt -Check | 9469 | 01/17/2019 | FedEx | 1040 · Citizens Bank | -227.54 |
| Bill Pmt -Check | 9470 | 01/17/2019 | MacMurray & Shuster | 1040 · Citizens Bank | 0.00 |
| Bill Pmt -Check | 9471 | 01/17/2019 | Staples Advantage | 1040 · Citizens Bank | -546.83 |
| Bill Pmt -Check | 9472 | 01/17/2019 | Toshiba Financial Services | 1040 · Citizens Bank | 0.00 |
| Bill Pmt -Check | 9473 | 01/17/2019 | Wells Fargo Vendor Financial Services | 1040 · Citizens Bank | -2,900.00 |
| Bill Pmt -Check | 9478 | 01/21/2019 | Ricoh USA, Inc. | 1040 · Citizens Bank | 0.00 |
| Bill Pmt -Check | 9513 | 01/23/2019 | IRS | 1040 · Citizens Bank | -620.00 |
| Bill Pmt -Check | 9514 | 01/23/2019 | R P Solutions, Inc. | 1040 · Citizens Bank | -817.00 |

# Central Processing Services LLC - Check Detail
## December 7, 2018 through March 5, 2019

| Type | Num | Date | Name | Account | Amount |
|---|---|---|---|---|---|
| Bill Pmt -Check | 9515 | 01/23/2019 | Rubber Stamps Unlimited, Inc. | 1040 · Citizens Bank | -30.70 |
| Check | 9516 | 01/24/2019 | Hopkins, Piet & Associates, Inc | 1040 · Citizens Bank | -2,440.00 |
| Bill Pmt -Check | 9517 | 01/24/2019 | On-Demand Mail Services | 1040 · Citizens Bank | -9,000.00 |
| Bill Pmt -Check | 9518 | 01/24/2019 | On-Demand Mail Services | 1040 · Citizens Bank | -9,000.00 |
| Bill Pmt -Check | 9519 | 01/24/2019 | On-Demand Mail Services | 1040 · Citizens Bank | 0.00 |
| Bill Pmt -Check | 9520 | 01/24/2019 | On-Demand Mail Services | 1040 · Citizens Bank | 0.00 |
| Bill Pmt -Check | 9521 | 01/24/2019 | On-Demand Mail Services | 1040 · Citizens Bank | 0.00 |
| Bill Pmt -Check | 9522 | 01/24/2019 | American Data Security, Inc | 1040 · Citizens Bank | -370.00 |
| Bill Pmt -Check | 9523 | 01/24/2019 | FedEx | 1040 · Citizens Bank | -338.01 |
| Check | 9565 | 01/31/2019 | Petty Cash | 1040 · Citizens Bank | -2,500.00 |
| Check | 9566 | 01/31/2019 | Hopkins, Piet & Associates, Inc | 1040 · Citizens Bank | -2,440.00 |
| Bill Pmt -Check | 9603 | 02/06/2019 | City of Southfield | 1040 · Citizens Bank | -717.63 |
| Bill Pmt -Check | 9604 | 02/06/2019 | FedEx | 1040 · Citizens Bank | -308.18 |
| Bill Pmt -Check | 9605 | 02/06/2019 | GTT Communications | 1040 · Citizens Bank | -1,537.15 |
| Bill Pmt -Check | 9606 | 02/06/2019 | Staples Advantage | 1040 · Citizens Bank | -423.10 |
| Check | 9608 | 02/06/2019 | Lamento Mailing Systems, Inc. | 1040 · Citizens Bank | -1,500.00 |
| Check | 9609 | 02/07/2019 | Hopkins, Piet & Associates, Inc | 1040 · Citizens Bank | -2,440.00 |
| Check | 9610 | 02/07/2019 | Park Place | 1040 · Citizens Bank | -153.70 |
| Check | 9656 | 02/14/2019 | Hopkins, Piet & Associates, Inc | 1040 · Citizens Bank | -2,440.00 |
| Check | 9657 | 02/14/2019 | Petty Cash | 1040 · Citizens Bank | 0.00 |
| Check | 9658 | 02/14/2019 | Petty Cash | 1040 · Citizens Bank | 0.00 |
| Check | 9659 | 02/14/2019 | Petty Cash | 1040 · Citizens Bank | -2,800.00 |
| Bill Pmt -Check | 9660 | 02/15/2019 | Accident Fund | 1040 · Citizens Bank | -848.75 |
| Bill Pmt -Check | 9661 | 02/15/2019 | American Data Security, Inc | 1040 · Citizens Bank | -370.00 |
| Bill Pmt -Check | 9662 | 02/15/2019 | FedEx | 1040 · Citizens Bank | -508.79 |
| Bill Pmt -Check | 9663 | 02/15/2019 | Mail Delivery Service | 1040 · Citizens Bank | -1,290.75 |
| Bill Pmt -Check | 9664 | 02/15/2019 | Mechanical Comfort, Inc | 1040 · Citizens Bank | -285.00 |
| Bill Pmt -Check | 9665 | 02/15/2019 | R P Solutions, Inc. | 1040 · Citizens Bank | -1,500.00 |
| Bill Pmt -Check | 9666 | 02/15/2019 | Staples Advantage | 1040 · Citizens Bank | -41.11 |
| Bill Pmt -Check | 9667 | 02/15/2019 | Wells Fargo Vendor Financial Services | 1040 · Citizens Bank | -2,879.57 |
| Check | 9708 | 02/20/2019 | Lamento Mailing Systems, Inc. | 1040 · Citizens Bank | -1,500.00 |
| Check | 9709 | 02/21/2019 | Hopkins, Piet & Associates, Inc | 1040 · Citizens Bank | -2,440.00 |
| Bill Pmt -Check | 9713 | 02/25/2019 | Ricoh USA, Inc. | 1040 · Citizens Bank | -8,164.86 |
| Bill Pmt -Check | 9714 | 02/25/2019 | IRS | 1040 · Citizens Bank | -620.00 |
| Check | 9749 | 02/27/2019 | Petty Cash | 1040 · Citizens Bank | 0.00 |
| Check | 9750 | 02/28/2019 | Hopkins, Piet & Associates, Inc | 1040 · Citizens Bank | -2,440.00 |

# Central Processing Services LLC - Check Detail
## December 7, 2018 through March 5, 2019

| Type | Num | Date | Name | Account | Amount |
|---|---|---|---|---|---|
| Bill Pmt -Check | 9751 | 02/28/2019 | American Data Security, Inc | 1040 · Citizens Bank | -370.00 |
| Bill Pmt -Check | 9752 | 02/28/2019 | Bell and Howell, LLC | 1040 · Citizens Bank | -121.02 |
| Bill Pmt -Check | 9753 | 02/28/2019 | Deluxe Business Checks and Solutions | 1040 · Citizens Bank | -376.36 |
| Bill Pmt -Check | 9754 | 02/28/2019 | FedEx | 1040 · Citizens Bank | -716.12 |
| Bill Pmt -Check | 9755 | 02/28/2019 | GTT Communications | 1040 · Citizens Bank | -1,537.16 |
| Bill Pmt -Check | 9756 | 02/28/2019 | Lori J Frank PC | 1040 · Citizens Bank | -500.00 |
| Bill Pmt -Check | 9757 | 02/28/2019 | Mail Delivery Service | 1040 · Citizens Bank | -1,500.00 |
| Bill Pmt -Check | 9758 | 02/28/2019 | MailFinance | 1040 · Citizens Bank | -1,251.43 |
| Bill Pmt -Check | 9759 | 02/28/2019 | Toshiba Business Solutions | 1040 · Citizens Bank | -893.11 |
| Bill Pmt -Check | 9760 | 02/28/2019 | Staples Advantage | 1040 · Citizens Bank | -136.22 |
| Bill Pmt -Check | 9798 | 03/04/2019 | Ricoh USA, Inc. | 1040 · Citizens Bank | -5,433.24 |
| Check | ACH | 12/07/2018 | Fidelity Investments | 1040 · Citizens Bank | -224.85 |
| Check | ACH | 12/10/2018 | Paycom | 1040 · Citizens Bank | -6,842.29 |
| Check | ACH | 12/17/2018 | Paycom | 1040 · Citizens Bank | -6,786.27 |
| Check | ACH | 12/17/2018 | Citizens Bank | 1040 · Citizens Bank | -938.16 |
| Check | ACH | 12/18/2018 | Fidelity Investments | 1040 · Citizens Bank | -232.64 |
| Check | ACH | 12/20/2018 | Citizens Bank | 1040 · Citizens Bank | -117.00 |
| Check | ACH | 12/20/2018 | Fidelity Investments | 1040 · Citizens Bank | -201.23 |
| Check | ACH | 12/21/2018 | Fidelity Investments | 1040 · Citizens Bank | -212.52 |
| Check | ACH | 12/24/2018 | Paycom | 1040 · Citizens Bank | -6,902.21 |
| Check | ACH | 12/28/2018 | Paycom | 1040 · Citizens Bank | -7,990.74 |
| Check | ACH | 01/08/2019 | Citizens Bank | 1040 · Citizens Bank | -117.00 |
| Check | ACH | 01/11/2019 | Paycom | 1040 · Citizens Bank | -4,636.14 |
| Check | ACH | 01/14/2019 | Fidelity Investments | 1040 · Citizens Bank | -226.80 |
| Check | ACH | 01/14/2019 | Paycom | 1040 · Citizens Bank | -11,110.89 |
| Check | ACH | 01/17/2019 | Citizens Bank | 1040 · Citizens Bank | -989.49 |
| Check | ACH | 01/17/2019 | Citizens Bank | 1040 · Citizens Bank | -39.00 |
| Check | ACH | 01/18/2019 | Fidelity Investments | 1040 · Citizens Bank | -67.53 |
| Check | ACH | 01/18/2019 | Citizens Bank | 1040 · Citizens Bank | -117.00 |
| Check | ACH | 01/22/2019 | Paycom | 1040 · Citizens Bank | -4,893.69 |
| Check | ACH | 01/24/2019 | Paycom | 1040 · Citizens Bank | -10,972.12 |
| Check | ACH | 01/25/2019 | Fidelity Investments | 1040 · Citizens Bank | -292.25 |
| Check | ACH | 02/04/2019 | Citizens Bank | 1040 · Citizens Bank | -156.00 |
| Check | ACH | 02/11/2019 | Paycom | 1040 · Citizens Bank | -6,950.49 |
| Check | ACH | 02/11/2019 | Paycom | 1040 · Citizens Bank | -10,758.29 |
| Check | ACH | 02/14/2019 | Citizens Bank | 1040 · Citizens Bank | -10.00 |

# Central Processing Services LLC - Check Detail
## December 7, 2018 through March 5, 2019

| Type | | Date | Payee | Account | Amount |
|---|---|---|---|---|---|
| Check | ACH | 02/19/2019 | Paycom | 1040 · Citizens Bank | -10,681.19 |
| Check | ACH | 02/19/2019 | Citizens Bank | 1040 · Citizens Bank | -1,046.97 |
| Check | ACH | 02/19/2019 | Fidelity Investments | 1040 · Citizens Bank | -293.52 |
| Check | ACH | 02/19/2019 | Fidelity Investments | 1040 · Citizens Bank | -335.83 |
| Check | ACH | 02/19/2019 | Fidelity Investments | 1040 · Citizens Bank | -337.51 |
| Check | ACH | 02/22/2019 | Citizens Bank | 1040 · Citizens Bank | -156.00 |
| Check | ACH | 02/25/2019 | Citizens Bank | 1040 · Citizens Bank | -35.00 |
| Bill Pmt -Check | ACH | 03/01/2019 | Microsoft Corporation | 1040 · Citizens Bank | -224.00 |
| Check | ACH | 03/04/2019 | Paycom | 1040 · Citizens Bank | -10,409.01 |
| Bill Pmt -Check | Cashiers Ck | 02/14/2019 | Blue Cross Blue Shield | 1040 · Citizens Bank | -6,218.44 |
| Bill Pmt -Check | Cashiers Ck | 02/28/2019 | Blue Cross Blue Shield | 1040 · Citizens Bank | -6,218.44 |
| Bill Pmt -Check | Wire | 12/10/2018 | Bull Run Press Inc. | 1040 · Citizens Bank | -20,000.00 |
| Bill Pmt -Check | Wire | 12/14/2018 | On-Demand Mail Services | 1040 · Citizens Bank | -17,700.00 |
| Bill Pmt -Check | Wire | 12/14/2018 | Bull Run Press Inc. | 1040 · Citizens Bank | -10,000.00 |
| Bill Pmt -Check | Wire | 12/17/2018 | Bull Run Press Inc. | 1040 · Citizens Bank | -10,000.00 |
| Bill Pmt -Check | Wire | 12/18/2018 | Bull Run Press Inc. | 1040 · Citizens Bank | -5,000.00 |
| Bill Pmt -Check | Wire | 12/21/2018 | Bull Run Press Inc. | 1040 · Citizens Bank | -10,000.00 |
| Bill Pmt -Check | Wire | 12/28/2018 | Bull Run Press Inc. | 1040 · Citizens Bank | -15,000.00 |
| Bill Pmt -Check | Wire | 01/04/2019 | Bull Run Press Inc. | 1040 · Citizens Bank | -10,000.00 |
| Check | Wire | 01/07/2019 | Paycom | 1040 · Citizens Bank | -12,112.24 |
| Bill Pmt -Check | Wire | 01/09/2019 | On-Demand Mail Services | 1040 · Citizens Bank | -11,800.00 |
| Bill Pmt -Check | Wire | 01/10/2019 | Bull Run Press Inc. | 1040 · Citizens Bank | -5,000.00 |
| Bill Pmt -Check | Wire | 01/11/2019 | Bull Run Press Inc. | 1040 · Citizens Bank | -10,000.00 |
| Bill Pmt -Check | Wire | 01/14/2019 | Bull Run Press Inc. | 1040 · Citizens Bank | -10,000.00 |
| Bill Pmt -Check | Wire | 01/15/2019 | Bull Run Press Inc. | 1040 · Citizens Bank | -10,000.00 |
| Bill Pmt -Check | Wire | 01/17/2019 | Bull Run Press Inc. | 1040 · Citizens Bank | -5,000.00 |
| Bill Pmt -Check | Wire | 01/18/2019 | Bull Run Press Inc. | 1040 · Citizens Bank | -5,000.00 |
| Bill Pmt -Check | Wire | 01/23/2019 | Bull Run Press Inc. | 1040 · Citizens Bank | -10,000.00 |
| Check | Wire | 01/24/2019 | Citizens Bank | 1040 · Citizens Bank | -117.00 |
| Bill Pmt -Check | Wire | 01/25/2019 | On-Demand Mail Services | 1040 · Citizens Bank | -9,200.00 |

# Central Processing Services LLC - Check Detail
## December 7, 2018 through March 5, 2019

| Type | Date | Name | Account | Amount |
|---|---|---|---|---|
| Check | 01/29/2019 | Citizens Bank | 1040 · Citizens Bank | -78.00 |
| Check | 01/30/2019 | Citizens Bank | 1040 · Citizens Bank | -156.00 |
| Bill Pmt -Check | 01/31/2019 | On-Demand Mail Services | 1040 · Citizens Bank | -9,000.00 |
| Bill Pmt -Check | 02/01/2019 | Bull Run Press Inc. | 1040 · Citizens Bank | -15,000.00 |
| Bill Pmt -Check | 02/01/2019 | On-Demand Mail Services | 1040 · Citizens Bank | -30,000.00 |
| Check | 02/04/2019 | On-Demand Mail Services | 1040 · Citizens Bank | -10,000.00 |
| Check | 02/07/2019 | On-Demand Mail Services | 1040 · Citizens Bank | -21,000.00 |
| Bill Pmt -Check | 02/08/2019 | Bull Run Press Inc. | 1040 · Citizens Bank | -10,000.00 |
| Check | 02/08/2019 | On-Demand Mail Services | 1040 · Citizens Bank | -9,000.00 |
| Check | 02/11/2019 | On-Demand Mail Services | 1040 · Citizens Bank | -8,471.00 |
| Bill Pmt -Check | 02/11/2019 | Ricoh USA, Inc. | 1040 · Citizens Bank | -21,184.44 |
| Check | 02/13/2019 | Citizens Bank | 1040 · Citizens Bank | -156.00 |
| Check | 02/15/2019 | On-Demand Mail Services | 1040 · Citizens Bank | -10,000.00 |
| Bill Pmt -Check | 02/19/2019 | Bull Run Press Inc. | 1040 · Citizens Bank | -20,000.00 |
| Bill Pmt -Check | 02/22/2019 | Bull Run Press Inc. | 1040 · Citizens Bank | -10,000.00 |
| Check | 02/22/2019 | On-Demand Mail Services | 1040 · Citizens Bank | -10,000.00 |
| Bill Pmt -Check | 02/25/2019 | Bull Run Press Inc. | 1040 · Citizens Bank | -5,000.00 |
| Bill Pmt -Check | 02/27/2019 | Bull Run Press Inc. | 1040 · Citizens Bank | -10,000.00 |
| Check | 02/27/2019 | On-Demand Mail Services | 1040 · Citizens Bank | -35,000.00 |
| Bill Pmt -Check | 03/01/2019 | Bull Run Press Inc. | 1040 · Citizens Bank | -15,000.00 |
| Check | 03/01/2019 | On-Demand Mail Services | 1040 · Citizens Bank | -25,000.00 |
| Bill Pmt -Check | 03/04/2019 | Bull Run Press Inc. | 1040 · Citizens Bank | -5,000.00 |
| TOTAL | | | | -859,202.56 |

# EXHIBIT C

# Central Processing Services LLC
## Profit & Loss
### January 1 through March 6, 2019

| | Jan 1 - Mar 6, 19 |
|---|---|
| **Ordinary Income/Expense** | |
| **Income** | |
| 4070 · Services | 2,844.96 |
| 4199 · Commissions Received | 959,739.70 |
| **Total Income** | 962,584.66 |
| **Gross Profit** | 962,584.66 |
| **Expense** | |
| 6120 · Bank Service Charges | 3,559.78 |
| 6135 · Contract Labor | 22,204.00 |
| 6145 · Commission | 311,189.28 |
| 6147 · Computer Expense | 6,063.72 |
| 6150 · Depreciation Expense | 20,000.00 |
| 6165 · Education | 0.00 |
| 6175 · Employee Relations | 7.45 |
| 6180 · Insurance | |
| 6186 · Employee Life Ins | 476.28 |
| 6181 · Medical | 25,488.20 |
| 6420 · Work Comp | 1,697.50 |
| **Total 6180 · Insurance** | 27,661.98 |
| 6200 · Interest Expense | 51.28 |
| 6235 · Mail Room Equipment Parts | |
| 6235A · Mail Room Equipment Repair | 3,000.00 |
| 6235 · Mail Room Equipment Parts - Other | 2,143.50 |
| **Total 6235 · Mail Room Equipment Parts** | 5,143.50 |
| 6236 · Maintenance Contract | 6,656.45 |
| 6240 · Miscellaneous | 750.00 |
| 6242 · Office Expense | 16,559.67 |
| 6245 · Payroll | |
| 6245C · Bonus | 1,350.00 |
| 6245 · Payroll - Other | 352,170.84 |
| **Total 6245 · Payroll** | 353,520.84 |
| 6247 · Payroll fees | 3,761.48 |
| 6250 · Postage and Delivery | |
| 6253 · Forwarding Funds | 56.67 |
| 6250 · Postage and Delivery - Other | 276,618.88 |
| **Total 6250 · Postage and Delivery** | 276,675.55 |
| 6260 · Printing and Reproduction | 64,315.30 |
| 6270 · Professional Fees | |
| 6280 · Legal Fees | 0.00 |
| **Total 6270 · Professional Fees** | 0.00 |
| 6290 · Rent | 55,787.49 |
| 6350 · Travel & Ent | |
| 6380 · Travel | 55.05 |
| **Total 6350 · Travel & Ent** | 55.05 |
| 6390 · Utilities | |
| 6400 · Gas and Electric | 4,016.70 |
| 6390 · Utilities - Other | 2,008.35 |
| **Total 6390 · Utilities** | 6,025.05 |
| 6550 · Office Supplies | 1,172.25 |
| 6820 · Taxes | |
| 6821 · Federal Unemployment Taxes | 921.02 |
| 6835 · FICA & Medicare | 16,774.46 |

Page 1

# Central Processing Services LLC
## Profit & Loss
### January 1 through March 6, 2019

|  | Jan 1 - Mar 6, 19 |
|---|---|
| 6845 · State of Michigan Unemployment | 9,181.66 |
| Total 6820 · Taxes | 26,877.14 |
| Total Expense | 1,208,157.26 |
| Net Ordinary Income | -245,572.60 |
| Other Income/Expense | |
| Other Expense | |
| 8030 · Late fees | 6,064.22 |
| Total Other Expense | 6,064.22 |
| Net Other Income | -6,064.22 |
| Net Income | -251,636.82 |

# Central Processing Services LLC
## Balance Sheet
### As of March 6, 2019

| | Mar 6, 19 |
|---|---|
| **ASSETS** | |
| **Current Assets** | |
| **Checking/Savings** | |
| 1002 · Comerica | 250.00 |
| 1010 · Bank of America | 1,409.93 |
| 1040 · Citizens Bank | -10,863.58 |
| 1041 · Citizens - savings | 50.09 |
| 1075 · Best Bank | 431.00 |
| **Total Checking/Savings** | -8,722.56 |
| **Accounts Receivable** | |
| 1200 · Accounts Receivable | 1,618,092.57 |
| **Total Accounts Receivable** | 1,618,092.57 |
| **Other Current Assets** | |
| 1124 · Exchange | 3,403.70 |
| 1218 · Receivable - Dale Corp | 334.47 |
| 1251 · Officer Loan Rec - Cole | 392,881.27 |
| 1252 · Off Loan rec - Burland | 857,728.00 |
| **Total Other Current Assets** | 1,254,347.44 |
| **Total Current Assets** | 2,863,717.45 |
| **Fixed Assets** | |
| 1800 · Equipment | 1,104,787.78 |
| 1801 · Leasehold Improvements | 95,777.29 |
| 1820 · Accumulated Depreciation | -889,782.00 |
| **Total Fixed Assets** | 310,783.07 |
| **TOTAL ASSETS** | 3,174,500.52 |
| **LIABILITIES & EQUITY** | |
| **Liabilities** | |
| **Current Liabilities** | |
| **Accounts Payable** | |
| 2001 · Accounts Payable-Post Petition | 185.00 |
| 2000 · Accounts Payable | 737,874.15 |
| **Total Accounts Payable** | 738,059.15 |
| **Other Current Liabilities** | |
| 2160 · Loan Payable - FJ&H | 25,000.00 |
| 2110 · Accrued FICA & Fedl W/H | 93,254.88 |
| 2115 · Accrued Mich W/H | 12,228.61 |
| 2120 · Accrued Detroit W/H | 318.08 |
| 2121 · Accrued Port Huron WH | 91.24 |
| 2125 · Accrued 401K | 8,813.78 |
| 2130 · Accrued Medical Ins | -30,229.68 |
| 2131 · Accr Dental/Vision | -2,125.84 |
| 2135 · Accrued Garnishments | 841.74 |
| 2139 · Unfunded Payroll Taxes | 174,349.78 |
| 2140 · Accrued FUTA | -385.77 |
| 2141 · Accrued Mich Unemployment | 2,948.28 |
| 2142 · Accrued Payroll | 30,562.82 |
| 2143 · Accrued Wages - Directors | 75,383.38 |
| 2147 · Payable - CSA | 106,950.34 |
| 2148 · Payable - Assoc Community Svcs | 3,564,616.82 |
| 2155 · Amy Burland | 35,000.00 |
| **Total Other Current Liabilities** | 4,097,618.46 |
| **Total Current Liabilities** | 4,835,677.61 |
| **Long Term Liabilities** | |
| 2220 · Lease Payable- Ricoh | 5,133.77 |

Page 1

# Central Processing Services LLC
## Balance Sheet
### As of March 6, 2019

|  | Mar 6, 19 |
|---|---|
| 2230 · Lease Payable - Ricoh 2 prntrs | 304,543.12 |
| **Total Long Term Liabilities** | 309,676.89 |
| **Total Liabilities** | 5,145,354.50 |
| **Equity** | |
| 3110 · Retained Earnings | -1,041,010.77 |
| 3135 · Partner One Equity | |
| 3145 · Partner One Draws-Cole | -214,000.00 |
| 3135 · Partner One Equity - Other | -121,419.70 |
| **Total 3135 · Partner One Equity** | -335,419.70 |
| 3170 · Partner Two Equity | |
| 3180 · Partner Two Draws-Burland | -215,860.00 |
| 3170 · Partner Two Equity - Other | -121,626.69 |
| **Total 3170 · Partner Two Equity** | -337,486.69 |
| **Net Income** | -256,936.82 |
| **Total Equity** | -1,970,853.98 |
| **TOTAL LIABILITIES & EQUITY** | 3,174,500.52 |

# Central Processing Services LLC
## Balance Sheet
### As of December 31, 2018

|  | Dec 31, 18 |
|---|---|
| **ASSETS** | |
| **Current Assets** | |
| **Checking/Savings** | |
| 1002 · Comerica | 250.00 |
| 1010 · Bank of America | 1,439.93 |
| 1040 · Citizens Bank | -39,835.96 |
| 1041 · Citizens - savings | 50.09 |
| 1075 · Best Bank | 441.00 |
| **Total Checking/Savings** | -37,654.94 |
| **Accounts Receivable** | |
| 1200 · Accounts Receivable | 1,635,887.93 |
| **Total Accounts Receivable** | 1,635,887.93 |
| **Other Current Assets** | |
| 1124 · Exchange | 480.70 |
| 1218 · Receivable - Dale Corp | 334.47 |
| 1251 · Officer Loan Rec - Cole | 392,881.27 |
| 1252 · Off Loan rec - Burland | 857,728.00 |
| 1560 · Prepaid Insurance | 848.75 |
| **Total Other Current Assets** | 1,252,273.19 |
| **Total Current Assets** | 2,850,506.18 |
| **Fixed Assets** | |
| 1800 · Equipment | 1,104,787.78 |
| 1801 · Leasehold Improvements | 95,777.29 |
| 1820 · Accumulated Depreciation | -869,782.00 |
| **Total Fixed Assets** | 330,783.07 |
| **TOTAL ASSETS** | 3,181,289.25 |
| **LIABILITIES & EQUITY** | |
| **Liabilities** | |
| **Current Liabilities** | |
| **Accounts Payable** | |
| 2000 · Accounts Payable | 766,928.52 |
| **Total Accounts Payable** | 766,928.52 |
| **Other Current Liabilities** | |
| 2160 · Loan Payable - FJ&H | 25,000.00 |
| 2110 · Accrued FICA & Fedl W/H | 104,039.81 |
| 2115 · Accrued Mich W/H | 13,490.94 |
| 2120 · Accrued Detroit W/H | 415.30 |
| 2121 · Accrued Port Huron WH | 100.22 |
| 2125 · Accrued 401K | 11,285.10 |
| 2130 · Accrued Medical Ins | -28,694.31 |
| 2131 · Accr Dental/Vision | -2,212.91 |
| 2135 · Accrued Garnishments | 862.54 |
| 2139 · Unfunded Payroll Taxes | 174,349.78 |
| 2140 · Accrued FUTA | 0.33 |
| 2142 · Accrued Payroll | 30,562.82 |
| 2143 · Accrued Wages - Directors | 75,383.38 |
| 2147 · Payable - CSA | 104,500.00 |
| 2148 · Payable - Assoc Community Svcs | 3,261,641.46 |
| 2155 · Amy Burland | 35,000.00 |
| **Total Other Current Liabilities** | 3,805,724.46 |
| **Total Current Liabilities** | 4,574,652.98 |
| **Long Term Liabilities** | |
| 2220 · Lease Payable- Ricoh | 5,133.77 |
| 2230 · Lease Payable - Ricoh 2 prntrs | 315,419.66 |

# Central Processing Services LLC
## Balance Sheet
### As of December 31, 2018

|  | Dec 31, 18 |
|---|---|
| **Total Long Term Liabilities** | 320,553.43 |
| **Total Liabilities** | 4,896,206.41 |
| **Equity** |  |
| 3110 · Retained Earnings | -686,221.98 |
| 3135 · Partner One Equity |  |
| 3145 · Partner One Draws-Cole | -214,000.00 |
| 3135 · Partner One Equity - Other | -121,419.70 |
| **Total 3135 · Partner One Equity** | -335,419.70 |
| 3170 · Partner Two Equity |  |
| 3180 · Partner Two Draws-Burland | -215,660.00 |
| 3170 · Partner Two Equity - Other | -121,826.69 |
| **Total 3170 · Partner Two Equity** | -337,486.69 |
| **Net Income** | -354,788.79 |
| **Total Equity** | -1,713,917.16 |
| **TOTAL LIABILITIES & EQUITY** | 3,181,289.25 |

# Central Processing Services LLC
# Profit & Loss
## January through December 2018

|  | Jan - Dec 18 |
|---|---:|
| **Ordinary Income/Expense** | |
| **Income** | |
| 4070 · Services | 12,950.14 |
| 4199 · Commissions Received | 8,368,907.81 |
| 4222 · BankChargesAssessed-ProfitStars | 15,181.09 |
| **Total Income** | 8,397,039.04 |
| **Cost of Goods Sold** | |
| 5222 · ServiceCharges-ProfitStars | 31,122.42 |
| **Total COGS** | 31,122.42 |
| **Gross Profit** | 8,365,916.62 |
| **Expense** | |
| 6040 · Amortization Expense | 160.00 |
| 6115 · Bad Debt Expense | 38,425.70 |
| 6120 · Bank Service Charges | 11,024.47 |
| 6135 · Contract Labor | 131,918.80 |
| 6145 · Commission | 1,812,899.11 |
| 6147 · Computer Expense | 22,756.36 |
| 6150 · Depreciation Expense | 120,000.00 |
| 6160 · Dues and Subscriptions | 1,285.03 |
| 6165 · Education | 2,689.12 |
| 6175 · Employee Relations | 2,673.46 |
| 6180 · Insurance | |
| 6186 · Employee Life Ins | 1,203.19 |
| 6181 · Medical | 132,624.18 |
| 6420 · Work Comp | 3,943.92 |
| **Total 6180 · Insurance** | 137,771.29 |
| 6200 · Interest Expense | 980.98 |
| 6230 · Licenses and Permits | |
| 6230A · Bonds | 375.00 |
| 6230 · Licenses and Permits - Other | -150.00 |
| **Total 6230 · Licenses and Permits** | 225.00 |
| 6235 · Mail Room Equipment Parts | |
| 6235A · Mail Room Equipment Repair | 7,162.70 |
| 6235 · Mail Room Equipment Parts - Other | 15,385.47 |
| **Total 6235 · Mail Room Equipment Parts** | 22,548.17 |
| 6236 · Maintenance Contract | 25,637.25 |
| 6242 · Office Expense | 292,605.53 |
| 6245 · Payroll | |
| 6245C · Bonus | -7,885.00 |
| 6245 · Payroll - Other | 1,778,654.97 |
| **Total 6245 · Payroll** | 1,770,769.97 |
| 6247 · Payroll fees | 16,682.50 |
| 6250 · Postage and Delivery | |
| 6253 · Forwarding Funds | 18,989.35 |
| 6254 · MBE Box Rental | 7,203.00 |
| 6250 · Postage and Delivery - Other | 2,449,423.25 |
| **Total 6250 · Postage and Delivery** | 2,475,615.60 |
| 6260 · Printing and Reproduction | 1,045,349.49 |
| 6270 · Professional Fees | |
| 6280 · Legal Fees | 78,252.57 |
| 6650 · Accounting | 2,043.75 |
| 6270 · Professional Fees - Other | 210.00 |

# Central Processing Services LLC
## Profit & Loss
### January through December 2018

| | Jan - Dec 18 |
|---|---|
| Total 6270 · Professional Fees | 80,506.32 |
| **6290 · Rent** | 218,687.04 |
| **6300 · Repairs** | |
| 6310 · Building Repairs | 2,000.00 |
| Total 6300 · Repairs | 2,000.00 |
| **6350 · Travel & Ent** | |
| 6370 · Meals | 6.58 |
| 6380 · Travel | 944.13 |
| 6350 · Travel & Ent - Other | 12.77 |
| Total 6350 · Travel & Ent | 963.48 |
| **6390 · Utilities** | |
| 6400 · Gas and Electric | 24,100.20 |
| Total 6390 · Utilities | 24,100.20 |
| **6550 · Office Supplies** | 17,595.96 |
| **6555 · Cleaning Supplies** | 63.84 |
| **6820 · Taxes** | |
| 6821 · Federal Unemployment Taxes | 1,313.68 |
| 6825 · Payroll | 47,794.00 |
| 6835 · FICA & Medicare | 120,129.20 |
| 6845 · State of Michigan Unemployment | 12,841.42 |
| 6850 · Property | 18,587.69 |
| Total 6820 · Taxes | 200,665.99 |
| **Total Expense** | 8,476,590.66 |
| **Net Ordinary Income** | -110,674.04 |
| **Other Income/Expense** | |
| **Other Income** | |
| 7010 · Interest Income | 0.45 |
| 7030 · Other Income | 33,016.83 |
| Total Other Income | 33,017.28 |
| **Other Expense** | |
| 8010 · Other Expenses | 30,999.84 |
| 8030 · Late fees | 29,598.66 |
| Total Other Expense | 60,598.50 |
| **Net Other Income** | -27,581.22 |
| **Net Income** | -138,255.26 |

TAXPAYER COPY

# Form 1065

**U.S. Return of Partnership Income**

OMB No. 1545-0123

Department of the Treasury
Internal Revenue Service

For calendar year 2017, or tax year beginning _____ , ending _____
► Go to www.irs.gov/Form1065 for instructions and the latest information.

**2017**

| A Principal business activity | | | |
|---|---|---|---|
| BUSINESS SUPPORT | | | |

| B Principal product or service | | | |
|---|---|---|---|
| SUPPORT SERVICES | | | |

| C Business code number | | | |
|---|---|---|---|
| 561490 | | | |

Type or Print

**Name of partnership**
CENTRAL PROCESSING SERVICES LLC

**Number, street, and room or suite no. If a P.O. box, see the instructions.**
23800 WEST TEN MILE ROAD STE 200

| City or town | State | ZIP code |
|---|---|---|
| SOUTHFIELD | MI | 48033 |

| Foreign country name | Foreign province/state/county | Foreign postal code |
|---|---|---|

D Employer Identification number
____8479

E Date business started
2/25/2004

F Total assets (see the instructions)
$ 4,082,711

G Check applicable boxes: (1) ☐ Initial return (2) ☐ Final return (3) ☐ Name change (4) ☐ Address change (5) ☐ Amended return
(6) ☐ Technical termination - also check (1) or (2)

H Check accounting method: (1) ☐ Cash (2) ☒ Accrual (3) ☐ Other (specify) ►

I Number of Schedules K-1. Attach one for each person who was a partner at any time during the tax year ► ____2

J Check if Schedules C and M-3 are attached . . . . . . . . . . . . . . . . . . . . . . . . . . . . ☐

**Caution: Include only trade or business income and expenses on lines 1a through 22 below. See the instructions for more information.**

### Income

| | | | |
|---|---|---|---|
| 1a | Gross receipts or sales | 1a | 9,740,227 |
| b | Returns and allowances | 1b | |
| c | Balance. Subtract line 1b from line 1a | 1c | 9,740,227 |
| 2 | Cost of goods sold (attach Form 1125-A) | 2 | 56,055 |
| 3 | Gross profit. Subtract line 2 from line 1c | 3 | 9,684,172 |
| 4 | Ordinary income (loss) from other partnerships, estates, and trusts (attach statement) | 4 | |
| 5 | Net farm profit (loss) (attach Schedule F (Form 1040)) | 5 | |
| 6 | Net gain (loss) from Form 4797, Part II, line 17 (attach Form 4797) | 6 | |
| 7 | Other income (loss) (attach statement) | 7 | 14,675 |
| 8 | Total income (loss). Combine lines 3 through 7 | 8 | 9,698,847 |

### Deductions (see the instructions for limitations)

| | | | |
|---|---|---|---|
| 9 | Salaries and wages (other than to partners) (less employment credits) | 9 | 2,072,515 |
| 10 | Guaranteed payments to partners | 10 | |
| 11 | Repairs and maintenance | 11 | 398 |
| 12 | Bad debts | 12 | 21,793 |
| 13 | Rent | 13 | 87,210 |
| 14 | Taxes and licenses | 14 | 171,218 |
| 15 | Interest | 15 | 28,027 |
| 16a | Depreciation (if required, attach Form 4562) | 16a | 154,518 |
| b | Less depreciation reported on Form 1125-A and elsewhere on return | 16b | |
| 16c | | 16c | 154,518 |
| 17 | Depletion (Do not deduct oil and gas depletion.) | 17 | |
| 18 | Retirement plans, etc. | 18 | |
| 19 | Employee benefit programs | 19 | |
| 20 | Other deductions (attach statement) | 20 | 7,657,027 |
| 21 | Total deductions. Add the amounts shown in the far right column for lines 9 through 20 | 21 | 10,192,704 |
| 22 | Ordinary business income (loss). Subtract line 21 from line 8 | 22 | -493,857 |

### Sign Here

Under penalties of perjury, I declare that I have examined this return, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete. Declaration of preparer (other than partner or limited liability company member) is based on all information of which preparer has any knowledge.

May the IRS discuss this return with the preparer shown below (see instructions)? ☒ Yes ☐ No

► Signature of partner or limited liability company member        Date

ATS Advisors

### Paid Preparer Use Only

| Print/Type preparer's name | Preparer's signature | Date | Check ☐ if self-employed | PTIN |
|---|---|---|---|---|
| JAMES R SULLIVAN, CPA | | 9/11/2018 | | ____7112 |

Firm's name ► ATS ADVISORS, A CPA FIRM
Firm's address ► 875 SOUTH MAIN STREET
City PLYMOUTH        State MI        ZIP code 48170

Firm's EIN ►
Phone no. (734) 454-4100

For Paperwork Reduction Act Notice, see separate instructions.
HTA
Form **1065** (2017)

## Schedule B    Other Information

| | | | | | Yes | No |
|---|---|---|---|---|---|---|
| 1 | What type of entity is filing this return? Check the applicable box: | | | | | |
| a | ☐ Domestic general partnership | | b | ☐ Domestic limited partnership | | |
| c | ☒ Domestic limited liability company | | d | ☐ Domestic limited liability partnership | | |
| e | ☐ Foreign partnership | | f | ☐ Other ▶ | | |

| | | Yes | No |
|---|---|---|---|
| 2 | At any time during the tax year, was any partner in the partnership a disregarded entity, a partnership (including an entity treated as a partnership), a trust, an S corporation, an estate (other than an estate of a deceased partner), or a nominee or similar person? | | X |
| 3 | At the end of the tax year: | | |
| a | Did any foreign or domestic corporation, partnership (including any entity treated as a partnership), trust, or tax-exempt organization, or any foreign government own, directly or indirectly, an interest of 50% or more in the profit, loss, or capital of the partnership? For rules of constructive ownership, see instructions. If "Yes," attach Schedule B-1, Information on Partners Owning 50% or More of the Partnership | | X |
| b | Did any individual or estate own, directly or indirectly, an interest of 50% or more in the profit, loss, or capital of the partnership? For rules of constructive ownership, see instructions. If "Yes," attach Schedule B-1, Information on Partners Owning 50% or More of the Partnership | X | |
| 4 | At the end of the tax year, did the partnership: | | |
| a | Own directly 20% or more, or own, directly or indirectly, 50% or more of the total voting power of all classes of stock entitled to vote of any foreign or domestic corporation? For rules of constructive ownership, see instructions. If "Yes," complete (i) through (iv) below . . . | | X |

| (i) Name of Corporation | (ii) Employer Identification Number (if any) | (iii) Country of Incorporation | (iv) Percentage Owned in Voting Stock |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

| | | | | | Yes | No |
|---|---|---|---|---|---|---|
| b | Own directly an interest of 20% or more, or own, directly or indirectly, an interest of 50% or more in the profit, loss, or capital in any foreign or domestic partnership (including an entity treated as a partnership) or in the beneficial interest of a trust? For rules of constructive ownership, see instructions. If "Yes," complete (i) through (v) below . . | | | | | | X |

| (i) Name of Entity | (ii) Employer Identification Number (if any) | (iii) Type of Entity | (iv) Country of Organization | (v) Maximum Percentage Owned in Profit, Loss, or Capital |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |

| | | Yes | No |
|---|---|---|---|
| 5 | Did the partnership file Form 8893, Election of Partnership Level Tax Treatment, or an election statement under section 6231(a)(1)(B)(ii) for partnership-level tax treatment, that is in effect for this tax year? See Form 8893 for more details | | X |
| 6 | Does the partnership satisfy all four of the following conditions? | | |
| a | The partnership's total receipts for the tax year were less than $250,000; | | |
| b | The partnership's total assets at the end of the tax year were less than $1 million; | | |
| c | Schedules K-1 are filed with the return and furnished to the partners on or before the due date (including extensions) for the partnership return. | | |
| d | The partnership is not filing and is not required to file Schedule M-3 . . . . . . . . . . . . . . . . If "Yes," the partnership is not required to complete Schedules L, M-1, and M-2; Item F on page 1 of Form 1065; or Item L on Schedule K-1. | | X |
| 7 | Is this partnership a publicly traded partnership as defined in section 469(k)(2)? . . . . . . . . . | | X |
| 8 | During the tax year, did the partnership have any debt that was cancelled, was forgiven, or had the terms modified so as to reduce the principal amount of the debt? . . . . . . . . . . . . . . . . . | | X |
| 9 | Has this partnership filed, or is it required to file, Form 8918, Material Advisor Disclosure Statement, to provide information on any reportable transaction? . . . . . . . . . . . . . . . . . . . | | X |
| 10 | At any time during calendar year 2017, did the partnership have an interest in or a signature or other authority over a financial account in a foreign country (such as a bank account, securities account, or other financial account)? See the instructions for exceptions and filing requirements for FinCEN Form 114, Report of Foreign Bank and Financial Accounts (FBAR). If "Yes," enter the name of the foreign country. ▶ | | X |

Form **1065** (2017)

**Schedule B    Other Information** *(continued)*

| | | Yes | No |
|---|---|---|---|
| 11 | At any time during the tax year, did the partnership receive a distribution from, or was it the grantor of, or transferor to, a foreign trust? If "Yes," the partnership may have to file Form 3520, Annual Return To Report Transactions With Foreign Trusts and Receipt of Certain Foreign Gifts. See instructions | | X |
| 12a | Is the partnership making, or had it previously made (and not revoked), a section 754 election? See instructions for details regarding a section 754 election. | | X |
| b | Did the partnership make for this tax year an optional basis adjustment under section 743(b) or 734(b)? If "Yes," attach a statement showing the computation and allocation of the basis adjustment. See instructions | | X |
| c | Is the partnership required to adjust the basis of partnership assets under section 743(b) or 734(b) because of a substantial built-in loss (as defined under section 743(d)) or substantial basis reduction (as defined under section 734(d))? If "Yes," attach a statement showing the computation and allocation of the basis adjustment. See instructions | | X |
| 13 | Check this box if, during the current or prior tax year, the partnership distributed any property received in a like-kind exchange or contributed such property to another entity (other than disregarded entities wholly owned by the partnership throughout the tax year) ▶ ☐ | | |
| 14 | At any time during the tax year, did the partnership distribute to any partner a tenancy-in-common or other undivided interest in partnership property? | | X |
| 15 | If the partnership is required to file Form 8858, Information Return of U.S. Persons With Respect To Foreign Disregarded Entities, enter the number of Forms 8858 attached. See instructions | | |
| 16 | Does the partnership have any foreign partners? If "Yes," enter the number of Forms 8805, Foreign Partner's Information Statement of Section 1446 Withholding Tax, filed for this partnership. ▶ | | X |
| 17 | Enter the number of Forms 8865, Return of U.S. Persons With Respect to Certain Foreign Partnerships, attached to this return. ▶    0 | | |
| 18a | Did you make any payments in 2017 that would require you to file Form(s) 1099? See instructions | X | |
| b | If "Yes," did you or will you file required Form(s) 1099? | X | |
| 19 | Enter the number of Form(s) 5471, Information Return of U.S. Persons With Respect To Certain Foreign Corporations, attached to this return. ▶    0 | | |
| 20 | Enter the number of partners that are foreign governments under section 892. ▶    0 | | |
| 21 | During the partnership's tax year, did the partnership make any payments that would require it to file Form 1042 and 1042-S under chapter 3 (sections 1441 through 1464) or chapter 4 (sections 1471 through 1474)? | | X |
| 22 | Was the partnership a specified domestic entity required to file Form 8938 for the tax year. (See the Instructions for Form 8938)? | | X |

**Designation of Tax Matters Partner** (see instructions)
Enter below the general partner or member-manager designated as the tax matters partner (TMP) for the tax year of this return.

| Name of designated TMP ▶ | ROBERT W BURLAND JR | Identifying number of TMP ▶ | ████6833 |
|---|---|---|---|
| If the TMP is an entity, name of TMP representative ▶ | | Phone number of TMP ▶ | |

| Address of designated TMP ▶ | 2887 SILVERSIDE ROAD | | |
|---|---|---|---|
| | WATERFORD | MI | 48328 |

Form **1065** (2017)

## Schedule K    Partners' Distributive Share Items

| | | | Total amount |
|---|---|---|---|
| **Income (Loss)** | 1 | Ordinary business income (loss) (page 1, line 22) | 1 | -493,857 |
| | 2 | Net rental real estate income (loss) (attach Form 8825) | 2 | |
| | 3a | Other gross rental income (loss) | 3a | |
| | b | Expenses from other rental activities (attach statement) | 3b | |
| | c | Other net rental income (loss). Subtract line 3b from line 3a | 3c | 0 |
| | 4 | Guaranteed payments | 4 | |
| | 5 | Interest income | 5 | |
| | 6 | Dividends: a Ordinary dividends | 6a | |
| | | b Qualified dividends | 6b | |
| | 7 | Royalties | 7 | |
| | 8 | Net short-term capital gain (loss) (attach Schedule D (Form 1065)) | 8 | |
| | 9a | Net long-term capital gain (loss) (attach Schedule D (Form 1065)) | 9a | |
| | b | Collectibles (28%) gain (loss) | 9b | |
| | c | Unrecaptured section 1250 gain (attach statement) | 9c | |
| | 10 | Net section 1231 gain (loss) (attach Form 4797) | 10 | |
| | 11 | Other income (loss) (see instructions) Type ▶ | 11 | |
| **Deductions** | 12 | Section 179 deduction (attach Form 4562) | 12 | |
| | 13a | Contributions | 13a | |
| | b | Investment interest expense | 13b | |
| | c | Section 59(e)(2) expenditures: (1) Type ▶     (2) Amount ▶ | 13c(2) | |
| | d | Other deductions (see instructions) Type ▶ | 13d | |
| **Self-Employment** | 14a | Net earnings (loss) from self-employment | 14a | -493,857 |
| | b | Gross farming or fishing income | 14b | |
| | c | Gross nonfarm income | 14c | 9,696,947 |
| **Credits** | 15a | Low-income housing credit (section 42(j)(5)) | 15a | |
| | b | Low-income housing credit (other) | 15b | |
| | c | Qualified rehabilitation expenditures (rental real estate) (attach Form 3468, if applicable) | 15c | |
| | d | Other rental real estate credits (see instructions) Type ▶ | 15d | |
| | e | Other rental credits (see instructions) Type ▶ | 15e | |
| | f | Other credits (see instructions) Type ▶ | 15f | |
| **Foreign Transactions** | 16a | Name of country or U.S. possession ▶ | | |
| | b | Gross income from all sources | 16b | |
| | c | Gross income sourced at partner level | 16c | |
| | | Foreign gross income sourced at partnership level | | |
| | d | Passive category ▶   e General category ▶   f Other ▶ | 16f | |
| | | Deductions allocated and apportioned at partner level | | |
| | g | Interest expense ▶    h Other ▶ | 16h | |
| | | Deductions allocated and apportioned at partnership level to foreign source income | | |
| | i | Passive category ▶   j General category ▶   k Other ▶ | 16k | |
| | l | Total foreign taxes (check one): ▶ Paid ☐ Accrued ☐ | 16l | |
| | m | Reduction in taxes available for credit (attach statement) | 16m | |
| | n | Other foreign tax information (attach statement) | | |
| **Alternative Minimum Tax (AMT) Items** | 17a | Post-1986 depreciation adjustment | 17a | |
| | b | Adjusted gain or loss | 17b | |
| | c | Depletion (other than oil and gas) | 17c | |
| | d | Oil, gas, and geothermal properties—gross income | 17d | |
| | e | Oil, gas, and geothermal properties—deductions | 17e | |
| | f | Other AMT items (attach statement) | 17f | |
| **Other Information** | 18a | Tax-exempt interest income | 18a | |
| | b | Other tax-exempt income | 18b | |
| | c | Nondeductible expenses | 18c | 32,180 |
| | 19a | Distributions of cash and marketable securities | 19a | |
| | b | Distributions of other property | 19b | |
| | 20a | Investment income | 20a | |
| | b | Investment expenses | 20b | |
| | c | Other items and amounts (attach statement) | | |

Form **1065** (2017)

## Analysis of Net Income (Loss)

| | | | | | | |
|---|---|---|---|---|---|---|
| 1 | Net income (loss). Combine Schedule K, lines 1 through 11. From the result, subtract the sum of Schedule K, lines 12 through 13d, and 16l | | | | | 1 | -493,867 |

| 2 | Analysis by partner type: | (i) Corporate | (ii) Individual (active) | (iii) Individual (passive) | (iv) Partnership | (v) Exempt Organization | (vi) Nominee/Other |
|---|---|---|---|---|---|---|---|
| a | General partners | | | | | | |
| b | Limited partners | | -493,867 | | | | |

## Schedule L   Balance Sheets per Books

| | Assets | Beginning of tax year (a) | (b) | End of tax year (c) | (d) |
|---|---|---|---|---|---|
| 1 | Cash | | 87,815 | | |
| 2a | Trade notes and accounts receivable | 1,783,905 | | 1,804,639 | |
| b | Less allowance for bad debts | | 1,783,905 | | 1,804,639 |
| 3 | Inventories | | | | |
| 4 | U.S. government obligations | | | | |
| 5 | Tax-exempt securities | | | | |
| 6 | Other current assets (attach statement) | | 2,970 | | 1,173 |
| 7a | Loans to partners (or persons related to partners) | | 1,334,482 | | 1,837,839 |
| b | Mortgage and real estate loans | | | | |
| 8 | Other investments (attach statement) | | | | |
| 9a | Buildings and other depreciable assets | 1,146,896 | | 1,198,860 | |
| b | Less accumulated depreciation | 606,782 | 540,114 | 760,900 | 439,066 |
| 10a | Depletable assets | | | | |
| b | Less accumulated depletion | | 0 | | 0 |
| 11 | Land (net of any amortization) | | | | |
| 12a | Intangible assets (amortizable only) | | | | |
| b | Less accumulated amortization | | 0 | | 0 |
| 13 | Other assets (attach statement) | | | | |
| 14 | Total assets | | 3,729,086 | | 4,082,711 |
| | **Liabilities and Capital** | | | | |
| 15 | Accounts payable | | | | |
| 16 | Mortgages, notes, bonds payable in less than 1 year | | 1,139,077 | | 1,224,820 |
| 17 | Other current liabilities (attach statement) | | 66,776 | | 274,949 |
| 18 | All nonrecourse loans | | | | |
| 19a | Loans from partners (or persons related to partners) | | 2,254,277 | | 3,044,291 |
| b | Mortgages, notes, bonds payable in 1 year or more | | 672,706 | | 478,688 |
| 20 | Other liabilities (attach statement) | | | | |
| 21 | Partners' capital accounts | | -403,750 | | 939,787 |
| 22 | Total liabilities and capital | | 3,729,086 | | 4,082,711 |

## Schedule M-1   Reconciliation of Income (Loss) per Books With Income (Loss) per Return
Note. The partnership may be required to file Schedule M-3 (see instructions).

| | | | | | | |
|---|---|---|---|---|---|---|
| 1 | Net income (loss) per books | -826,037 | 6 | Income recorded on books this year not included on Schedule K, lines 1 through 11 (itemize): | | |
| 2 | Income included on Schedule K, lines 1, 2, 3c, 5, 6a, 7, 8, 9a, 10, and 11, not recorded on books this year (itemize): | | | a Tax-exempt interest   $ | | |
| | | 0 | 7 | Deductions included on Schedule K, lines 1 through 13d, and 16l, not charged against book income this year (itemize): | | 0 |
| 3 | Guaranteed payments (other than health insurance) | 0 | | a Depreciation   $ | | |
| 4 | Expenses recorded on books this year not included on Schedule K, lines 1 through 13d, and 16l (itemize): | | 8 | Add lines 6 and 7 | | 0 |
| a | Depreciation   $ | See Statement | 9 | Income (loss) (Analysis of Net Income (Loss), line 1). Subtract line 8 from line 5 | | -493,867 |
| b | Travel and entertainment   $   102 | 32,160 | | | | |
| 5 | Add lines 1 through 4 | -493,867 | | | | |

## Schedule M-2   Analysis of Partners' Capital Accounts

| | | | | | | |
|---|---|---|---|---|---|---|
| 1 | Balance at beginning of year | -403,750 | 6 | Distributions:   a Cash | | |
| 2 | Capital contributed:   a Cash | | |        b Property | | |
| |        b Property | | 7 | Other decreases (itemize): | | |
| 3 | Net income (loss) per books | -826,037 | | See Statement | | 10,000 |
| 4 | Other increases (itemize): | | 8 | Add lines 6 and 7 | | 10,000 |
| 5 | Add lines 1 through 4 | -829,787 | 9 | Balance at end of year. Subtract line 8 from line 5 | | -939,787 |

| Form **1065** | | **U.S. Return of Partnership Income** | | OMB No. 1545-0123 |
|---|---|---|---|---|
| Department of the Treasury Internal Revenue Service | | For calendar year 2016, or tax year beginning _____, ending _____ Information about Form 1065 and its separate instructions is at www.irs.gov/form1065. | | **2016** |

| A Principal business activity | Name of partnership | D Employer identification number |
|---|---|---|
| BUSINESS SUPPORT | CENTRAL PROCESSING SERVICES LLC | 6479 |
| B Principal product or service | | E Date business started |
| SUPPORT SERVICES | Type or Print | Number, street, and room or suite no. If a P.O. box, see the instructions. 23800 WEST TEN MILE ROAD STE 200 | 2/25/2004 |
| C Business code number | City or town: SOUTHFIELD  State: MI  ZIP code: 48033 | F Total assets (see the instructions) |
| 561490 | Foreign country name  Foreign province/state/county  Foreign postal code | $ 3,729,086 |

G Check applicable boxes: (1) ☐ Initial return (2) ☐ Final return (3) ☐ Name change (4) ☐ Address change (5) ☐ Amended return
(6) ☐ Technical termination - also check (1) or (2)
H Check accounting method: (1) ☐ Cash (2) ☒ Accrual (3) ☐ Other (specify) ▶ _____
I Number of Schedules K-1. Attach one for each person who was a partner at any time during the tax year. ▶ ........ 2
J Check if Schedules C and M-3 are attached ..........................

**Caution.** Include only trade or business income and expenses on lines 1a through 22 below. See the instructions for more information.

| | | | | | |
|---|---|---|---|---|---|
| **Income** | 1a | Gross receipts or sales ................ | 1a | 12,673,630 | |
| | b | Returns and allowances ................ | 1b | | |
| | c | Balance. Subtract line 1b from line 1a ................ | 1c | | 12,673,630 |
| | 2 | Cost of goods sold (attach Form 1125-A) ................ | 2 | | 127,898 |
| | 3 | Gross profit. Subtract line 2 from line 1c ................ | 3 | | 12,545,732 |
| | 4 | Ordinary income (loss) from other partnerships, estates, and trusts (attach statement) ...... | 4 | | |
| | 5 | Net farm profit (loss) (attach Schedule F (Form 1040)) ................ | 5 | | |
| | 6 | Net gain (loss) from Form 4797, Part II, line 17 (attach Form 4797) ...... | 6 | | |
| | 7 | Other income (loss) (attach statement) ................ | 7 | | 11,300 |
| | 8 | Total income (loss). Combine lines 3 through 7 ................ | 8 | | 12,557,032 |
| **Deductions** (see the instructions for limitations) | 9 | Salaries and wages (other than to partners) (less employment credits) ...... | 9 | | 2,519,629 |
| | 10 | Guaranteed payments to partners ................ | 10 | | |
| | 11 | Repairs and maintenance ................ | 11 | | 35,890 |
| | 12 | Bad debts ................ | 12 | | 99,590 |
| | 13 | Rent ................ | 13 | | 166,131 |
| | 14 | Taxes and licenses ................ | 14 | | 205,733 |
| | 15 | Interest ................ | 15 | | |
| | 16a | Depreciation (if required, attach Form 4562) ...... | 16a | 88,094 | |
| | b | Less depreciation reported on Form 1125-A and elsewhere on return .... | 16b | | |
| | 16c | | 16c | | 88,094 |
| | 17 | Depletion (Do not deduct oil and gas depletion.) ................ | 17 | | |
| | 18 | Retirement plans, etc. ................ | 18 | | |
| | 19 | Employee benefit programs ................ | 19 | | 139,357 |
| | 20 | Other deductions (attach statement) ................ | 20 | | 9,443,445 |
| | 21 | Total deductions. Add the amounts shown in the far right column for lines 9 through 20 .... | 21 | | 12,699,869 |
| | 22 | Ordinary business income (loss). Subtract line 21 from line 8 ...... | 22 | | -142,837 |

**Sign Here**

Under penalties of perjury, I declare that I have examined this return, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete. Declaration of preparer (other than general partner or limited liability company member/manager) is based on all information of which preparer has any knowledge.

▶ _____  Signature of general partner or limited liability company member/manager   Date _____

May the IRS discuss this return with the preparer shown below (see instructions)? ☒ Yes ☐ No

| **Paid Preparer Use Only** | Print/Type preparer's name | Preparer's signature | Date | Check ☐ if self-employed | PTIN |
|---|---|---|---|---|---|
| | JAMES R SULLIVAN, CPA | | 10/13/2017 | | 8394 |
| | Firm's name ▶ ATS ADVISORS, A CPA FIRM | | | Firm's EIN ▶ 7112 | |
| | Firm's address ▶ 675 SOUTH MAIN STREET | | | Phone no. (734) 454-4100 | |
| | City PLYMOUTH | State MI | | ZIP code 48170 | |

For Paperwork Reduction Act Notice, see separate instructions.   Form **1065** (2016)
HTA

## Schedule B    Other Information

| | | | Yes | No |
|---|---|---|---|---|
| 1 | What type of entity is filing this return? Check the applicable box: | | | |
| a | ☐ Domestic general partnership | b ☐ Domestic limited partnership | | |
| c | ☒ Domestic limited liability company | d ☐ Domestic limited liability partnership | | |
| e | ☐ Foreign partnership | f ☐ Other ▶ | | |
| 2 | At any time during the tax year, was any partner in the partnership a disregarded entity, a partnership (including an entity treated as a partnership), a trust, an S corporation, an estate (other than an estate of a deceased partner), or a nominee or similar person? | | | X |
| 3 | At the end of the tax year: | | | |
| a | Did any foreign or domestic corporation, partnership (including any entity treated as a partnership), trust, or tax-exempt organization, or any foreign government own, directly or indirectly, an interest of 50% or more in the profit, loss, or capital of the partnership? For rules of constructive ownership, see instructions. If "Yes," attach Schedule B-1, Information on Partners Owning 50% or More of the Partnership | | | X |
| b | Did any individual or estate own, directly or indirectly, an interest of 50% or more in the profit, loss, or capital of the partnership? For rules of constructive ownership, see instructions. If "Yes," attach Schedule B-1, Information on Partners Owning 50% or More of the Partnership | | X | |
| 4 | At the end of the tax year, did the partnership: | | | |
| a | Own directly 20% or more, or own, directly or indirectly, 50% or more of the total voting power of all classes of stock entitled to vote of any foreign or domestic corporation? For rules of constructive ownership, see instructions. If "Yes," complete (i) through (iv) below | | | X |

| (i) Name of Corporation | (ii) Employer Identification Number (if any) | (iii) Country of Incorporation | (iv) Percentage Owned in Voting Stock |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |

| | | | | | Yes | No |
|---|---|---|---|---|---|---|
| b | Own directly an interest of 20% or more, or own, directly or indirectly, an interest of 50% or more in the profit, loss, or capital in any foreign or domestic partnership (including an entity treated as a partnership) or in the beneficial interest of a trust? For rules of constructive ownership, see instructions. If "Yes," complete (i) through (v) below | | | | | X |

| (i) Name of Entity | (ii) Employer Identification Number (if any) | (iii) Type of Entity | (iv) Country of Organization | (v) Maximum Percentage Owned in Profit, Loss, or Capital |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |

| | | Yes | No |
|---|---|---|---|
| 5 | Did the partnership file Form 8893, Election of Partnership Level Tax Treatment, or an election statement under section 6231(a)(1)(B)(ii) for partnership-level tax treatment, that is in effect for this tax year? See Form 8893 for more details | | X |
| 6 | Does the partnership satisfy all four of the following conditions? | | |
| a | The partnership's total receipts for the tax year were less than $250,000. | | |
| b | The partnership's total assets at the end of the tax year were less than $1 million. | | |
| c | Schedules K-1 are filed with the return and furnished to the partners on or before the due date (including extensions) for the partnership return. | | |
| d | The partnership is not filing and is not required to file Schedule M-3. | | |
| | If "Yes," the partnership is not required to complete Schedules L, M-1, and M-2; Item F on page 1 of Form 1065; or Item L on Schedule K-1. | | |
| 7 | Is this partnership a publicly traded partnership as defined in section 469(k)(2)? | | X |
| 8 | During the tax year, did the partnership have any debt that was cancelled, was forgiven, or had the terms modified so as to reduce the principal amount of the debt? | | X |
| 9 | Has this partnership filed, or is it required to file, Form 8918, Material Advisor Disclosure Statement, to provide information on any reportable transaction? | | X |
| 10 | At any time during calendar year 2016, did the partnership have an interest in or a signature or other authority over a financial account in a foreign country (such as a bank account, securities account, or other financial account)? See the instructions for exceptions and filing requirements for FinCEN Form 114, Report of Foreign Bank and Financial Accounts (FBAR). If "Yes," enter the name of the foreign country. ▶ | | X |

**Schedule B    Other Information** *(continued)*

|  |  | Yes | No |
|---|---|---|---|
| 11 | At any time during the tax year, did the partnership receive a distribution from, or was it the grantor of, or transferor to, a foreign trust? If "Yes," the partnership may have to file Form 3520, Annual Return To Report Transactions With Foreign Trusts and Receipt of Certain Foreign Gifts. See instructions . . . . . . . . . . . . |  | X |
| 12a | Is the partnership making, or had it previously made (and not revoked), a section 754 election? See instructions for details regarding a section 754 election. |  | X |
| b | Did the partnership make for this tax year an optional basis adjustment under section 743(b) or 734(b)? If "Yes," attach a statement showing the computation and allocation of the basis adjustment. See instructions . . . . . . |  | X |
| c | Is the partnership required to adjust the basis of partnership assets under section 743(b) or 734(b) because of a substantial built-in loss (as defined under section 743(d)) or substantial basis reduction (as defined under section 734(d))? If "Yes," attach a statement showing the computation and allocation of the basis adjustment. See instructions |  | X |
| 13 | Check this box if, during the current or prior tax year, the partnership distributed any property received in a like-kind exchange or contributed such property to another entity (other than disregarded entities wholly owned by the partnership throughout the tax year) . . . . . . . . . . . . . . . . . . . . . . ▶ ☐ |  |  |
| 14 | At any time during the tax year, did the partnership distribute to any partner a tenancy-in-common or other undivided interest in partnership property? . . . . . . . . . . . . . . . . . . . . . . . . . . . . |  | X |
| 15 | If the partnership is required to file Form 8858, Information Return of U.S. Persons With Respect To Foreign Disregarded Entities, enter the number of Forms 8858 attached. See instructions   ▶ |  |  |
| 16 | Does the partnership have any foreign partners? If "Yes," enter the number of Forms 8805, Foreign Partner's Information Statement of Section 1446 Withholding Tax, filed for this partnership.   ▶   0 |  | X |
| 17 | Enter the number of Forms 8865, Return of U.S. Persons With Respect to Certain Foreign Partnerships, attached to this return.   ▶   0 |  |  |
| 18a | Did you make any payments in 2016 that would require you to file Form(s) 1099? See instructions . . . . . . . | X |  |
| b | If "Yes," did you or will you file required Form(s) 1099? . . . . . . . . . . . . . . . . . . . . . . | X |  |
| 19 | Enter the number of Form(s) 5471, Information Return of U.S. Persons With Respect To Certain Foreign Corporations, attached to this return.   ▶   0 |  |  |
| 20 | Enter the number of partners that are foreign governments under section 892.   ▶   0. |  |  |
| 21 | During the partnership's tax year, did the partnership make any payments that would require it to file Form 1042 and 1042-S under chapter 3 (sections 1441 through 1464) or chapter 4 (sections 1471 through 1474)? . . . . . |  | X |
| 22 | Was the partnership a specified domestic entity required to file Form 8938 for the tax year (See the Instructions for Form 8938)? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . |  | X |

**Designation of Tax Matters Partner (see instructions)**
Enter below the general partner or member-manager designated as the tax matters partner (TMP) for the tax year of this return:

| Name of designated TMP ▶ | ROBERT W BURLAND JR. | Identifying number of TMP ▶ | 5633 |
|---|---|---|---|
| If the TMP is an entity, name of TMP representative ▶ | | Phone number of TMP ▶ | |
| Address of designated TMP ▶ | 2667 SILVERSIDE ROAD | | |
| | WATERFORD | MI | 48328 |

Form **1065** (2016)

| Schedule K | Partners' Distributive Share Items | | Total amount |
|---|---|---|---|
| **Income (Loss)** | 1 Ordinary business income (loss) (page 1, line 22) . . . . . . . . . . . . . | 1 | -142,837 |
| | 2 Net rental real estate income (loss) (attach Form 8825) . . . . . . . . . | 2 | |
| | 3a Other gross rental income (loss) . . . . . . . . . | 3a | | |
| | b Expenses from other rental activities (attach statement) | 3b | | |
| | c Other net rental income (loss). Subtract line 3b from line 3a . . . . . . . | 3c | 0 |
| | 4 Guaranteed payments . . . . . . . . . . . . . . . . . . . . . | 4 | |
| | 5 Interest income . . . . . . . . . . . . . . . . . . . . . . . | 5 | |
| | 6 Dividends:  a Ordinary dividends . . . . . . . . . . . . . . . . . | 6a | |
| | b Qualified dividends . . . . . . . | 6b | | |
| | 7 Royalties . . . . . . . . . . . . . . . . . . . . . . . . . | 7 | |
| | 8 Net short-term capital gain (loss) (attach Schedule D (Form 1065)) . . . . | 8 | |
| | 9a Net long-term capital gain (loss) (attach Schedule D (Form 1065)) . . . . | 9a | |
| | b Collectibles (28%) gain (loss) . . . . . . | 9b | | |
| | c Unrecaptured section 1250 gain (attach statement) . . | 9c | | |
| | 10 Net section 1231 gain (loss) (attach Form 4797) . . . . . . . . . . . | 10 | |
| | 11 Other income (loss) (see instructions) Type ▶ | 11 | |
| **Deductions** | 12 Section 179 deduction (attach Form 4562) . . . . . . . . . . . . . | 12 | |
| | 13a Contributions . . . . . . . . . . . . . . . . . . . . . . . | 13a | 1,800 |
| | b Investment interest expense . . . . . . . . . . . . . . . . . | 13b | |
| | c Section 59(e)(2) expenditures:  (1) Type ▶_____  (2) Amount ▶ | 13c(2) | |
| | d Other deductions (see instructions)  Type ▶ | 13d | |
| **Self-Employment** | 14a Net earnings (loss) from self-employment . . . . . . . . . . . . . | 14a | -142,837 |
| | b Gross farming or fishing income . . . . . . . . . . . . . . . . | 14b | |
| | c Gross nonfarm income . . . . . . . . . . . . . . . . . . . . | 14c | 12,557,032 |
| **Credits** | 15a Low-income housing credit (section 42(j)(5)) . . . . . . . . . . . . | 15a | |
| | b Low-income housing credit (other) . . . . . . . . . . . . . . . | 15b | |
| | c Qualified rehabilitation expenditures (rental real estate) (attach Form 3468, if applicable) | 15c | |
| | d Other rental real estate credits (see instructions)  Type ▶ | 15d | |
| | e Other rental credits (see instructions)  Type ▶ | 15e | |
| | f Other credits (see instructions)  Type ▶ | 15f | |
| **Foreign Transactions** | 16a Name of country or U.S. possession ▶ | | |
| | b Gross income from all sources . . . . . . . . . . . . . . . . . | 16b | |
| | c Gross income sourced at partner level . . . . . . . . . . . . . . | 16c | |
| | Foreign gross income sourced at partnership level | | |
| | d Passive category ▶____ e General category ▶____ f Other ▶ | 16f | |
| | Deductions allocated and apportioned at partner level | | |
| | g Interest expense ▶____ h Other . . . . . . . . . . . ▶ | 16h | |
| | Deductions allocated and apportioned at partnership level to foreign source income | | |
| | i Passive category ▶____ j General category ▶____ k Other ▶ | 16k | |
| | l Total foreign taxes (check one): ▶ Paid ☐ Accrued ☐ . . . . . . | 16l | |
| | m Reduction in taxes available for credit (attach statement) . . . . . . . | 16m | |
| | n Other foreign tax information (attach statement) . . . . . . . . . . | | |
| **Alternative Minimum Tax (AMT) Items** | 17a Post-1986 depreciation adjustment . . . . . . . . . . . . . . . . | 17a | |
| | b Adjusted gain or loss . . . . . . . . . . . . . . . . . . . . | 17b | |
| | c Depletion (other than oil and gas) . . . . . . . . . . . . . . . | 17c | |
| | d Oil, gas, and geothermal properties—gross income . . . . . . . . . | 17d | |
| | e Oil, gas, and geothermal properties—deductions . . . . . . . . . . | 17e | |
| | f Other AMT items (attach statement) . . . . . . . . . . . . . . | 17f | |
| **Other Information** | 18a Tax-exempt interest income . . . . . . . . . . . . . . . . . . | 18a | |
| | b Other tax-exempt income . . . . . . . . . . . . . . . . . . . | 18b | |
| | c Nondeductible expenses . . . . . . . . . . . . . . . . . . . | 18c | 28,265 |
| | 19a Distributions of cash and marketable securities . . . . . . . . . . . | 19a | |
| | b Distributions of other property . . . . . . . . . . . . . . . . | 19b | |
| | 20a Investment income . . . . . . . . . . . . . . . . . . . . . | 20a | |
| | b Investment expenses . . . . . . . . . . . . . . . . . . . . | 20b | |
| | c Other items and amounts (attach statement) . . . . . . . . . . . | | |

Form **1065** (2016)

## Analysis of Net Income (Loss)

| 1 | Net income (loss). Combine Schedule K, lines 1 through 11. From the result, subtract the sum of Schedule K, lines 12 through 13d, and 16l | | | | 1 | -144,437 |
|---|---|---|---|---|---|---|

| 2 | Analysis by partner type: | (i) Corporate | (ii) Individual (active) | (iii) Individual (passive) | (iv) Partnership | (v) Exempt Organization | (vi) Nominee/Other |
|---|---|---|---|---|---|---|---|
| a | General partners | | | | | | |
| b | Limited partners | | -144,437 | | | | |

## Schedule L   Balance Sheets per Books

| | | Beginning of tax year | | End of tax year | |
|---|---|---|---|---|---|
| | Assets | (a) | (b) | (c) | (d) |
| 1 | Cash | | 86,283 | | 67,616 |
| 2a | Trade notes and accounts receivable | 1,607,663 | | 1,783,905 | |
| b | Less allowance for bad debts | | 1,607,663 | | 1,783,905 |
| 3 | Inventories | | | | |
| 4 | U.S. government obligations | | | | |
| 5 | Tax-exempt securities | | | | |
| 6 | Other current assets (attach statement) | | | | 2,970 |
| 7a | Loans to partners (or persons related to partners) | | 908,929 | | 1,384,482 |
| b | Mortgage and real estate loans | | | | |
| 8 | Other investments (attach statement) | | | | |
| 9a | Buildings and other depreciable assets | 697,688 | | 1,145,896 | |
| b | Less accumulated depreciation | 650,267 | 47,421 | 605,782 | 540,114 |
| 10a | Depletable assets | | | | |
| b | Less accumulated depletion | | 0 | | 0 |
| 11 | Land (net of any amortization) | | | | |
| 12a | Intangible assets (amortizable only) | | | | |
| b | Less accumulated amortization | | 0 | | 0 |
| 13 | Other assets (attach statement) | | | | |
| 14 | Total assets | | 2,652,196 | | 3,729,086 |
| | Liabilities and Capital | | | | |
| 15 | Accounts payable | | 353,551 | | 1,139,077 |
| 16 | Mortgages, notes, bonds payable in less than 1 year | | | | |
| 17 | Other current liabilities (attach statement) | | 32,802 | | 86,776 |
| 18 | All nonrecourse loans | | | | |
| 19a | Loans from partners (or persons related to partners) | | 2,250,405 | | 2,254,277 |
| b | Mortgages, notes, bonds payable in 1 year or more | | 248,586 | | 672,706 |
| 20 | Other liabilities (attach statement) | | | | |
| 21 | Partners' capital accounts | | -233,048 | | -403,750 |
| 22 | Total liabilities and capital | | 2,652,196 | | 3,729,086 |

## Schedule M-1   Reconciliation of Income (Loss) per Books With Income (Loss) per Return
Note. The partnership may be required to file Schedule M-3 (see instructions).

| 1 | Net income (loss) per books | -170,702 | 6 | Income recorded on books this year not included on Schedule K, lines 1 through 11 (itemize): | |
|---|---|---|---|---|---|
| 2 | Income included on Schedule K, lines 1, 2, 3c, 5, 6a, 7, 8, 9a, 10, and 11, not recorded on books this year (itemize): | 0 | a | Tax-exempt interest $ | |
| | | | | | 0 |
| 3 | Guaranteed payments (other than health insurance) | 0 | 7 | Deductions included on Schedule K, lines 1 through 13d, and 16l, not charged against book income this year (itemize): | |
| 4 | Expenses recorded on books this year not included on Schedule K, lines 1 through 13d, and 16l (itemize): | See Statement | a | Depreciation $ | |
| a | Depreciation $ | | | | 0 |
| b | Travel and entertainment $ 911 | 28,265 | 8 | Add lines 6 and 7 | 0 |
| | | | 9 | Income (loss) (Analysis of Net Income (Loss), line 1). Subtract line 8 from line 5 | -144,437 |
| 5 | Add lines 1 through 4 | -144,437 | | | |

## Schedule M-2   Analysis of Partners' Capital Accounts

| 1 | Balance at beginning of year | -233,048 | 6 | Distributions:   a Cash | |
|---|---|---|---|---|---|
| 2 | Capital contributed:   a Cash | | | b Property | |
| |   b Property | | 7 | Other decreases (itemize): | |
| 3 | Net income (loss) per books | -170,702 | | | |
| 4 | Other increases (itemize): | 0 | 8 | Add lines 6 and 7 | |
| 5 | Add lines 1 through 4 | -403,750 | 9 | Balance at end of year. Subtract line 8 from line 5 | -403,750 |

Form **1065** (2016)

# EXHIBIT D

Central Processing Services
Operating Statement (P & L)
Case No: 19-43217-pjs

3/31/2019

| Revenue: | | Current Month | | Total Since Filing |
|---|---|---|---|---|
| Services | $ | 1,234 | $ | 1,234 |
| Commissions-Received | $ | 386,238 | $ | 386,238 |
| **GROSS PROFIT** | $ | 387,472 | $ | 387,472 |

| Expense: | | | | |
|---|---|---|---|---|
| Officer Compensation | $ | -- | $ | -- |
| Salary Expenses other Employees. | $ | 135,476 | $ | 135,476 |
| Employee Benefits & Pensions | $ | 6 | $ | 6 |
| Payroll taxes | $ | 10,334 | $ | 10,334 |
| Other Taxes -Property | $ | 27 | $ | 27 |
| Contract Labor | $ | 9,303 | $ | 9,303 |
| Rent and Lease Expense | $ | - | $ | - |
| Interest Expense. | $ | - | $ | - |
| Insurance | $ | 11,070 | $ | 11,070 |
| Commission | $ | 150,000 | $ | 150,000 |
| Automobile & Truck Expense | $ | - | $ | - |
| Utilities (gas, electric, phone) | $ | - | $ | - |
| Depreciation | $ | 10,000 | $ | 10,000 |
| Travel & Entertainment | $ | - | $ | - |
| Repairs and Maintenance | $ | 455 | $ | 455 |
| Advertising | $ | - | $ | - |
| Supplies, Office Expense, etc. | $ | 19,421 | $ | 19,421 |
| Other-Payroll Fees | $ | 1,472 | $ | 1,472 |
| Other-Postage & Delivery | $ | 79,188 | $ | 79,188 |
| Other -Printing & Reproduction | $ | 109,875 | $ | 109,875 |
| **Total Expenses** | $ | 536,625 | $ | 536,625 |
| | | | | |
| Net Operating Profit/Loss | $ | (149,153) | $ | (149,153) |
| | | | | |
| Add: Non-Operating Income | | | | |
| Interest Income | $ | - | $ | - |
| Other Income | $ | 314 | $ | 314 |
| | | | | |
| Less: Non-Operating Expenses | | | | |
| Professional Fees | $ | 16,000 | $ | 16,000 |
| Other Expenses. | | | | |
| | | | | |
| Net Income/ (Loss) | $ | (164,839) | $ | (164,839) |

**CENTRAL PROCESSING SERVICES**
Balance Sheet
March 31, 2019
Case No: 19-43217-pjs

| Assets | | Current Month | Prior Month | | At Filing | |
|---|---|---|---|---|---|---|
| Cash | $ | 4,019 | $ | - | $ | (14,721) |
| Accounts receivable | $ | 1,660,542 | $ | - | $ | 1,618,093 |
| Insider Receivables | $ | 1,252,469 | $ | - | $ | 1,250,609 |
| Land & Buildings | $ | 95,777 | $ | - | $ | 95,777 |
| Funiture, Fixtures, Equip. | $ | 1,104,788 | $ | - | $ | 1,104,788 |
| Prepaid Insurance | $ | - | $ | - | $ | - |
| Accumulated Depreciation | $ | (889,782) | $ | - | $ | (889,782) |
| Other Recaivables | $ | 3,738 | $ | - | $ | 3,738 |
| **TOTAL ASSETS** | $ | 3,221,551 | $ | - | $ | 3,168,501 |

**Liabilities - Post Petition**

| | | | | | | |
|---|---|---|---|---|---|---|
| Accounts Payable | $ | 63,762 | $ | - | $ | 4,767 |
| Rent and Lease Payable | $ | 20,690 | $ | - | $ | - |
| Wages and Salaries | $ | 105,946 | $ | - | $ | 105,946 |
| Taxes Payable | $ | 93,465 | $ | - | $ | 90,459 |
| Total | $ | 283,863 | $ | - | $ | 201,172 |

**Liabilities-Pre Petition**

| | | | | | | |
|---|---|---|---|---|---|---|
| Payroll Taxes | $ | 174,350 | $ | - | $ | 174,350 |
| Secured Liabilities | $ | 294,854 | $ | - | $ | 309,677 |
| Unsecured Liabilities | $ | 736,782 | $ | - | $ | 733,284 |
| Loan Payable | $ | 25,000 | $ | - | $ | 25,000 |
| Payable CSA | $ | 106,950 | $ | - | $ | 106,950 |
| Payable ACS | $ | 3,702,910 | $ | - | $ | 3,558,617 |
| Payable-Amy Burland | $ | 35,000 | | | $ | 35,000 |
| Total | $ | 5,075,847 | $ | - | $ | 4,942,878 |

**Equity**

| | | | | | | |
|---|---|---|---|---|---|---|
| Partner Draw-Cole | $ | (335,420) | | | $ | (335,420) |
| Partner Draw-Burland | $ | (335,627) | | | $ | (337,487) |
| Retained Earnings | $ | (1,035,026) | | | $ | (1,035,026) |
| Net Income | $ | (432,086) | | | $ | (267,617) |
| | $ | (2,138,159) | $ | - | $ | (1,975,550) |

| **Total Liabilities & Equity** | $ | 3,221,551 | $ | - | $ | 3,168,501 |



Central Processing Services
Operating Statement (P & L)
Case No: 19-43217-pjs

4/30/2019

| Revenue: | | Current Month | | Total Since Filing | |
|---|---|---|---|---|---|
| | Services | $ | - | $ | 1,234 |
| | Commissions-Received | $ | 292,286 | $ | 678,524 |
| GROSS PROFIT | | $ | 292,286 | $ | 679,758 |
| | | | | | |
| Expense: | | | | | |
| | Officer Compensation | $ | - | $ | - |
| | Salary Expenses other Employees | $ | 237,806 | $ | 373,281 |
| | Employee Benefits & Pensions | $ | - | $ | 0 |
| | Payroll taxes | $ | 23,497 | $ | 33,830 |
| | Other Taxes -Property | $ | - | $ | 27 |
| | Contract Labor | $ | 9,760 | $ | 19,083 |
| | Rent and Lease Expense | $ | 16,596 | $ | 16,596 |
| | Interest Expense | $ | | $ | |
| | Insurance | $ | 16,878 | $ | 27,949 |
| | Commission | $ | 150,000 | $ | 300,000 |
| | Automobile & Truck Expense | $ | - | $ | |
| | Utilities (gas, electric, phone) | $ | 2,008 | $ | 2,008 |
| | Depreciation | $ | 10,000 | $ | 20,000 |
| | Travel & Entertainment | $ | - | $ | |
| | Repairs and Maintenance | $ | - | $ | 455 |
| | Advertising | $ | - | $ | - |
| | Supplies, Office Expense, etc. | $ | 22,722 | $ | 42,143 |
| | Other-Payroll Fees | $ | 3,746 | $ | 5,217 |
| | Other-Postage & Delivery | $ | 39,517 | $ | 115,705 |
| | Other -Printing & Reproduction | $ | 51,771 | $ | 161,848 |
| Total Expenses | | $ | 583,300 | $ | 1,119,926 |
| | | | | | |
| Net Operating Profit/Loss | | $ | (291,014) | $ | (440,167) |
| | | | | | |
| Add: Non-Operating Income | | | | | |
| | Interest Income | $ | - | $ | - |
| | Other Income | $ | - | $ | 314 |
| | | | | | |
| Less: Non-Operating Expenses | | | | | |
| | Professional Fees | $ | 26,443 | $ | 42,443 |
| | Other Expenses | | | | |
| | | | | | |
| Net Income/ (Loss) | | $ | (317,457) | $ | (482,296) |



**CENTRAL PROCESSING SERVICES**
Balance Sheet
4/30/19
Case No: 19-43217-pjs

| Assets | | Current Month | | Prior Month | | At Filing |
|---|---|---|---|---|---|---|
| Cash | $ | - | $ | 4,019 | $ | (14,721) |
| Accounts receivable | $ | 1,630,488 | $ | 1,660,542 | $ | 1,618,093 |
| Insider Receivables | $ | 1,252,469 | $ | 1,252,469 | $ | 1,250,609 |
| Land & Buildings | $ | 95,777 | $ | 95,777 | $ | 95,777 |
| Funiture, Fixtures, Equip, | $ | 1,104,788 | $ | 1,104,788 | $ | 1,104,788 |
| Prepaid Insurance | $ | - | $ | - | $ | - |
| Accumulated Depreciation | $ | (909,782) | $ | (899,782) | $ | (889,782) |
| Other Receivables | $ | 35,229 | $ | 3,738 | $ | 3,738 |
| TOTAL ASSETS | $ | 3,208,969 | $ | 3,221,551 | $ | 3,168,501 |

**Liabilities - Post Petition**

| | | | | | | |
|---|---|---|---|---|---|---|
| Accounts Payable | $ | 70,101 | $ | 63,762 | $ | 4,767 |
| Rent and Lease Payable | $ | 20,604 | $ | 20,690 | $ | - |
| Wages and Salaries | $ | 105,946 | $ | 105,946 | $ | 105,946 |
| Taxes Payable | $ | 140,257 | $ | 93,465 | $ | 90,459 |
| Total | $ | 336,908 | $ | 283,863 | $ | 201,172 |

**Liabilities-Pre Petition**

| | | | | | | |
|---|---|---|---|---|---|---|
| Payroll Taxes | $ | 174,350 | $ | 174,350 | $ | 174,350 |
| Secured Liabilities | $ | 304,543 | $ | 294,854 | $ | 309,677 |
| Unsecured Liabilities | $ | 753,197 | $ | 736,782 | $ | 733,284 |
| Loan Payable | $ | 25,000 | $ | 25,000 | $ | 25,000 |
| Payable CSA | $ | 126,950 | $ | 106,950 | $ | 106,950 |
| Payable ACS | $ | 3,908,336 | $ | 3,702,910 | $ | 3,558,617 |
| Payable Robert Burland | $ | 300 | $ | - | $ | - |
| Payable Amy Burland | $ | 35,000 | $ | 35,000 | $ | 35,000 |
| Total | $ | 5,327,676 | $ | 5,075,846 | $ | 4,942,878 |

**Equity**

| | | | | | | |
|---|---|---|---|---|---|---|
| Partner Draw-Cole | $ | (335,420) | $ | (335,420) | $ | (335,420) |
| Partner Draw-Burland | $ | (335,627) | $ | (335,627) | $ | (337,487) |
| Retained Earnings | $ | (1,035,026) | $ | (1,035,026) | $ | (1,035,026) |
| Net Income | $ | (749,542) | $ | (432,086) | $ | (267,617) |
| | $ | (2,455,615) | $ | (2,138,159) | $ | (1,975,550) |
| **Total Liabilities & Equity** | $ | 3,208,969 | $ | 3,221,550 | $ | 3,168,501 |

# EXHIBIT E

**Central Processing Services**
**Income Statement Projections**

*Prepared as of July 2019[2]*

| | Actual 2018 Total[1] | Year 1 2019 Sept - Dec | Year 2 2020 Jan - Dec | Year 3 2021 Jan - Dec | Year 4 2022 Jan - Dec | Year 5 2023 Jan - Dec | 5-Year Total |
|---|---|---|---|---|---|---|---|
| **Revenue** | | | | | | | |
| Commissions Received | $ 8,530,034 | $ 1,680,000 | $ 5,300,000 | $ 5,300,000 | $ 5,300,000 | $ 5,300,000 | $ 22,880,000 |
| Commissions - Directel | | 297,548 | 1,105,313 | 1,138,000 | 1,172,000 | 1,207,000 | 4,919,860 |
| Commissions - Charitable Initiative | | 147,784 | 897,366 | 1,085,000 | 1,190,000 | 1,233,000 | 4,553,149 |
| Commissions - ACS Acquisitions (PACs) | | 464,887 | 1,973,280 | 2,183,000 | 2,273,000 | 2,301,000 | 9,195,167 |
| Other Services | 14,594 | 14,000 | 52,500 | 58,000 | 64,000 | 70,000 | 258,500 |
| Bank Charges Assessed - Profit Stars | 21,162 | | | | | | |
| **Total Revenue** | $ 8,565,790 | $ 2,604,218 | $ 9,328,459 | $ 9,764,000 | $ 9,999,000 | $ 10,111,000 | $ 41,806,677 |
| | | | | | | | |
| **Direct Expenses** | | | | | | | |
| Payroll | 1,764,786 | 697,000 | 2,623,500 | 2,728,000 | 2,837,000 | 2,950,000 | 11,835,500 |
| Payroll Taxes | 182,078 | 69,700 | 262,350 | 273,000 | 284,000 | 295,000 | 1,184,050 |
| Employee Benefits | 144,226 | 57,300 | 178,800 | 191,000 | 204,000 | 218,000 | 849,100 |
| Commissions | 1,807,567 | - | - | - | - | - | - |
| Contract Labor | 143,527 | 8,500 | - | - | - | - | 8,500 |
| Service Charges - Profit Stars | 31,122 | - | - | - | - | - | - |
| Other Direct Expenses | | - | - | - | - | - | - |
| **Total Direct Expenses** | $ 4,073,306 | $ 832,500 | $ 3,064,650 | $ 3,192,000 | $ 3,325,000 | $ 3,463,000 | $ 13,877,150 |
| | 47.6% | 32.0% | 32.9% | 32.7% | 33.3% | 34.2% | 33.2% |
| | | | | | | | |
| **Net Operating Margin** | $ 4,492,484 | $ 1,771,718 | $ 6,263,809 | $ 6,572,000 | $ 6,674,000 | $ 6,648,000 | $ 27,929,527 |
| | 52.4% | 68.0% | 67.1% | 67.3% | 66.7% | 65.8% | 66.8% |
| | | | | | | | |
| **Operating Expenses** | | | | | | | |
| Bad Debt | 38,426 | 25,000 | 40,000 | 49,000 | 50,000 | 51,000 | 215,000 |
| Bank Service Charges | 11,024 | 8,000 | 24,000 | 29,000 | 35,000 | 42,000 | 138,000 |
| Computer Expense | 33,563 | 10,280 | 42,840 | 86,000 | 95,000 | 105,000 | 339,120 |
| Mail Room Equipment Parts | 23,750 | 3,000 | 10,000 | 12,000 | 14,000 | 17,000 | 56,000 |
| Maintenance Contract | 27,467 | 910 | 20,220 | 21,000 | 22,000 | 23,000 | 87,130 |
| Office Expense[3] | 330,985 | 80,200 | 303,600 | 334,000 | 367,000 | 404,000 | 1,488,800 |
| Payroll fees (Processing) | 16,683 | 5,865 | 18,285 | 19,000 | 20,000 | 21,000 | 84,150 |
| Postage & Delivery | 2,658,195 | 784,517 | 2,639,257 | 2,715,615 | 2,754,675 | 2,774,520 | 11,668,584 |
| Printing & Reproduction | 1,178,434 | 331,619 | 1,138,198 | 1,171,665 | 1,189,215 | 1,198,530 | 5,029,226 |
| Professional Fees | 281,835 | 28,000 | 90,000 | 99,000 | 109,000 | 120,000 | 446,000 |
| Rent | 218,315 | 81,013 | 227,418 | 165,131 | 169,594 | 174,057 | 817,213 |
| Utilities | 24,100 | 8,032 | 24,096 | 2,232 | 2,232 | 2,232 | 38,823 |
| Office Supplies | 17,456 | 5,600 | 18,000 | 18,900 | 19,845 | 20,837 | 83,182 |
| Personal Property Taxes | 22,980 | 12,800 | 13,800 | 14,490 | 15,215 | 15,975 | 72,280 |
| Other Operating Expenses | 17,551 | 11,900 | 31,450 | 33,023 | 34,674 | 36,407 | 147,453 |
| **Total Operating** | $ 4,900,763 | $ 1,396,736 | $ 4,641,163 | $ 4,770,055 | $ 4,897,449 | $ 5,005,558 | $ 20,710,961 |
| | | | | | | | |
| **Operating Income** | $ (408,279) | $ 374,982 | $ 1,622,645 | $ 1,801,945 | $ 1,776,551 | $ 1,642,442 | $ 7,218,566 |
| *Operating Margin* | -4.8% | 14.4% | 17.4% | 18.5% | 17.8% | 16.2% | 17.3% |

# Central Processing Services
## Income Statement Projections

*Prepared as of July 2019 [1]*

| Other Income / Expense | Actual 2018 Total [2] | Year 1 2019 Sept - Dec | Year 2 2020 Jan - Dec | Year 3 2021 Jan - Dec | Year 4 2022 Jan - Dec | Year 5 2023 Jan - Dec | 5-Year Total |
|---|---|---|---|---|---|---|---|
| Depreciation | $ 120,000 | $ 40,000 | $ 120,000 | $ 120,000 | $ 120,000 | $ 120,000 | 520,000 |
| Amortization | 150 | - | - | - | - | - | - |
| Other (Income)/Expense | 26,218 | - | - | - | - | - | - |
| Interest Expense | 981 | - | - | - | - | - | - |
| Non-Recurring Professional Fees | | | | | | | |
| * Schafer & Weiner | - | 74,000 | - | - | - | - | 74,000 |
| * Harmon Partners | - | 40,000 | 30,000 | - | - | - | 70,000 |
| * UST Fees | - | 6,500 | 13,000 | - | - | - | 19,500 |
| **Total Other Expenses** | 147,349 | 160,500 | 163,000 | 120,000 | 120,000 | 120,000 | 683,500 |
| **Pre-tax Income** | $ (555,629) | $ 214,482 | $ 1,459,645 | $ 1,681,945 | $ 1,656,551 | $ 1,522,442 | $ 6,535,066 |
| Income Tax Expense (40%) [4] | $ - | $ - | $ 583,858 | $ 672,778 | $ 662,621 | $ 608,977 | $ 2,528,233 |
| **Net Income** | $ (555,629) | $ 214,482 | $ 875,787 | $ 1,009,167 | $ 993,931 | $ 913,465 | $ 4,006,832 |

### EBITDA

| | Actual 2018 Total | Year 1 2019 Sept - Dec | Year 2 2020 Jan - Dec | Year 3 2021 Jan - Dec | Year 4 2022 Jan - Dec | Year 5 2023 Jan - Dec | 5-Year Total |
|---|---|---|---|---|---|---|---|
| Net Income | $ (555,629) | $ 214,482 | $ 875,787 | $ 1,009,167 | $ 993,931 | $ 913,465 | $ 4,006,832 |
| Interest Expense | 981 | - | - | - | - | - | 0 |
| Income Tax Expense | - | - | 583,858 | 672,778 | 662,621 | 608,977 | 2,528,233 |
| Depreciation | 120,000 | 40,000 | 120,000 | 120,000 | 120,000 | 120,000 | 520,000 |
| Amortization | 150 | - | - | - | - | - | - |
| **EBITDA** | $ (434,498) | $ 254,482 | $ 1,579,645 | $ 1,801,945 | $ 1,776,551 | $ 1,642,442 | $ 7,055,066 |
| **Cumulative EBITDA** | | $ 254,482 | $ 1,834,128 | $ 3,636,073 | $ 5,412,624 | $ 7,055,066 | |

### PLAN PAYMENTS [5]

**Group I: Priority Tax Claim - IRS**

| | Balance | Year 1 2019 Sept - Dec | Year 2 2020 Jan - Dec | Year 3 2021 Jan - Dec | Year 4 2022 Jan - Dec | Year 5 2023 Jan - Dec | 5-Year Total |
|---|---|---|---|---|---|---|---|
| Beginning Balance | $ 93,255 | $ - | $ 93,255 | $ 69,941 | $ 46,627 | $ 23,314 | $ - |
| Principal (Annually, 4-Yr Term) | 4-Yr Am | - | 23,314 | 23,314 | 23,314 | 23,314 | 93,255 |
| Interest | 6.00% | - | 4,896 | 3,497 | 2,098 | 699 | 11,191 |
| **Total Payment** | | $ - | $ 28,210 | $ 26,811 | $ 25,412 | $ 24,013 | $ 104,445 |
| **Ending Balance** | | $ - | $ 69,941 | $ 46,627 | $ 23,314 | $ - | |

**Group I: Priority Tax Claim - State of Michigan**

| | Balance | Year 1 2019 Sept - Dec | Year 2 2020 Jan - Dec | Year 3 2021 Jan - Dec | Year 4 2022 Jan - Dec | Year 5 2023 Jan - Dec | 5-Year Total |
|---|---|---|---|---|---|---|---|
| Beginning Balance | $ 12,229 | $ - | $ 12,229 | $ 9,171 | $ 6,114 | $ 3,057 | $ - |
| Principal (Annually, 4-Yr Term) | 4-Yr Am | - | 3,057 | 3,057 | 3,057 | 3,057 | 12,229 |
| Interest | 4.51% | - | 483 | 345 | 207 | 69 | 1,103 |
| **Total Payment** | | $ - | $ 3,540 | $ 3,402 | $ 3,264 | $ 3,126 | $ 13,332 |
| **Ending Balance** | | $ - | $ 9,171 | $ 6,114 | $ 3,057 | $ - | |

**Central Processing Services**
**Income Statement Projections**

*Prepared as of July 2019 [2]*

| | Actual 2018 Total[1] | Year 1 2019 Sept - Dec | Year 2 2020 Jan - Dec | Year 3 2021 Jan - Dec | Year 4 2022 Jan - Dec | Year 5 2023 Jan - Dec | 5-Year Total |
|---|---|---|---|---|---|---|---|
| **Group I: Priority Tax Claim – City of Southfield** [2] | | | | | | | |
| Beginning Balance | $ 318 | | | | | | $ - |
| Principal (Monthly, 5-Yr Term) | N/A | 318 | - | - | - | - | 318 |
| Interest | 0.00% | - | - | - | - | - | - |
| Total Payment | | $ 318 | $ - | $ - | $ - | $ - | $ 318 |
| Ending Balance | | $ - | $ - | $ - | $ - | $ - | |
| **Group I: Priority Tax Claim – City of Port Huron** | | | | | | | |
| Beginning Balance | $ 91 | | | | | | $ - |
| Principal (Monthly, 5-Yr Term) | N/A | 91 | - | - | - | - | 91 |
| Interest | 0.00% | 91 | - | - | - | - | - |
| Total Payment | | $ 91 | $ - | $ - | $ - | $ - | $ 91 |
| Ending Balance | | $ - | $ - | $ - | $ - | $ - | |
| **Class I- Secured Claims** [3] | | | | | | | |
| **Class II - Convenience Class** | | | | | | | |
| Beginning Balance | $ 8,853 | | 8,853 | - | - | - | $ - |
| Principal (25% - 6 months after Effective Date) | | - | 2,213 | - | - | - | 2,213 |
| Interest (None) | 0.00% | - | - | - | - | - | - |
| Total Payment | | $ - | $ 2,213 | $ - | $ - | $ - | $ 2,213 |
| Ending Balance | | $ - | $ - | $ - | $ - | $ - | |
| **Class II - Unsecured Creditors > $5k** [4] | | | | | | | |
| Beginning Balance | $ 13,203,937 | $ 13,203,937 | $ 13,203,937 | $ 13,203,937 | $ 13,203,937 | $ 12,941,755 | $ - |
| Principal (15% of Net Cash) | | - | - | - | 262,181 | 242,295 | 504,477 |
| Interest (None) | 0.00% | - | - | - | - | - | - |
| Total Payment | | $ - | $ - | $ - | $ 262,181 | $ 242,295 | $ 504,477 |
| Ending Balance | | $ 13,203,937 | $ 13,203,937 | $ 13,203,937 | $ 12,941,755 | $ 12,699,460 | |
| **Class III - Richard Dawson** | | | | | | | |
| Beginning Balance ($13,650 at 0%) | $ 13,650 | 13,650 | 6,825 | - | - | - | $ - |
| Principal (2 installments) | N/A | 6,825 | 6,825 | - | - | - | 13,650 |
| Interest | 0.00% | - | - | - | - | - | - |
| Total Payment | | $ 6,825 | $ 6,825 | $ - | $ - | $ - | $ 13,650 |
| Ending Balance | | $ 6,825 | $ - | $ - | $ - | $ - | |
| **TOTAL PLAN PAYMENTS** | | $ 7,234 | $ 40,788 | $ 30,213 | $ 290,857 | $ 269,435 | $ 638,526 |

**Central Processing Services**

Income Statement Projections

*Prepared as of July 2019[2]*

CASH FLOW SUMMARY:

| | Actual 2018 Total[1] | Year 1 2019 Sept - Dec | Year 2 2020 Jan - Dec | Year 3 2021 Jan - Dec | Year 4 2022 Jan - Dec | Year 5 2023 Jan - Dec | 5-Year Total |
|---|---|---|---|---|---|---|---|
| Projected Beginning Cash Balance | | $ 4,394 | $ 128,199 | $ 1,667,057 | $ 3,438,789 | $ 4,924,484 | $ 4,394 |
| Plus: EBITDA | | 254,482 | 1,579,645 | 1,801,945 | 1,776,551 | 1,642,442 | 7,055,066 |
| Plus: Financing Proceeds | | 103,426 | - | - | - | - | 103,426 |
| Less: IRS - Past Due 2019 Taxes (Post Petition) | | (103,426) | - | - | - | - | (103,426) |
| Less: Principle Debt Repayments | | (116,919) | - | - | - | - | (116,919) |
| Less: Interest Debt Repayments | | (6,524) | - | - | - | - | (6,524) |
| Less: Plan Payments | | (7,234) | (40,788) | (30,213) | (290,857) | (269,435) | (638,526) |
| Ending Cash Balance | | $ 128,199 | $ 1,667,057 | $ 3,438,789 | $ 4,924,484 | $ 6,297,491 | $ 6,297,491 |

**Notes:**

1. 2018 results are on an accrual basis.

2. Plan projections were prepared as of July 2019 and are qualified by the attached assumptions. Future events may impact or alter the expected results.

3. All payments to Class I creditors, totaling $4,795.49 per month, are included in the office expense line item.

4. Full year fiscal 2019 results would result in an overall net loss, therefore no income taxes were included.

5. Unless otherwise noted, all balances are based on the Schedules.

6. Amount differs from Schedules and reflects Convenience Class and Cure Payments otherwise addressed herein. Distributions for Class II claims greater than $5,000 (unsecured creditors) will occur in fiscal years 2022, 2023 and 2024. Unsecured creditors will receive an estimated distribution of $250,000 in year 6 of

CPS Plan Projection
Fiscal 2019 -2023
*Projection Assumptions*

**General Assumption - there are no changes to the regulatory or tax environment that would impact sales generation and that the Debtor's customer base remains static. The Debtor is reliant on two major customers. Plan projections were prepared as of July 2019 and are qualified by the attached assumptions. Future events may impact or alter the expected results.**

1 Fiscal year 2018 represents accrual basis financial results.

2 Projections assume a DIP loan in the amount of $150,000.

   a. Terms of the loan: $5k commitment fee and estimated $10k in closing costs (all to be included in addition to the $150k loan), 18% interest for a 6 month period, weekly principle and interest payment

   b. Assumes first portion of the loan is approximately $47,000 which will be funded by July 15, 2019 and paid back over 8 weeks.

   c. Assumes a second loan is provided for upon Plan Confirmation for approximately $103k to be used to fund the anticipated administrative claim of the IRS.

3 Payroll - assumes headcount and wage reductions are implemented starting the second week of July 2019, resulting in a weekly payroll reduction of at least $5,000 per week through the end of fiscal 2019. Projections for fiscal 2020 assumes some additional headcount is added back for the top line growth and that those employees that took wage reductions in 2019 are adjusted back to their normal levels. Additionally, $2k per week in total was included as payroll for the owners. Projections for fiscal 2021 through 2023 assume a 4% annual growth rate for raises and inflation adjustments.

4 Payroll taxes are assumed to be 10% of total payroll.

5 Employee benefits are based on current rates and headcount for fiscal 2019 and 2020. Thereafter, the projections assume a 7% annual increase to address rising costs.

6 Contract Labor – IT fees for Hopkins Pete. Assumes a reduction in contracted time to $500 per week with the contract ending at the end of the year.

7 Bad Debt Expense - assumes approximately 1/2 percent of annual sales.

8 Bank Services Charges - fiscal 2019 and 2020 are based on current run rates which are higher than typical given fees associated with having a DIP account. The projections continue to assume the higher rate along with an annual 20% growth rate for the additional activity that would flow through the account due to revenue growth.

9 Computer Expense

   a. 2019 - includes $1,500 per month for the company's cable bill plus $1,000 per month for other miscellaneous computer expense needs.

   b. 2020 - assumes an increase of $1,000 per month for computer expense needs.

   c. 2021 - assumes the expense doubles for purchases of new computer equipment.

   d. 2022 through 2023 - assumes a 10% annual growth rate.

10 Mail Room Equipment Parts - 2019 is based on actual expense of $1,500 per quarter, 2020 assumes an increase to $2,500 per quarter due to increased sales volume, and then an annual 20% growth rate.

11 Maintenance Contracts - based on actual contracts in place in for 2019 and 2020. Fiscal 2021 through 2023 assumes a 5% annual growth rate.

**CFS Plan Projection**
**Fiscal 2019 -2023**
*Projection Assumptions*

12  Office Expense (primarily driven by quarterly print charges based on pcs of mailing going out)

    a.  2019 represents actual expenses for contracted services

    b.  2020 - represents all of the contracted expenses for 2019 plus a quarterly increase of $6,000 in print charges totaling $45,000/qtr.  Historically, the company has never reached or exceeded $45k per quarter so this was a conservative estimate for the expense.

    c.  2021 through 2023 - assumes a 10% annual growth rate

13  Payroll processing fees - assumes an annual growth rate of 3% for 2021 through 2023.

14  Postage & Delivery / Printing & Reproduction - is formula driven and calculated as 45% of sales (excluding the Charitable initiative which pays its own expenses, and Other Service revenue is excluded from Postage and Delivery), split 70% to postage and delivery and 30% to printing and reproduction.  Based on historical results, 45% of sales would reflect an expense higher than historical averages and this approach was taken in order to be conservative in the projections.

15  Professional Fees - Assumes legal and CPA fees in line with historical results for 2019 and 2020 and a 10% annual growth thereafter.

16  Rent - this line item reflects Class IV treatment.

17  Utilities - based on the current contractual rate of $1.35/SF.  Projections assume it increase to $1.50/SF for fiscal 2021 through 2023.

18  Office Supplies - assume a 5% growth rate for 2021 through 2023.

19  Personal Property Taxes - 2019 and 2020 forecasts are based on historical amounts, and then increased by 5% annual for 2021 - 2023.

20  Other operating expenses - 2019 and 2020 forecasts are based on current information, and then increased by 5% annual for 2021 - 2023.

21  Depreciation is assumed to remain flat at $10,000 per month over the entire projection period.  No material assets are expected to be acquired.